No. 12-2312

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

SUN CAPITAL PARTNERS III, LP, ET AL.,

Plaintiffs-Appellees,

v.

NEW ENGLAND TEAMSTERS AND
TRUCKING INDUSTRY PENSION FUND,

Defendant-Appellant.

**On Appeal from the United States District Court
For the District of Massachusetts, Boston**

**BRIEF OF DEFENDANT-APPELLANT NEW ENGLAND TEAMSTERS
AND TRUCKING INDUSTRY PENSION FUND**

Catherine M. Campbell, Esq.
Renee J. Bushey, Esq.
Melissa A. Brennan, Esq.
Feinberg, Campbell & Zack, PC
177 Milk Street
Suite 300
Boston, MA 02109
Telephone: (617) 338-1976
Facsimile: (617) 338-7070

Attorneys for Defendant-Appellant

# TABLE OF CONTENTS

***Page***

TABLE OF AUTHORITIES .......................................................................iv

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ............viii

JURISDICTIONAL STATEMENT............................................................1

STATEMENT OF THE ISSUES ................................................................1

STATEMENT OF THE CASE ...................................................................2

STATEMENT OF THE FACTS.................................................................3

    A. Sun Capital Partner Structure ........................................................4

    B. Purchase of Controlling Interest in SBI........................................6

    C. Actions to Evade and Avoid Withdrawal Liability .......................8

    D. Management of SBI........................................................................9

SUMMARY OF THE ARGUMENT .......................................................10

ARGUMENT ..........................................................................................13

    A. STANDARD OF REVIEW............................................................13

    B. THE DISTRICT COURT ERRED IN FINDING THAT
       THE APPELLEES WERE NOT TRADES OR BUSINESSES
       UNDER THE *GROETZINGER* TEST .........................................13

       1. The District Court Incorrectly Dismissed The Analysis
          Of The PBGC Appeals Board .................................................15

       2. The Court Erred In Disregarding Delaware Partnership
          Law Without Explanation.........................................................18

i

*Page*

3. As Venture Capital Operating Companies Under
ERISA, The SCP, LPs Are By Definition Trades Or
Businesses ...............................................................................19

4. The Governing Documents And The Actions Of SCP, LPs
Present Indisputable Evidence That They Are
"Trades Or Businesses" Under *Groetzinger* ...........................21

C. THE DISTRICT COURT ERRED IN FINDING THAT
APPELLEES DID NOT ACT TO EVADE AND AVOID WITHDRAWAL
LIABILITY ...................................................................................24

1. The District Court Ignored The Clear Language Of The
Statute Which Is Violated When "A" Principal Purpose
Of A Transaction Is To Evade And Avoid
Withdrawal Liability.................................................................25

2. The Court's Conclusion That The "Transaction" Is Not
Within The Purview Of The Statute Is Contrary To The Plain
Language Of The Statute And Incorrect ..................................27

3. Finding The Division of Ownership Is A Transaction That Violates
§ 1392(c) Furthers Congress' Intent.......................................29

CONCLUSION............................................................................................30

SIGNATURE ..............................................................................................31

CERTIFICATE OF COMPLIANCE WITH
Fed. R. App. P. 32(a)(7)............................................................................32

CERTIFICATE OF SERVICE ...................................................................33

ADDENDUM

Electronic Order on Cross Motions for Summary Judgment ....... Tab 1

***Page***

Memorandum and Order ...........................................................Tab 2

Judgment....................................................................................Tab 3

PBGC Decision..........................................................................Tab 4

# TABLE OF AUTHORITIES

## Cases

*Beck v. Pace Intern. Union,* 551 U.S. 96 (2007) ....................................................17

*Berkshire Hathaway Inc. v. Textile Workers Pension Fund*, 874 F.2d 53 (1st Cir.

    1989) ......................................................................................................17

*Board of Trustees, Sheet Metal Workers' National Pension Fund v. Palladium*

    *Equity Partners, LLC, et al.*, 722 F. Supp. 2d 854 (E.D. Mich. 2010) .. 12, 13, 14,

    15, 16, 19

*Cent. States, SE & SW Areas Pension Fund v. Fulkerson*, 238 F.3d 891 (7th Cir.

    2001) ......................................................................... 14, 15, 16, 17

*Cent. States, Se. & Sw. Areas Pension Fund v. White*, 258 F.3d 636 (7th Cir. 2001)

    ......................................................................................... 14, 15, 17

*Cent. States, Southeast & Southwest Areas Pension Fund v. Nitehawk Express, Inc.,*

    223 F.3d 483 (7th Cir. 2000) ..............................................................17

*Central States Southeast & Southwest Areas Pension Fund v. Chatham Props*., 929

    F.2d 260 (6th Cir. 1991) ..................................................................13

*Commissioner of Internal Revenue v. Groetzinger*, 480 U.S. 23 (1987).......... 14, 15

*Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S.*

    *Cal*., 508 U.S. 602 (1993)..................................................................10

*Connors v. Incoal, Inc*., 995 F.2d 245, 301 U.S. App. D.C. 345 (D.C. Cir. 1993) .14

*Estate of Hevia v. Portrio Corp.*, 602 F.3d 34 (1st Cir. 2010) ................................13

*Harrell v. Eller Mar. Co.*, 2010 U.S. Dist. LEXIS 104826 (M.D. Fla. Sept. 30, 2010) ..........................................................................................................14

*Hartford Fire Ins. Co. v. CNA Ins. Co. (Europe) Ltd,* 633 F.3d 50
(1st Cir. 2011) ........................................................................................13

*Higgins v. Comm'r of Internal Rev.,* 312 U.S. 212 (1941) .....................................16

*McDougall v. Pioneer Ranch Ltd. Partnership*, 494 F.3d 571 (7th Cir. 2007).......14

*Mead Corp. v. Tilley,* 490 U.S. 714 (1989) ..........................................................17

*One Beacon Am. Ins. Co. v. Commercial Union Assur. Co.*, 684 F.3d 237 (1st Cir. Mass. 2012) ...........................................................................................13

*Operating Engineers & Pension Trust Fund v. Western Power & Equip. Corp*.,
2011 U.S. Dist. LEXIS 67306 (N.D. Cal. June 23, 2011) ...........................26, 30

*PBGC v. Ouimet Corp*., 630 F.2d 4 (1st Cir. 1980)...............................................14

*PBGC v. R.A. Gray & Co.,* 467 U.S. 717 (1984)......................................................10

*Penn Cent. Corp. v. Western Conference of Teamsters Pension Trust Fund*, 75 F.3d 529 (9th Cir. 1996) ...........................................................................17

*Retirement Benefit Plan of Graphic Arts International Union Local 20-B v. Standard Bindery Co.*, 654 F. Supp. 770 (E.D. Mich. 1986)...............................29

*Santa Fe Pacific Corp. v. Central States, Southeast & Southwest Areas Pension Fund*, 22 F.3d 725 (7th Cir. 1994) ...............................................24, 25

*Sarsfield v. Great Am. Ins. Co. of N.Y.*, 335 F. App'x 63 (1st Cir. 2009)................13

*Sherwin Williams v. New York State Teamsters Conference Pension and*

*Retirement Fund,* 158 F.3d 387 (1998) ..................................................25

*Smith v. CMTA-IAM Pension Trust*, 746 F.2d 587 (9th Cir. 1984).........................30

*Supervalu, Inc. v. Board of Trustees of the Southwestern Pennsylvania and Western*

*Maryland Area Teamsters and Employers Pension Fund*, 500 F.3d 334 (3rd Cir.

2007) ............................................................................ 26, 27

*Trustees Of The Utah Carpenters' And Cement Masons' Pension Trust et al. v.*

*Loveridge*, 2012 U.S. Dist. LEXIS 90274 (D.C. UT 2012) ................................27

*Whipple v. Comm'r of Internal Rev.*, 373 U.S. 193 (1963).........................16

## Statutes

28 U.S.C. § 1291 ........................................................................1

29 U.S.C. § 1132(e) .....................................................................1

29 U.S.C. § 1301(a)(14)(B) ............................................................17

29 U.S.C. § 1383(a) ...................................................................11

29 U.S.C. §1001 .........................................................................1

29 U.S.C. §1301(b)(1)............................................................ viii, 2, 11

29 U.S.C. §1381 .....................................................................1, 10

29 U.S.C. §1392(c) ............................................................... 3, 11, 24

6 Del. C. § 1509(a)....................................................................18

6 Del. C. § 17-403 ..................................................................................18

ERISA § 1391 ........................................................................................10

ERISA § 4001(b)(1) ................................................................. viii, 2, 11

ERISA § 4201 ........................................................................................10

ERISA § 4203(a) ...................................................................................11

ERISA § 4204 ........................................................................................28

ERISA § 4211 ........................................................................................10

ERISA § 4212(c) ..................................................... 1, 3, 11, 12, 24, 30

ERISA § 4218 ........................................................................................28

R.I. §7-6-22 ...........................................................................................24

**Rules**

1st Cir. R. 34.0(a) ............................................................................. viii

**Regulations**

26 C.F.R. § 1.414(c)-2(b)(2)(i) ...........................................................25

29 C.F.R. § 2510.3-101........................................................... viii, 4, 20

## <u>REASONS WHY ORAL ARGUMENT SHOULD BE HEARD</u>

In accordance with 1st Cir. R. 34.0(a), Appellant respectfully requests oral argument in this case for the following reasons.  First, the issue of whether private equity limited partnerships, such as the Appellees, are "trades or businesses" under the Employee Retirement Income Security Act ("the Act") § 4001(b)(1), 29 U.S.C. § 1301(b)(1) is a matter of first impression in this Circuit.  Second, in finding against the Appellant, the District Court dismissed as unpersuasive an opinion by the Pension Guaranty Benefits Corporation, the entity tasked with the interpretation and enforcement of the Act, that is supportive of the Appellant's case on the issue of "trades or businesses."  Third, another matter of first impression is whether an entity found not to be a "trade or business" but "passive investor" under the Act can properly be designated as a Venture Capital Operating Company pursuant to Department of Labor Regulations § 2510.3-101.

JURISDICTIONAL STATEMENT

This is an appeal by the New England Teamsters and Trucking Industry Pension Fund ("the Pension Fund") from a final judgment of the United States District Court for the District of Massachusetts entered on October 18, 2012 in favor of the Appellees on Cross Motions for Summary Judgment. (Addendum ("Add.") p. 41). The Court has subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e) as this case arises out of a claim for unpaid withdrawal liability pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, *et seq*., as amended by the Multiemployer Pension Plan Amendments Act, 29 U.S.C. §1381 *et seq*. ("MPPAA"). The Notice of Appeal was timely filed on October 30, 2012. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291. (Appendix ("App.") p. 116).[1]

STATEMENT OF THE ISSUES

1. Whether the Court erred in finding Appellees were not trades or businesses under the *Groetzinger* test despite the regular and continuous activities of Appellees' General Partners in their portfolio companies.

2. Whether the Court erred in not finding the Appellees' stated intent to avoid withdrawal liability by dividing their ownership interest in SBI was a violation of ERISA § 4212(c) and so should be disregarded.

---

[1] All relevant documents in this case, including deposition testimony, were sealed in the District Court. Appellant has submitted a separate Sealed Appendix.

1

## STATEMENT OF THE CASE

On June 4, 2010, Appellees Sun Capital Partners III, LP ("SCP III, LP"), Sun Capital Partners III, QP LP ("SCP III, QP LP") and Sun Capital Partners IV, LP (SCP IV, LP)[2] filed a Complaint against the Pension Fund seeking a declaratory judgment that they are not liable for payment of withdrawal liability to the Pension Fund because they are not "employers" within the meaning of the MPPAA. They further requested that unless the Court finds that they are "employers", they are neither obligated to make interim payments of withdrawal liability nor obligated to arbitrate the claims contained in the Complaint (Fourth Claim for Relief).  (App. p. 19, ¶ 88).

On June 24, 2010, the Pension Fund filed an Answer to the Complaint, Third Party Claims against Scott Brass Holding Corp. ("SBHC") and Sun Scott Brass, LLC ("SSB") and Counterclaims against each of the SCP, LPs.  The Pension Fund claimed that the SCP, LPs, SSB and SBHC were "employers" for purposes of assessing and collecting withdrawal liability pursuant to ERISA § 4001(b)(1), 29 U.S.C. §1301(b)(1) jointly and severally liable for the payment of withdrawal liability to the Pension Fund in the amount of $4,516,539.  The SCP, LPs answered the Counterclaim on July 15, 2010.  SBHC and SSB were defaulted for failure to

---

[2] Appellees will be referred to hereafter collectively as the SCP, LPs.

answer on September 3, 2010 but the Pension Fund's Motion to Enter a Default Judgment was denied without prejudice on August 4, 2011.

The SCP, LPs' Motion for Partial Judgment on the Pleadings with respect to the Fourth Claim (Arbitration) was granted on September 3, 2010. On August 4, 2011, the Pension Fund added a Counterclaim against the SCP, LPs pursuant to ERISA § 4212(c), 29 U.S.C. §1392(c). (App. p. 24) SCP, LPs filed an Answer on August 15, 2011. (App. p. 43).

Cross motions for Summary Judgment were filed on September 12, 2011. An electronic order granting Appellees' Motion and Denying Appellant's Motion was issued on September 30, 2012. (Add. p. 1). A Judgment as well as a Memorandum and Order were entered on October 18, 2012. (Add. pp. 3, 41). The Notice of Appeal was filed on October 30, 2012. (App. p. 116).

## STATEMENT OF THE FACTS

The Pension Fund is a "multiemployer pension plan" governed by ERISA. Scott Brass Inc. ("SBI"), a Rhode Island Corporation, was obligated to contribute to the Pension Fund pursuant to its agreements with Teamsters Local Union 251. SBI withdrew from the Pension Fund in October 2008 when it ceased covered operations and eventually filed for bankruptcy. On December 19, 2008, the Pension Fund sent a demand for payment of estimated withdrawal liability to SBI pursuant to the MPPAA. (App. p. 53, ¶ 5). The Pension Fund later notified and demanded

payment of SBI's withdrawal liability in the amount $4,516,539 directly from the SCP, LPs as required by the Act.  (App. pp. 52-54, ¶ 1-7).

A.  <u>Sun Capital Partner Structure</u>.  Appellees are Delaware partnerships, governed by substantially similar Limited Partnership Agreements ("LPAs"), each with a stated purpose of investing in securities, managing and supervising investments and "engaging *in such other activities incidental or ancillary* thereto as the General Partner deems necessary or advisable." (emphasis added)  (Sealed App. p. 5, p. 66 Art. 1.3, p. 124 Art. 1.3).  A primary focus of the partnerships is the acquisition of controlling interests in "portfolio" companies with strong market positions or franchise value, but with poor performance, significant operating challenges, inadequate or incomplete management or in "out of favor" industries. (App. p. 3; Sealed App. pp. 182, 226, 248).  The acquisition is perfected through "a holding co., [that] looks to buy a majority ownership in each company in which it invests." (Sealed App. p. 410).  The SCP, LPs are designated and managed as Venture Capital Operating Companies (VCOCs) under Department of Labor Regulations § 2510.3-101. (Sealed App. pp. 221, 259-260).

According to the LPAs, each General Partner is the managers of their respective limited partnership with full control of the business affairs of the partnership, the power to carry out any and all objectives of the partnerships, including all undertakings which the General Partners, "in their sole discretion,

deem necessary or advisable or incidental thereto." Third parties can rely conclusively upon the General Partner's certification that "it is acting on behalf of the Partnership and that its acts are authorized." (Add. p. 6; Sealed App. pp. 28-29, 89, 147).

Appellees' general partners, Sun Capital Advisors IV, LP ("SCA IV, LP") and Sun Capital Advisors III, LP ("SCA III, LP")[3] (hereafter collectively referred to as "GPs") are governed by substantially similar LPAs. (Sealed App. pp. 265, 302; App. p. 3, ¶ 10, 11). The activities of each GP are directed by the Limited Partner Committee ("LPC") whose members are also the Managing Directors of the GP. Each LPC is empowered to make all material decisions for its respective GP including purchasing portfolio companies and "hiring, terminating and establishing the compensation of employees and agents of the Fund[4] *or Portfolio Companies*." (emphasis added). (Sealed App. pp. 321-322, 283-284). Marc Leder and Rodger Krouse [5] are the sole members of each LPC. (App. p. 65, ¶ 36).

Private Placement Memoranda ("PPMs") are prepared to inform prospective investors of the partnership structure as well as the partnerships' investment and operating strategies. (Sealed App. pp. 181-264). The PPMs list the names of the

---

[3] SCP III, LP and SCP III, QP LP are parallel funds which invest side by side and share the same general partner, SCA III, LP. (Sealed App. p. 155 Art. 6.15).
[4] The Fund refers to the Sun Capital Partners Limited Partnership.
[5] They are also Limited Partners in both GPs. They and their respective spouses, together are entitled to 64.7400% of the aggregate profits of Sun Capital Advisors III, LP and 61.04% of the aggregate profits of SCA IV, LP. (App. p. 67, ¶ 41).

"Principals" of each GP[6], including Leder, Krouse and Steven Liff,[7] and details the role of the Principals in the portfolio companies. (Sealed App. pp. 197, 235). The GPs are entitled to a management fee equal to 2% of the SCP, LP's aggregate commitments pursuant to the partnerships agreements. (Sealed App. pp. 26-27 Art. 5.1, p. 86 Art. 5.1, p. 144 Art. 5.1, pp. 201-202, 240-241)

The GPs entered into a "Master Advisory Agreement" for business and financial management services with Sun Capital Advisors, Inc.[8] ("SCA, Inc."). The GPs compensate SCA, Inc. for their services. Leder signed the agreement on behalf of all the GPs and SCA, Inc. (Sealed App. p. 912). Leder and Krouse are the sole shareholders and Co-Chief Executive Officers of SCP, Inc. and SCA, Inc. (App. p. 68, ¶ 43).

B. Purchase of Controlling Interest in SBI. On November 28, 2006, Sun Capital Partners Group IV, Inc. sent a letter of intent to purchase to SBI stating that "New controlling-interest investments were being made through Sun Capital Partners IV, LP." (Sealed App. pp. 350, 369-371, App. pp. 73-74, ¶ 56). The SCP, Inc. "deal team" for SBI, led by Liff, investigated the purchase of SBI as set forth in a "Final Diligence Memo," and recommended the purchase to Leder and

---

[6] The Principals commit 10% of the capital of the SCP IV LPs. (Sealed App. p. 196) and 5% of SCP III, LP and SCP III, QP LP capital. (Sealed App. p. 234).

[7] In addition to his role as Principal of the GPs, Liff is a Senior Managing Director at SCA, Inc. and a limited partner in both GPs.  (App. p. 70, ¶ 47).

[8] Sun Capital Partners, Inc. (SCP, Inc.) is the branding entity of Sun Capital Advisors, Inc. (App. p. 55, ¶ 10).

Krouse.  Acting in their capacity as LPCs, they decided to purchase SBI on behalf of the SCP, LPs.  (Sealed App. pp. 359-367, 418-419, 422, 443-447).

To facilitate the purchase of SBI, Liff signing on behalf of all SCP, LPs formed SSB on December 15, 2006.  (Sealed App. pp. 448; 426-427).  The ownership of the LLC was divided as follows: SCP IV, LP - 70%, SCP III, QP LP - 29.4% and SCP III, LP - .6%. (App. p. 6, ¶ 23, Sealed App. p. 480).  Leder and Krouse are the Co-CEOs of SSB. (App. p. 85, ¶ 86).  On December 15, 2006, SSB formed a wholly owned subsidiary, SBHC, a Delaware Corporation.  (Sealed App. p. 486, App. p. 86, ¶ 87).

On February 7, 2007, Liff as sole director of SBHC directed the corporation to sign the Stock Purchase Agreement with SBI. (Sealed App. p. 487).  Other than Barry Golden ("Golden")[9] and the Chief Financial Officer, SBHC officers were employees of SCA, Inc. (App. pp. 90-91, ¶ 100-102).  On February 8, 2007, pursuant to the Stock Purchase Agreement, SBHC purchased the stock of SBI. (Sealed App. p. 491, App. p. 78 ¶ 66).  On February 9, 2007, Liff, signing as the Vice President of SSB, resigned from the SBHC Board of Directors and appointed Chris Metz ("Metz"), Dixon McElwee ("McElwee")[10] and Golden as the new

---

[9] Golden was the CEO and owner of SBI prior to the sale.  (App. p. 81, ¶ 75)

[10] Metz and McElwee were employees of SCA, Inc. and limited partners in the GPs.  Donald Roach ("Roach") replaced McElwee. (App. pp. 71-73, 96, ¶ 50, 53 and 116).

Board.  (Sealed App. p. 587, App. p. 71-72, ¶ 51).  The Board of SBHC met once a

quarter and oversaw the major decisions of SBI. (Sealed App. pp. 610- 611).

On February 9, 2007, Metz and McElwee took control of the Board of

Directors of SBI as they were appointed to two of the three positions on the

Board, along with Golden.  They set up a new governance model for SBI. (Sealed

App. pp. 428-429, 589; 619, 661).  Golden was retained as CEO of SBI under an

employment agreement with SBHC.  (Sealed App. pp. 667; 561, ¶ 2a).  A graphic

depiction of the ownership structure was produced with SCP, LPs at the top of the

ownership tree.  (Sealed App. p. 668).

C.    Actions to Evade and Avoid Withdrawal Liability.  Prior to the formation

of SSB, the SCP, LPs were aware that SBI participated in the Pension Fund and

that SBI had an estimated $2 million in unfunded pension liability.  As a result, the

SCP, LPs discounted the purchase price by 25%.  (Sealed App. pp. 375; 415-417,

670-672, 678-680; App. pp. 46 and 81, ¶ 44 and 76).

Leder testified that the LPCs made the decision to split the ownership of

interest in SSB on a 70/30 basis because, among other reasons, it was safer to split

the ownership, "My understanding is, if one party owns 80 percent or more of an

underfunded pension, they can be put at risk of taking on that liability" (Sealed

App. pp. 416-417, 670-675, 687).  Liff testified that "a principal reason" for the

division of ownership among the SCP, LPs was the mitigation of SCP, LPs'

potential liability for unfunded pension liability.  (Sealed App. pp. 675-677).  Kurt Lentz memorialized the reason for the division of ownership of SBI in an email.  In response to a question from McElwee about the amount the "funds" have invested in SBI, he states: "Fund IV; $2.1mm.  Fund III: $0.9mm.  Total investment: $3mm (on the nose). Did this due to unfunded pension liability."  (Sealed App. p. 691).

    D.   <u>Management of SBI</u>. Leder, Krouse and Liff were involved in the operations of SBI on a regular and continuous basis.  The "jump start" meeting covered such varied topics as shutting down a plant, to software modules to outsourcing. (Sealed App. pp. 858).  Myriad emails show Leder, Krouse and Liff's in depth involvement in SBI management such as staffing, dividends, mergers and liquidity issues.  (Sealed App. pp. 695-702, 423-425, 733).   In addition, they received weekly flash reports regarding such items as finances, market activity, and sales opportunities. (App. p. 98, ¶ 121-122).

    Liff was a member of the "Sun Capital Management Team" for SBI and participated in conferences regarding the operations of SBI on a regular basis. (Sealed App. pp. 610-611, 733-747, 858-865).  The SBI Board of Directors met monthly. (App. p. 97, ¶ 120).  Emails demonstrate that Metz, Roach and McElwee who controlled the Board of SBI and SBHC, received weekly cash flow forecasts (App. p. 100, ¶ 129) and were deeply involved in the operations of SBI. (Sealed App. pp. 590- 660, 695 and 858, App. pp. 107-108, ¶ 150).

SCP IV, LP's GP wholly owns and is the sole managing member of Sun Capital Partners Management IV, LLC.  ("SCPM"). (App. p. 3, ¶ 11; Sealed App. pp. 866-899).  On February 9, 2007, SCPM entered into a management agreement with SBHC to provide SBI with management services; Liff signed on behalf of both parties. (Sealed App. pp. 340-349).  SBI paid SCPM at least $186,368.44. Any moneys received by the management services company was offset against the management fees owed to the GPs by the SCP, LPs.  (App. p. 97, ¶ 118-119). SCPM subcontracted with SCA, Inc. for personnel to perform services under the agreement.  (Sealed App. pp. 912-921).

## SUMMARY OF THE ARGUMENT

The case arises under the MPPAA enacted by Congress to protect the viability of defined benefit pension plans, to create a disincentive for employers to withdraw from multiemployer plans and to provide a means of recouping a plan's unfunded liabilities.  *See PBGC v. R.A. Gray & Co.,* 467 U.S. 717, 720-722 (1984). The Act requires withdrawing employers to pay their proportionate share of the pension fund's vested but unfunded benefits (hence the term "withdrawal liability").  ERISA § 4201, 4211, 29 U.S.C. § 1381, 1391; *Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal*., 508 U.S. 602, 609 (1993);   *Gray,* 467 U.S. at 725.   An employer "withdraws" when it

permanently ceases its obligation to contribute or ceases covered operations under the plan. ERISA § 4203(a), 29 U.S.C. § 1383(a).

The Pension Fund relies upon two provisions of the MPPAA designed to prevent withdrawing employers from circumventing their withdrawal liability in violation of the Act.  First, the Pension Fund seeks to hold the Appellees liable as trades or businesses "under common control" with the withdrawing employer, SBI under ERISA §4001(b)(1), 29 U.S.C. § 1301(b)(1).  Alternatively, the Pension Fund contends SCP IV, LP's division of its ownership interest in SBI was a transaction with a primary purpose to evade and avoid withdrawal liability in violation of ERISA § 4212(c), 29 U.S.C. 1392(c).  The division should thus be disregarded and judgment issue against SCP IV, LP alone.

The District Court did not reach the issue of common control (Add. p. 25) finding the Pension Fund did not meet the threshold requirement of demonstrating that the SCP, LPs were "trades and businesses."  ERISA §4001(b)(1), 29 U.S.C. § 1301(b)(1) provides:

> all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer. The regulations prescribed under the preceding sentence shall be consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under section 414(c) of Title 26.

The Court found the Appellees were merely "passive investment funds" and that the regular and continuous activity of Appellees' GPs and their agents with

respect to the portfolio companies could not be attributed to the Appellees. In fact, the Court found generally the relationship between a general partner and its limited partnership was nothing more than a "real estate agent" to a homeowner. In so holding, the Court rejected outright the opinion of the PBGC, the federal agency tasked with interpreting ERISA, which reached the opposite conclusion in a substantially similar case to the one at bar. (Add. pp. 43-56). It also ignored the analysis of the Court in *Board of Trustees, Sheet Metal Workers' National Pension Fund v. Palladium Equity Partners, LLC, et al.*, 722 F. Supp. 2d 854 (E.D. Mich. 2010) - the only other federal court to consider the issue. The Court's reasoning is contrary to Delaware partnership law. It ignores the Appellees' status as a VCOC as well as the SCP, LPs' governing documents and the activity of GPs in the operation of SBI through its principals and agents.

Second, the Court erred in finding the clear and undisputed evidence of an intent to evade and avoid withdrawal liability by dividing the ownership of SBI among the three Appellees did not violate §4212(c). It ignored the plain language of the statute that an evasive intent need only be "a" principal reason for the transaction rather than "the major reason." Further, Court's holding that the "transaction" was not one contemplated by the statute is simply not supported by the case law or facts.

12

ARGUMENT

A. Standard of Review

A grant or denial of summary judgment by the District Court is reviewed de novo. *Sarsfield v. Great Am. Ins. Co. of N.Y.*, 335 F. App'x 63, 65 (1st Cir. 2009). The standard was detailed by this Court in *One Beacon Am. Ins. Co. v. Commercial Union Assur. Co.*, 684 F.3d 237, 241 (1st Cir. Mass. 2012). Where, there are cross-motions, each motion must be reviewed in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor. *Estate of Hevia v. Portrio Corp.*, 602 F.3d 34, 40 (1st Cir. 2010). The Court is obligated to make a determination "based on undisputed facts whether either the plaintiffs or the defendants deserve judgment as a matter of law." *Hartford Fire Ins. Co. v. CNA Ins. Co. (Europe) Ltd,* 633 F.3d 50, 53 (1st Cir. 2011).

B. The District Court Erred In Finding That The Appellees Were Not Trades Or Businesses Under The *Groetzinger* Test.

To prevent an employer from avoiding liability by operating through separate entities instead of divisions of a single entity, Congress amended Title IV of ERISA to provide that members of a "common controlled group," which includes the withdrawing employer, are held jointly and severally liable for withdrawal payments. *Central States Southeast & Southwest Areas Pension Fund v. Chatham Props.*, 929 F.2d 260, 263 (6th Cir. 1991); *Palladium* 722 F. Supp. 2d at 858;. See

also, *PBGC v. Ouimet Corp.*, 630 F.2d 4, 9-11 (1st Cir. 1980), cert. denied; 450 U.S. 914 (1981) and cert. denied, 464 U.S. 961 (1983)**.** "To impose withdrawal liability on an organization other than the one obligated to the Fund, two conditions must be satisfied: 1) the organization must be under 'common control' with the obligated organization, and 2) the organization must be a trade or business." *McDougall v. Pioneer Ranch Ltd. Partnership*, 494 F.3d 571, 577 (7th Cir. 2007); *Palladium,* 722 F. Supp. 2d at 858, *Harrell v. Eller Mar. Co.*, 2010 U.S. Dist. LEXIS 104826 (M.D. Fla. Sept. 30, 2010).

Although the term "trade or business" is not defined in ERISA, MPPAA, the tax code or tax regulation, the definition most often used in the MPPAA context is the two-prong test outlined by the Supreme Court in *Commissioner of Internal Revenue v. Groetzinger*, 480 U.S. 23 (1987). See *Connors v. Incoal, Inc.*, 995 F.2d 245, 250-51, 301 U.S. App. D.C. 345 (D.C. Cir. 1993) (states *Groetzinger* test as "the most authoritative pronouncement available" in the MPPAA context); *Cent. States, Se. & Sw. Areas Pension Fund v. White*, 258 F.3d 636, 642 (7th Cir. 2001); *Cent. States, SE & SW Areas Pension Fund v. Fulkerson*, 238 F.3d 891, 895 (7th Cir. 2001); *Palladium*, 722 F. Supp. 2d AT 867.

Under *Groetzinger*, a person's activity constitutes a "trade or business" when he engages in an activity (1) for the primary purpose of income or profit; and (2) with continuity and regularity. 480 U.S. at 35. A thorough examination of the

14

facts of each case is necessary to determine whether an entity constitutes a "trade or business." *Id*. at 36. The term has been found to exclude "purely 'personal' activities no matter how 'continuous' or 'extended' the activity may be nor how profitable . . . ." *White*, 258 F.3d at 642. A passive investment such as the "possession of a property, be it stocks, commodities, leases, or something else, without more[,]" is insufficient." *Fulkerson*, 238 F.3d at 895-896; *Palladium,* 722 F. Supp. 2d at 868.

The District Court ruled the SCP, LPs met the first prong of the test, but erred in finding that the SCP, LPs were mere passive investors ignoring the very regular and continuous activities of the GPs. (Add. p. 21).

1. The District Court Incorrectly Dismissed the Analysis of the PBGC Appeals Board.

The PBGC correctly concluded that a private equity limited partnership substantially similar to the Appellees satisfied the second prong of the *Groetzinger* test and should be used as precedent in the instant case. It regarded the stated purpose of the partnership, the management fees paid to the general partner, the size of the portfolio, the profits, the acquisition of a controlling interests and active involvement of the GP and its agents in the portfolio companies as relevant factors in determining whether a private equity fund is a trade or business. The *Palladium*

Court found the analysis persuasive and dubbed it the "investment plus" approach. (Add. pp. 49-55); *Palladium*, 722 F. Supp. 2d 868-869.

In finding the PBGC's reasoning unpersuasive, the District Court relies almost entirely on two pre-MPPAA tax cases, *Higgins v. Comm'r of Internal Rev.,* 312 U.S. 212 (1941) and *Whipple v. Comm'r of Internal Rev.*, 373 U.S. 193, 202 (1963) to support its finding that Appellees are not trades or businesses. The PBGC appropriately distinguished *Whipple* and *Higgins* as referring "to individuals managing their own personal investments rather than to partnerships, like the Fund, whose purpose is to acquire, hold, and sell securities and other investment interests in United States industrial businesses. . . ." (Add. p. 53).

The Seventh Circuit stated in *Fulkerson*, 238 F.3d at 895, fn 2.

"… we cautioned against using tax code cases to interpret MPPAA. *Ditello* noted that the phrase "trade or business" appears almost two hundred times in the tax code. *Id*. at 889. The particular meaning given to any single instance of the phrase may be shaped by the surrounding statutory context of the tax code and thus involve considerations that are absent in MPPAA. While we adhere to the idea that courts must be careful in using tax code cases to construe MPPAA because of the different context, *Groetzinger* states the common, ordinary definition of trade or business and is thus appropriately used to interpret § 1301(b)(1)."

In this light, the reasoning of the PBGC's analysis of the "trade or business" requirement in the MPPAA context should be given far more deference. The First Circuit has stated that deference to the PBGC's interpretation of the MPPAA is

appropriate. *Berkshire Hathaway Inc. v. Textile Workers Pension Fund*, 874 F.2d 53, 55 (1st Cir. 1989). Although the PBGC's interpretations are not binding, they require substantial deference as the agency is charged with interpreting the MPPAA. *Cent. States, Southeast & Southwest Areas Pension Fund v. Nitehawk Express, Inc.,* 223 F.3d 483, 491 (7th Cir. 2000); *Penn Cent. Corp. v. Western Conference of Teamsters Pension Trust Fund*, 75 F.3d 529, 534 (9th Cir. 1996); 29 U.S.C. § 1301(a)(14)(B). The Supreme Court has regularly deferred to PBGC's permissible construction of ERISA noting that "to attempt to answer these questions without the views of the agencies responsible for enforcing ERISA would be to embark upon a voyage without a compass." *Beck v. Pace Intern. Union,* 551 U.S. 96, 104 (2007) *citing Mead Corp. v. Tilley,* 490 U.S. 714, 722, 725-726 (1989). This seems particularly relevant in this case where neither the Internal Revenue Code nor its regulations define the term "trade or business."

In the MPPAA context, courts have found that activities were *not* trades or businesses under ERISA where the business in question was typically very small in scale, *White*, 258 F.3d at 642 (rental of garage apartment in owners' home) and involved imposing personal liability against the owners of "mom and pop" type businesses. *Fulkerson*, 238 F.3d at 895. Neither concern is present here. Using the PBGC analysis of the private equity fund, the Court would be compelled to find the Appellees here are trades or businesses.

17

2. <u>The Court Erred In Disregarding Delaware Partnership Law Without Explanation.</u>

In dismissing the reasoning of the PBGC, the Court finds:

> The Appeals Board incorrectly attributed the activity of the general partner to the investment fund. The trade or business of an agent does not transfer to the principal. For example, a real estate broker is an agent for an individual looking to sell his home, but the homeowner is not therefore engaged in the broker's trade or business. App. 19.

This analysis contravenes Delaware Revised Uniform Partnership Act ("DRUP") without explanation. The SCP, LPs are Delaware partnerships. DRUP provides is that a general partner is a *partner* and *an agent of the partnership who by conducting partnership business binds the partnership*. 6 Del. C. § 1509(a), § 17-403. This is the fatal flaw in the Court's decision. The scope of a real estate broker's authority is limited. It is not a homeowner's partner, does not sign the purchase and sale, execute the mortgage or manage the homeowners' move to a new location. On the contrary, a GP is a partner of the LPs, its sole purpose is to manage the LPs business with full and broad authority, execute financial documents binding the LPs and engage "in such other activities incidental or ancillary thereto" the GP deems necessary. (Add. p. 6).

For this service, the GPs are paid a management fee equal to 2% of the SCP, LPs' aggregate commitments pursuant to the partnerships agreements. Given that aggregate capital commitment of Fund IV (i.e. SCP IV, LP) is $1.5 billion. (App. pp. 4-5 ¶ 16), SCP IV, LP's GP was then entitled to receive $30 million in

18

management fees.  The portfolio companies also pay the GPs for management services provided to them through wholly owned subsidiaries of the GPs.  These payments offset the management fees owed to the GPs by the SCP, LPs.

Clearly, the GPs were conducting and were paid for partnership business including their management of the portfolio companies.  Their actions bind the SCP, LPs.  This was the conclusion of the PBGC in analyzing the actions of a general partner with respect to a similar private equity limited partnership. (Add. pp. 50-1).  See also, *Palladium*, 722 F. Supp. 2d at 869.

### 3. As Venture Capital Operating Companies Under ERISA, The SCP, LPs Are By Definition Trades Or Businesses.

The District Court ignored the significance of the Appellees' designation as VCOCs.  This designation alone meets the *Groetzinger* "regular and continuous activity" prong.  Under the heading of "Legal and Tax Matters," the PPMs state that the SCP, LPs are designated and managed under the VCOC exception to the ERISA plan asset regulation. ((Sealed App. pp. 221-222, 259-260), also referenced in the LPAs (Sealed App. pp. 31, 150, 92)).  The PPMs accurately state that in order for ERISA benefit plans to *invest* in the limited partnerships without violating ERISA's plan asset rules, the SCP, LPs are designated and operated as VCOCs.  Such designation requires that the SCP, LPs have:

> direct contractual rights to substantially participate in or substantially influence the management of operating companies comprising at least

50% of its portfolio (measured at cost) and (ii) *in the ordinary course of its business, actively exercises such management rights with respect to at least one of the operating companies in which it invests*. An 'operating company' is an entity engaged in the production or sale of a product or service as distinguished from a reinvesting entity. (emphasis added) (Sealed App. pp. 221, 259); See 29 C.F.R. § 2510.3-101.

SSB's operating agreement states that its members, the SCP, LPs, have the right to substantially participate in or to substantially influence the conduct of the management of the LLC under § 2510.3-101." Further, it provides the SCP, LPs, "the right to meet *on a regular basis* with such management personnel of the LLC and each of its subsidiaries for the purpose of consulting with and advising and influencing management, obtaining information regarding the business and prospects of the Company and each of its subsidiaries or expressing its views thereon." (emphasis added). (Sealed App. pp. 465-467). This same provision is included in the LLC agreements of four other jointly owned SCP, LP portfolio companies. (Sealed App. pp. 900-911).

Ironically, Appellees tout their VCOC status and management rights in their portfolio companies when looking to attract ERISA benefit plan investors. However, when called upon to pay the withdrawal liability of one of the portfolio companies, they are "transformed" into passive investment vehicles. Certainly, the Appellees cannot be both VCOCs and passive investors.

4.  The Governing Documents And The Actions Of The SCP, LPs Present Indisputable Evidence That They Are "Trades Or Businesses" under *Groetzinger.*

a.  The Documents.  As evidence that the SCP, LPs are not trades or businesses, the Court stated they "have no employees" and "own no office space." (Add. pp. 5, 22).   However, under their respective LPAs and PPMs, they are neither homeless nor headless.  Rather, just as a corporation acts not through its shareholders but through its Board of Directors and Officers, a limited partnership acts through its general partner.

Under the LPAs, the place of business of SCP III, LP and SCP III, QP LP is Boca Raton, Florida. (Sealed App. pp. 66, 124).  SCP IV, LP resides with its GP stating as its place of business: "The General Partner shall maintain a principal office in Boca Raton, Florida, or at such other place or places as the General Partner may from time to time designate." (Sealed App. p. 6)

Under the governing documents, the GPs act through the LPCs (LPAs) and their Principals (PPMs).  The LPC is specifically empowered to make all material decisions of each GP authorizing Leder and Krouse to hire, fire and establish the compensation of employees and agents of the LPs and Portfolio Companies. (Sealed App. 321- 322, 284-285).

In the PPMs, "the Principals" of the GP are identified individuals who 1) determine who at the [portfolio] company likely will continue under Sun Capital's

21

ownership and who may need to be replaced (Sealed App. 208, 250-251); 2) act as chief executive officer and chief financial officer of new portfolio companies on an interim basis; 3) maintain an active role in all aspects of operations, including manufacturing, foreign sourcing, sales and marketing, logistics and distribution, cost reductions, containment and implementation or modification of information systems; 4) work to reduce costs, improve margins, accelerate sales growth through new products and market opportunities, implement or modify management information systems and improve reporting and control functions (Sealed App. 188, 227).  They also execute Sun Capital's investment strategy and operating approach (Sealed App. 196, 233); have an aggressive approach to operations and decisive decision-making that requires control of the portfolio company and under their guidance, portfolio companies significantly improve the strength, depth of experience and intensity of their staff.  (Sealed App. 208, 248-249).[11]  By the terms of their own agreements the SCP, LPs are trades or businesses based upon the authority given to the GPs to be taken by the LPC and Principals.

---

[11] In addition, under the category of "Director's Liability", each PPM states that the *Partnership appoints* representatives as officers and directors of portfolio companies, thereby exposing the *Partnerships* themselves to director liability. (Sealed App. 219, 257-258).  The PPMs list the GP Principals and SCA, Inc. employees as the "Fund Management" and "Management of the Partnership". (Sealed App. 190-195, 211-216, 252-254).  Such statements evince a clear line of authority from the portfolio company to the SCP, LPs themselves.

b. <u>The Actions</u>. The SCP, LPs purchased and operated SBI following the PPM Investment and Operating Strategies.  As cited above, once the decision to purchase SBI was made, the SCP, LPs through GP Principal Liff organized SSB. SSB incorporated its subsidiary "holding co.", SBHC, which in turn purchased SBI. SBHC then took "a controlling interest" in SBI by appointing Metz, McElwee and later Roach to two of the three positions on the Board of Directors of SBI.

The involvement of Leder, Krouse, Liff, Metz, McElwee and Roach (and other GP Principals and SCA, Inc. employees) in the operations of SBI is well documented.  The reporting requirements were regular and continuous.  The meetings were regular and continuous.  The emails were regular and continuous. Their management was as broad in scope and scale as detailed in the PPMs.

The Court and the Appellees essentially admit to the actors and the actions. The Court mistakenly attributes none of the actions of the GP to the LPs.  The Appellees attempt to distance the actions as simply SCA, Inc. employees acting as "consultants." (App. pp.  106-108).  This contradicts the PPMs.  Once again, when Appellees pitch to investors, the GP Principals are on the go and in the know - maintaining an active role, hiring and firing, reducing costs, improving sales and staff and using an "aggressive" approach.  When faced with liability, they are merely consultants. Metz and McElwee/Roach were Directors of SBI, not consultants. Under Rhode Island law the Board of Directors manages the affairs of the

23

corporation. R.I. §7-6-22.  Finally, the Master Advisory Agreement between the GPs and SCA, Inc. provides that nothing in the agreement can be construed to relieve the signatories of their duties, under any respective operating agreement.  Thus, the GPs' obligation to manage the limited partnerships is not abrogated by the "advisory agreement." (Sealed App. 912-921).  The documents and actions examined here are precisely those found by the PBGC to support a finding that the limited partnerships met the *Groetzinger* test for trades or businesses and are just as compelling in the instant case.

C.  The District Court Erred in Finding That Appellees Did Not Act To Evade And Avoid Withdrawal Liability In Violation of The MPPAA.

ERISA Section 4212(c), 29 U.S.C. 1392(c) provides: "If a principal purpose of any transaction is to evade or avoid liability under this part [MPPAA], this part shall be applied and liability shall be determined and collected without regard to such transaction." 29 U.S.C. 1392(c).  The elements of an § 4212(c) claim are (1) the consummation of the transaction which allows the evasion and avoidance of withdrawal liability, and (2) a principal purpose of the transaction being the evasion and avoidance of withdrawal liability.  See *Santa Fe Pacific Corp. v. Central States, Southeast & Southwest Areas Pension Fund*, 22 F.3d 725, 727 (7th Cir. 1994).

An entity is deemed under common control with an employer contributing to an ERISA pension plan if there is at least 80% common ownership.  26 C.F.R. §

1.414(c)-2(b)(2)(i).  By partitioning their interests in SSB, such that no one limited partnership held the requisite controlling interest, the Appellees sought to avoid withdrawal liability. There is ample documentary and testimonial evidence indicating that "a principal purpose" of Leder and Krouse's decision to partition the ownership of SSB among the three SCP, LPs was to avoid imposition of withdrawal liability.

1. The District Court Ignored The Clear Language Of The Statute Which Is Violated When "A" Principal Purpose Of A Transaction Is To Evade And Avoid Withdrawal.

The District Court held, "Thus, under the plain meaning of the text, a person or entity violates § 1392(c) when it carries out a business transaction whose most important goal is getting around or preventing withdrawal liability." (Add. p. 30) This statement is simply incorrect.  Courts have consistently held the plain meaning of the statute requires that *a* principal purpose not *the* principal purpose of the transaction is the avoidance of liability.  "MPPAA makes it clear that an employer can have more than one principal purpose in conducting a transaction." *Sherwin Williams v. New York State Teamsters Conference Pension and Retirement Fund,* 158 F.3d 387, 395 (1998): See also *Santa Fe Pacific Corp.*, 22 F.3d at 727.  Even if there is another legitimate and bona fide purpose for the transaction, this does not preclude a finding that the party had another principal motive to avoid withdrawal liability that violates § 1392(c).  See *Operating Engineers & Pension Trust Fund v. Western Power & Equip. Corp.*, 2011 U.S. Dist. LEXIS 67306, 10-

25

11 (N.D. Cal. June 23, 2011); *Supervalu, Inc. v. Board of Trustees of the Southwestern Pennsylvania and Western Maryland Area Teamsters and Employers Pension Fund*, 500 F.3d 334, 343-344 (3rd Cir. 2007).

Although the Appellees put forth alternative reasons for the ownership division, the evidence that "a principal reason" was avoidance of liability is overwhelming.  Appellees were well aware of the liability prior to the SBI purchase.  The SBI deal team identified the unfunded liability as a significant concern in its Diligence Report, and the purchase price of the SBI was discounted by 25% to reflect the liability.  (App. p. 81 ¶74, 76, Sealed App. p. 372-401).  Leder testified in detail about the necessity of keeping any one partnership's ownership under 80% to avoid withdrawal liability. (Sealed App. p. 415-417).  Liff, GP Principal and leader of the SBI "deal team," *admitted* that "a principal purpose" of the transaction which divided ownership among the Appellees was to avoid unfunded pension liability. (Sealed App. p. 677).  And the smoking gun - the Lentz email that states unambiguously regarding the divided ownership of SBI  "did this due to unfunded pension liability."  (Sealed App. p. 691).  Even the Court recognizes that the "email alone could be considered sufficient to create a genuine issue of material fact for trial."  (Sealed App. p. 33).  This statement alone is sufficient grounds for this Court to reverse the decision below.

2. <u>The Court's Conclusion That The "Transaction" Is Not Within The Purview Of The Statute Is Contrary To The Plain Language Of The Statute And Incorrect.</u>

Despite the evidence cited above, the Court holds that Congress did not intend § 1392(c) to apply to the situation at bar because it is primarily directed at "fraudulent maneuvers lacking in economic substance" by "employer-sellers". (Add. p. 33). This conclusion disregards the plain text of the statute. See *Trustees Of The Utah Carpenters' And Cement Masons' Pension Trust et al. v. Loveridge*, 2012 U.S. Dist. LEXIS 90274 (D.C. UT 2012). It contradicts the Court's own ruling that the statute is not limited to "employers" but to "any party" who has attempted to evade or avoid liability. (Add. p. 29-30). See also, *Supervalu,* 500 F.3d at 337-338 (transaction involved an agreement between an employer and a union).

The Court's rationale is premised upon a misunderstanding of the circumstances under which withdrawal liability is assessed. The Court states, "Here, there is no expectation of withdrawal, only the ever present future risk of it." It assumes liability occurs only when an employer is bankrupt reasoning that no "investor" intends to buy a business with "knowledge that such failure was imminent" resulting in withdrawal liability. (Add. p. 34-35). However, withdrawal liability occurs any time an employer's obligation to contribute ceases. It occurs when the employer does not sign a successor union agreement, signs an agreement

without pension contributions or *sells the business*.  That is why the Appellees were so focused on withdrawal liability.

The investment strategy of SCP, LPs is not to hold a business long term, "accordingly, the Principals expect to exit investments in two to five years (or sooner in appropriate circumstances), and consider sale transactions as well as public and private offerings and recapitalizations to achieve liquidity." (Sealed App. pp. 211, 251-252).  Except in the limited circumstance when a purchaser assumes the union agreement,[12] withdrawal liability is assessed whenever a contributing employer sells its business.  The SCP, LPs understood the inevitability that SBI (and consequently the SCP, LPs) would incur withdrawal liability when SBI was sold.  The Diligence Memo stated, "A future buyer may impair our exit value based on their desire to exit the Cranston, RI facility (which would trigger the Company's need to settle the underfunded amount)." (Sealed App. 378).  The Court's citation from *Supervalu* holds just as true here, "The illicit transaction took place when withdrawal was predetermined, and the parties were negotiating with the knowledge that withdrawal would occur." (Add. 38).

---

[12] Under ERISA § 4204, there is no withdrawal liability for an asset sale to a Purchaser who agrees to contribute the same contributions to the Pension Fund as the seller for a period of five years and posts a bond.  Also, a Stock Sale, such as the SBI sale, where there is no cessation of the obligation to contribute does not trigger withdrawal liability as it is considered a corporate reorganization under ERISA § 4218.

Finally, the Court appear to argue that the transaction must occur after withdrawal liability is determines. However, the transaction under the statute can occur well before the assessment of withdrawal liability. See *Retirement Benefit Plan of Graphic Arts International Union Local 20-B v. Standard Bindery Co.*, 654 F. Supp. 770 (E.D. Mich. 1986). In that case, a series of transactions, including some before the business closed and before notice of withdrawal liability was delivered, were all held to be actionable under Section 4212(c). *Id*. at 771-773.

### 3. Finding The Division of Ownership Is A Transaction That Violates § 1392(c) Furthers Congress' Intent.

As cited by the Court with regard to the legislative history of the provision, Representative Thompson stated, "We intend that employer not be able to evade or avoid withdrawal liability through changes in identity, form, or control, or through transactions which are less than *bona fide* and arm's length." (Add. pp. 33-34). What is so troubling to the Pension Fund is that the Appellees' decision to divide the ownership of SSB among the three SCP, LPs was far from arm's length and questionably *bona fide*. Leder and Krouse made the decision behalf of all SCP, LPs in essence taking money out of one pocket to put into another. Even SCP, LPs seemed to understand the division was not quite *bona fide* by carefully avoiding the explanation for the division in an interrogatory response and only disclosing the "to mitigate liability" reason upon a Motion to Compel. (Sealed App. 443-447).

With respect to the Court's contention that there is no remedy under the statute for this situation, the Court is in error.  Pursuant to the letter of intent to SBI, SCP IV, LP was the intended purchaser.  In its discovery response "Fund IV" has sufficient capital and sought out Fund III as a co-investor "based upon advice of counsel."  (Sealed App. p. 446).  SCP IV, LP was seeking to limit its ownership interest to less than 70%; SCP III, LP and SCP III, QP, LP were just happy to oblige.  Given that ERISA "is remedial legislation which should be liberally construed in favor of protecting participants in employee benefits plans," disregarding the division of ownership and finding SCP IV, LP liable for the withdrawal liability is entirely appropriate.  *Operating Engineers*, 2011 U.S. Dist. LEXIS 67306 at 4 quoting *Smith v. CMTA-IAM Pension Trust*, 746 F.2d 587, 589 (9th Cir. 1984).

## CONCLUSION

Based on the foregoing, Appellant respectfully requests the Court reverse the District Court's Judgment granting the Appellant's Motion for Summary Judgment and denying the Appellees' Motion for Summary Judgment.  If the Court finds that the Appellees violated ERISA § 4212(c), the Appellant requests a Judgment enter against the Appellees forthwith.  If the Court finds no violation of ERISA § 4212(c), Appellant requests the Court find Appellees are trades or business under MPPAA and remand the case to the District Court to determine whether the Appellees are under common control as this issue was not reached below.

Dated:  January 29, 2013                  Respectfully Submitted,

<u>/s/ Catherine M. Campbell</u>
Catherine M. Campbell, Esq.
BBO # 549397
Renee J. Bushey, Esq.
BBO # 629444
Melissa A. Brennan, Esq.
BBO # 669489
Attorney for Defendant-Appellant
Feinberg, Campbell & Zack, PC
177 Milk Street, Suite 300
Boston, MA 02109
(617) 338-1976
(617) 338-7070

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

The undersigned confirms that this brief complies with Rule 32(a).

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 7492 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word Times New Roman font size 14.

Dated:  January 29, 2013                    <u>/s/ Catherine M. Campbell</u>
                                            Catherine M. Campbell, Esq.

                                            Attorney for Appellant, the
                                            New England Teamsters and
                                            Trucking Industry Pension
                                            Fund

## <u>CERTIFICATE OF SERVICE</u>

I, Catherine M. Campbell, hereby certify that I caused a copy of the foregoing documents to be mailed this day by U.S. first-class mail to:

Theodore J. Folkman, Esq.
Murphy & King
One Beacon Street, 21st Floor
Boston, MA 02108

Jeffrey S. Quinn, Esq.
Marla Tun, Esq.
John F. Hartmann, Esq.
Kirkland & Ellis, LLP
230 N. LaSalle Street, Suite 2400
Chicago, IL 60654

Dated:  January 29, 2013                    /s/ Catherine M. Campbell
                                            Catherine M. Campbell, Esq.

                                            Attorney for Appellant, the
                                            New England Teamsters and
                                            Trucking Industry Pension
                                            Fund

33

# ADDENDUM

## TABLE OF CONTENTS

1.  Electronic Order on Cross Motions for Summary Judgment.....................................1

2.  Memorandum and Order........................................................................................3

3.  Judgment...............................................................................................................41

4.  PBGC Decision.....................................................................................................42

| | |
|---|---|
| **From:** | ECFnotice@mad.uscourts.gov |
| **To:** | CourtCopy@mad.uscourts.gov |
| **Subject:** | Activity in Case 1:10-cv-10921-DPW Sun Capital Partners III, LP, et al. v. New England Teamsters & Trucking Industry Pension Fund Order on Motion for Summary Judgment |
| **Date:** | Sunday, September 30, 2012 6:43:18 PM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## United States District Court

## District of Massachusetts

### Notice of Electronic Filing

The following transaction was entered on 9/30/2012 at 6:43 PM EDT and filed on 9/30/2012

| | |
|---|---|
| **Case Name:** | Sun Capital Partners III, LP, et al. v. New England Teamsters & Trucking Industry Pension Fund |
| **Case Number:** | 1:10-cv-10921-DPW |
| **Filer:** | |
| **Document Number:** | 104(No document attached) |

**Docket Text:**
**Judge Douglas P. Woodlock: ELECTRONIC ORDER entered granting [76] Motion for Summary Judgment; denying [82] Motion for Summary Judgment; a memorandum of decision upon which judgment will enter will be issued shortly providing an extended explanation for this Order. (Woodlock, Douglas)**

**1:10-cv-10921-DPW Notice has been electronically mailed to:**

Catherine M. Campbell  cmc@fczlaw.com, nadvady@fczlaw.com

Renee J. Bushey  rjb@fczlaw.com, mal@fczlaw.com, nadvady@fczlaw.com, ncp@fczlaw.com

Theodore J. Folkman  tjf@murphyking.com, cea@murphyking.com

John F. Hartmann  john.hartmann@kirkland.com

<u>Add. Pg. 1</u>

Jeffrey S. Quinn jeffrey.quinn@kirkland.com

Zubin P Khambatta zkhambatta@kirkland.com

Marla Tun marla.tun@kirkland.com

**1:10-cv-10921-DPW Notice will not be electronically mailed to:**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
SUN CAPITAL PARTNERS III, LP, SUN    )
CAPITAL PARTNERS III QP, LP, and     )
SUN CAPITAL PARTNERS IV, LP,         )
                                     )
          Plaintiffs/               )
          Counter-Defendants,        )    CIVIL ACTION NO.
                                     )    10-10921-DPW
v.                                   )
                                     )
NEW ENGLAND TEAMSTERS AND            )
TRUCKING INDUSTRY PENSION FUND,      )
                                     )
          Defendant/                )
          Counter-Plaintiff.         )
                                     )
```

MEMORANDUM AND ORDER
October 18, 2012

Sun Capital Partners III, LP and Sun Capital Partners III QP, LP (together, "Sun Fund III"), and Sun Capital Partners IV, LP ("Sun Fund IV") (collectively, the "Sun Funds"), seek a declaratory judgment that they are not liable to New England Teamsters and Trucking Industry Pension Fund (the "Pension Fund") for the payment of withdrawal liability stemming from the bankruptcy of Scott Brass, Inc., one of the companies in which the Sun Funds invested.

The Sun Funds moved for summary judgment, asserting that they are not "trades or businesses" under ERISA and the investment transactions were not structured with the primary purpose of "evading or avoiding" withdrawal liability.  The Pension Fund opposed the Sun Funds' motion and filed a cross-motion for summary judgment, seeking a declaration that the Funds

<u>Add. Pg. 3</u>

are jointly and severally liable for payment of Scott Brass,
Inc.'s withdrawal liability.  I have granted the motion of the
Sun Funds and denied that of the Pension Fund. This memorandum
provides the extended explanation of the reasons judgment shall
enter for the Sun Funds.

### I.  BACKGROUND

A.  <u>Withdrawal Liability</u>

The Pension Fund seeks to recover approximately $4.5 million
in "withdrawal liability" incurred by Scott Brass, Inc., under a
collective bargaining agreement, when it went bankrupt and
withdrew from the pension plan.  When an employer withdraws from
a multiemployer pension plan, the Multiemployer Pension Plan
Amendments Act of 1980 ("MPPAA") requires that the employer pay
the pension plan a sum sufficient to cover the employer's fair
share of the pension's unfunded liabilities, "that is, the
difference between the present value of vested benefits . . . and
the current value of the plan's assets." *Concrete Pipe & Prods.*
*of Cal., Inc.* v. *Constr. Laborers Pension Trust for S. Cal.*, 508
U.S. 602, 609 (1993) (quotations and citations omitted).  That
sum is the employer's "withdrawal liability."

B.  <u>Facts</u>

*I.   The Sun Funds*

Sun Capital Advisors, Inc. is a private investment firm
founded by Marc Leder and Rodger Krouse specializing in leveraged

2

<u>Add. Pg. 4</u>

buyouts and other investments in underperforming, market-leading companies. It provides investment advice to Sun Capital investment funds, two of which are the plaintiffs in this action, Sun Fund III[1] and Sun Fund IV. Sun Capital Advisors finds and recommends investment opportunities for the Sun Funds, then negotiates, structures, and finalizes the investment deals. Sun Capital Advisors also collects fees pursuant to management services agreements both from the Sun Funds and from the companies in which the Sun Funds invest on Sun Capital Advisor's recommendations.

Sun Fund III and Sun Fund IV are two of Sun Capital Advisors' investment funds. Each is a limited partnership, to which individuals and institutional investors contribute capital for investment purposes. Neither has any employees, owns any office space, or makes or sells any goods. They are simply pools of investment capital managed by a general partner.

The general partner oversees the fund's investment activities in return for a fee and a "carried interest" portion of the Fund's investment profits. The Sun Funds' limited

---

[1] Sun Fund III is actually two different funds, Sun Capital Partners III, LP and Sun Capital Partners III QP, LP. Sun Capital Partners III, LP and Sun Capital Partners III QP, LP, are "parallel funds" run by one general partner and generally make the same investments in the same proportions. For clarity, I consider them together in this Memorandum as one fund, which I refer to as Sun Fund III.

Add. Pg. 5

partnership agreements have identical language concerning the

powers of their general partners:

>    6.1.   <u>Management Authority.</u>
>    (a)    The management of the Partnership shall be vested
>           exclusively in the General Partner, and the
>           General Partner shall have full control over the
>           business and affairs of the Partnership. The
>           General Partner shall have the power on behalf and
>           in the name of the Partnership to carry out any
>           and all of the objectives and purposes of the
>           Partnership and to perform all acts and enter into
>           and perform all contracts and other undertakings
>           which the General Partner, in its sole discretion,
>           deems necessary or advisable or incidental
>           thereto, including the power to acquire and
>           dispose of any security (including marketable
>           securities).
>
>    (b)    All matters concerning (i) the allocation and
>           distribution of net profits, net losses,
>           Investment Proceeds, Short-Term Investment Income,
>           and the return of capital among the Partners,
>           including the taxes thereon, and (ii) accounting
>           procedures and determinations, estimates of the
>           amount of Management Fees payable by any
>           Defaulting Partner or Regulated Partner, tax
>           determinations and elections, and other
>           determinations not specifically and expressly
>           provided for by the terms of this Agreement, shall
>           be determined by the General Partner in good faith
>           and in a manner not inconsistent with this
>           Agreement, whose determination shall be final and
>           conclusive as to all the Partners absent manifest
>           error.
>
>    (c)    Third parties dealing with the Partnership can
>           rely conclusively upon the General Partner's
>           certification that it is acting on behalf of the
>           Partnership and that its acts are authorized. The
>           General Partner's execution of any agreement on
>           behalf of the Partnership is sufficient to bind
>           the Partnership for all purposes.

Sun Fund III's general partner is Sun Capital Advisors III,

LP, and Sun Fund IV's general partner is Sun Capital Advisors IV,

LP. Each general partner has a limited partner committee that
makes investment decisions for the Fund. The general partners'
limited partnership agreements states that:

> Except as otherwise expressly provided in this
> Agreement, *all material Partnership decisions and
> determinations will be made by the Limited Partner
> Committee* established under Article VI, including all
> Partnership decisions and determinations relating to
> (a) the acquisition of Fund investments, (b) the
> disposition of Fund investments, (c) distributions by
> the Fund of cash and/or securities, (d) amendments to
> the Fund Agreement, (e) distributions of Partnership
> cash and securities, (f) distributions of cash and
> securities from escrow accounts, (g) the borrowing of
> money, (h) hiring, terminating and establishing the
> compensation of employees and agents of the Fund or
> Portfolio Companies and (I) the incurring of expenses
> on behalf of the Partnership. The Partnership may (I)
> appoint such officers or employ such Persons on behalf
> of the Partnership, who may but need not be Active
> Limited Partners, to carry out such terms and to
> perform such functions as the Limited Partner Committee
> shall determine, (ii) appoint or otherwise contract
> with such other Persons for the transaction of the
> business of the Partnership or the performance of
> services for or on behalf of the Partnership as the
> Limited Partner Committee shall determine and (iii)
> delegate to any such officer or Person such authority
> to act on behalf of the Partnership as the Limited
> Partner Committee may from time to time deem
> appropriate. Each Founding Partner is hereby appointed
> as a "Managing Director" of the Partnership (in each
> case, only so long as such Person is an Active Partner)
> and shall have, in such capacity, the powers and duties
> granted to them by the Limited Partner Committee.

Leder and Krouse, the founders of Sun Capital Advisors,
Inc., are the sole members of the limited partner committees of
the general partners of both Sun Fund III and Sun Fund IV. In
turn, Sun Capital Advisors III, LP (the general partner of Sun
Fund III) also has a general partner, Sun Capital Partners III,

<center>5</center>

<center>Add. Pg. 7</center>

LLC.  Likewise, Sun Capital Advisors IV, LP (the general partner
of Sun Fund IV) has a general partner, Sun Capital Partners IV,
LLC.

Each of the Sun Funds' general partners also has a
management company, Sun Capital Partners Management III, LLC and
Sun Capital Partners Management IV, LLC respectively.  The
management companies of the general partners provide managerial
and consulting services to the holding companies in which the
Funds invest.  In essence, the management companies act as
middle-men, providing the companies in which the Sun Funds invest
with employees and consultants from Sun Capital Advisors.  The
management companies also collect the consulting and management
fees earned.

   *ii.  The Investment*

In 2006, Sun Capital Advisors brought Scott Brass, Inc., a
manufacturer of brass and copper coil for industrial purposes, to
the attention of the Sun Funds' general partners as a potential
investment opportunity.  The Sun Funds created a Delaware limited
liability corporation named Sun Scott Brass, LLC to act as an
investment vehicle.  Acting as the limited partner committee of
the Sun Funds' general partners, Leder and Krouse authorized Sun
Fund IV to invest $2.1 million in Sun Scott Brass, LLC, in
exchange for 70% ownership of its membership interests, and also

<u>Add. Pg. 8</u>

authorized Sun Fund III to invest $900,000 in exchange for the remaining 30%.

Sun Scott Brass, LLC, then invested that $3 million in a holding corporation, Scott Brass Holding Corp., in exchange for $1 million in Scott Brass Holding Corp. stock and $2 million in debt.  Scott Brass Holding Corp. then purchased all of the stock in Scott Brass, Inc. with this $3 million in cash and an additional $4.8 million it borrowed.

*iii. Bankruptcy and the Pension Fund*

At the time of purchase in 2006, Scott Brass, Inc. was regularly making its payments into the Pension Fund, and continued to do so over the next two years.  However, in the fall of 2008 the price of copper declined, and Scott Brass, Inc. was unable to obtain credit to stay in business.

In October 2008, Scott Brass, Inc. withdrew from the Pension Fund and, on November 21, 2008, entered into bankruptcy.  On December 19, 2008, the Pension Fund demanded Scott Brass, Inc. pay its withdrawal liability in the amount of $4,516,539.  Upon further investigation, the Pension Fund asserted that Sun Fund III and Sun Fund IV had entered into a joint venture or partnership in common control with Scott Brass, Inc., and were therefore jointly and severally liable for Scott Brass, Inc.'s withdrawal liability. Consequently, the Pension Fund demanded payment from the Sun Funds as well.

7

C.    Procedural History

Sun Funds III and IV filed this lawsuit in June 2010 seeking a declaration that each was not an "employer" under 29 U.S.C. § 1301(b)(1) that could be held liable for Scott Brass, Inc.'s withdrawal liability, because neither was (1) a "trade or business," or (2) under "common control" with Scott Brass, Inc.

The Pension Fund filed a counterclaim alleging that the Sun Funds were jointly and severally liable for Scott Brass, Inc.'s withdrawal liability under § 1301.  It also claimed that the "principal purpose" of the Sun Funds' decision to split their investments up 70% and 30% was to "evade or avoid" withdrawal liability, in violation of 29 U.S.C. § 1392(c).

In an order on September 3, 2010, I granted the Sun Funds' Partial Motion for Judgment on the Pleadings, Dkt. No. 19, finding that the question of whether the Sun Funds were "employers" under ERISA was a legal issue to be decided by the court, and not subject to ERISA's arbitration provision.  The parties then structured the case for resolution on the cross-motions for summary judgment now before me.

## II.    STANDARD OF REVIEW

A movant is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if the evidence about the fact is such that

<u>Add. Pg. 10</u>

a reasonable jury could resolve the point in the favor of the non-moving party," and "[a] fact is material if it has the potential of determining the outcome of the litigation." *Farmers Ins. Exch.* v. *RNK, Inc.,* 632 F.3d 777, 782 (1st Cir. 2011) (citation omitted).

I "view the facts in the light most favorable to the party opposing summary judgment." *Rivera–Colón* v. *Mills,* 635 F.3d 9, 10 (1st Cir. 2011). However, "conclusory allegations, improbable inferences, and unsupported speculation" are insufficient to create a genuine issue of material fact to survive summary judgment. *Sullivan* v. *City of Springfield*, 561 F.3d 7, 14 (1st Cir. 2009) (quotation and citation omitted). In dealing with cross-motions for summary judgment, I "must view each motion, separately, through this prism." *Estate of Hevia* v. *Portrio Corp.,* 602 F.3d 34, 40 (1st Cir. 2010).

### III. DISCUSSION

#### A.  Legal Background

Congress enacted the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA"), to ensure that private-sector employees would receive the pensions they had been promised by their employers. *Milwaukee Brewery Workers' Pension Plan* v. *Joseph Schlitz Brewing Co.*, 513 U.S. 414, 416 (1995). ERISA set minimum funding standards for employers in order to meet future vested pension liabilities, mandated termination

9

insurance to protect employees in event of pension bankruptcy, and made withdrawing employers liable for a fair share of a plan's deficits if the pension plan became insolvent during the first five years after withdrawal.

The Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §§ 1381-1461, was enacted to solve an unintentional side-effect of ERISA's regulations. In the pre-1980 regime, by only requiring withdrawing employers to pay a sum if the pension plan became insolvent after withdrawal, ERISA incentivized employers to withdraw from pension plans at the first sign of a plan's financial instability. When withdrawing early, an employer's risk was limited to paying its fair share if the plan became insolvent. If, however, an employer remained in a financially unstable pension plan, it ran the risk that other employers would leave and it would be left paying the entire pension by itself. Thus, before the enactment of the MPPAA, a pension plan's "financial troubles could trigger a stampede for the exit doors, thereby ensuring the plan's demise." *Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 417; *see, e.g.*, 29 U.S.C. § 1001a(a)(4) ("[W]ithdrawals of contributing employers from a multiemployer pension plan frequently result in substantially increased funding obligations for employers who continue to contribute to the plan, adversely affecting the plan, its participants and beneficiaries, and labor-management relations, and . . . in a declining

10

industry, the incidence of employer withdrawals is higher and the adverse effects described [above] are exacerbated.").

The MPPAA amended ERISA to require withdrawing employers to pay their fair share of the pension plan's unfunded liabilities. This changed the cost-benefit calculus for employers because the MPPAA turned into a guarantee what previously was only a risk of responsibility for the employer's fair share of the pension's unfunded liabilities upon withdrawal. *See* H.R. Rep. No. 869, 96th Cong., 2d Sess., 67, *reprinted in* 1980 U.S. Code Cong. & Ad. News 2918, 2935 (stating that the purpose of uniform withdrawal liability was to "relieve the funding burden on remaining employers and to eliminate the incentive to pull out of a plan which would result if liability were imposed only on a mass withdrawal by all employers.").

Under the MPPAA, members of a common controlled group are jointly and severally liable for the withdrawal liability of an employer so that employers cannot avoid liability by splintering into separate entities.  Under § 1301, "all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer."  29 U.S.C. § 1301(b)(1).  Thus, for another entity to be liable for the withdrawal liabilities of the employer, it must be (1) a

"trade or business," and (2) under "common control" with the employer. *Id.*

## B. Statutory Liability Analysis

The Sun Funds allege that they are passive investors whose only income is investment income from dividends and capital gains. This, they argue, is insufficient to constitute a "trade or business" for purposes of § 1301, and they therefore cannot be on the hook for Scott Brass, Inc.'s withdrawal liability.

The Pension Fund disagrees, arguing that the Sun Funds' income and activity is not limited to passive investment. The Pension Fund relies on an opinion by the Appeals Board of the Pension Benefit Guaranty Corporation ("PBGC") which held in a similar context that a private equity firm was engaged in a "trade or business" for purposes of § 1301 liability.

### 1. Defining "Trade or Business"

ERISA and the MPPAA do not define "trade or business," but rather direct courts to look to the tax code and tax caselaw to interpret such terms. 29 U.S.C. § 1301(b) (requiring that regulations pursuant to this section be "consistent and coextensive with" regulations under the Tax Code); *see also*, *Central States, Se. & Sw. Pension Fund* v. *Fulkerson*, 238 F.3d 891, 895 (7th Cir. 2001). In 1941, the Supreme Court held that an individual with extensive investments, who devoted a considerable portion of his time to managing them, hired others

12

to assist him in managing them, and rented offices for those helping him, was not engaged in a "business" as a matter of law, "[n]o matter how large the estate or how continuous or extended the work required may be." *Higgins* v. *Comm'r*, 312 U.S. 212, 218 (1941). Then, in 1963, the Supreme Court held that:

> Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. Though such activities may produce income, profit or gain in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself. *When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business since investing is not a trade or business* and the return to the taxpayer, though substantially the product of his services, legally arises not from his own trade or business but from that of the corporation.

*Whipple* v. *Comm'r*, 373 U.S. 193, 202 (1963) (emphasis added).

Most recently, in *Commissioner* v. *Groetzinger*, the Supreme Court established a test for when an activity constitutes a trade or business. *See* 480 U.S. 23, 35 (1987). Under *Groetzinger*, for a person to be engaged in a trade or business, (1) the primary purpose of the activity must be income or profit, and (2) the activity must be performed with continuity and regularity. *Id.* It is generally accepted that *Higgins* and *Whipple* remain good law, and their caution that investments are not trades or businesses survives *Groetzinger*. *See, e.g.*, *Fulkerson,* 238 F.3d at 895 ("One purpose of the *Groetzinger* test is to distinguish

trades or business from investments, which are not trades or business and thus cannot form a basis for imputing withdrawal liability under § 1301(b)(1).");  *see also id.* at 896 ("Given the prevalence of investing, permitting the holding of investments (which will normally satisfy the first prong of *Groetzinger* since the purpose is to produce income) without more to be considered regular and continuous activity would eviscerate the limitations placed on the text of § 1301(b)(1).").

In 2007, however, the PBGC Appeals Board released an opinion holding, in an informal adjudication, that a private equity fund in a factual situation similar to that presented here qualified as a "trade or business" for purposes of § 1301.  The PBGC Appeals Board applied the *Groetzinger* test, and found that both prongs were met.  The first prong was said to be met because the stated purpose of the fund was to make a profit, the fund's partnership tax returns stated that the fund was engaged in "investment services," and the general partner of the fund received compensation in the form of consulting fees, management fees, and carried interest, not just through investment income. *PBGC* at 11.  The Appeals Board held that the second prong was met because, although it had no evidence of the length of time the general partner devoted to managing the private equity fund's portfolio, the size of the fund's overall portfolio (approximately $470 million) and the profits generated therefrom

14

($207,000 in investment income and $7 million in management fees) were sufficient to evidence continuity and regularity. *Id.*

The Appeals Board purported to distinguish the holdings in *Higgins* and *Whipple* that investment activities do not constitute a trade or business. It characterized the holdings in both cases as being limited to personal investments and individuals, not partnerships like a private equity fund. *Id.* at 12. Specifically, the Appeals Board held,

> The Fund, unlike the taxpayer in *Higgins*, is not: (1) an individual acting on his own behalf; (2) merely keeping records and collecting dividends and interest from investments; and (3) solely receiving a return as an [sic] passive investor. Instead, the Fund is a "trade or business" because it regularly is involved in investment activities of a much more active nature than those in *Higgins*. This is reflected in the responsibilities of its agent . . . who: (I) provides investment advisory and management services to others (i.e., its partners); (ii) hires a third-party . . . to assist in selecting and purchasing potential investments . . . and in distributing the net profits and losses from these companies to itself and limited partners; and (iii) receive compensation for such services (e.g., 20% of all realized profits from the Fund's investments).
>
> . . .
>
> The facts in *Whipple* are distinguishable because the Fund, as evidenced by its tax returns and Partnership Agreement, was directly and substantially involved in a recognized business activity (i.e., providing investment advisory and management services) for the benefit of several other entities (i.e., its general and limited partners). . . . Furthermore, in contrast to the taxpayer in *Whipple*, . . . the Fund's agent was entitled to compensation for investment advisory and management services it performed.

*Id.* at 12-13.

15

2.  *Deference to the PBGC Appeals Board*

The parties disagree about how much deference I owe the 2007 PBGC Appeals Board opinion.  Ordinarily, as the agency responsible for interpreting the MPPAA and enacting regulations pursuant thereto, the PGBC would be entitled to substantial deference when it construes the statute.  *See United States* v. *Rutherford*, 442 U.S. 544, 553 (1979) ("As this Court has often recognized, the construction of a statute by those charged with its administration is entitled to substantial deference.")  But the deference extends only as far as the statutory grant, and here that grant extends only to regulations "consistent and coextensive" with Tax Code regulations.  *See* 29 U.S.C. § 1301(a)(14)(B) ("[T]he determination of whether two or more persons are under 'common control' shall be made under regulations of the [PBGC] which are consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under subsections (b) and (c) of section 414 of Title 26 . . . .").  Moreover, "interpretations contained in formats such as opinion letters are entitled to respect . . . only to the extent that those interpretations have the power to persuade." *Christensen* v. *Harris County*, 529 U.S. 576, 587 (2000) (citation and internal quotation marks omitted).  Thus, the 2007 PBGC Appeals Board opinion, which takes the form of an opinion

16

<u>Add. Pg. 18</u>

letter, will be given deference only to the degree it is
persuasive.

I find the Appeals Board opinion unpersuasive.  First, it
misunderstood the law of agency in determining whether the
private equity firm in that case was a "trade or business" for
purposes of the statute.  Second, it misread Supreme Court
precedent.

The Appeals Board incorrectly attributed the activity of the
general partner to the investment fund.  The trade or business of
an agent does not transfer to the principal.  For example, a real
estate broker is an agent for an individual looking to sell his
home, but the homeowner is not therefore engaged in the broker's
trade or business by fact of their relationship.  *See, e.g.*,
*Reynolds* v. *Comm'r*, 1945 WL 7104 (T.C. 1945) ("We do not agree
that the owner of property placed with an agent for sale is
thereby engaged in the same business as the agent.").  Thus, the
Appeals Board's misapplication of agency law in its "trade or
business" analysis is unpersuasive, in error, and not entitled to
deference.

More fundamentally, there is no basis for the Appeals
Board's interpretation of *Higgins* and *Whipple* as limited to
individuals and not partnerships.  In fact, courts have cited to
*Higgins* and *Whipple* in determining that a partnership was not
engaged in a "trade or business" when it invested research

17

<u>Add. Pg. 19</u>

funding into a startup.  *See, e.g.*, *LDL Research & Dev. II, Ltd.*
v. *Comm'r*, 124 F.3d 1338, 1344 (10th Cir. 1997) (reiterating that
"[m]anaging investments, no matter how time-consuming or
lucrative, does not constitute a trade or business.").  The IRS's
own Technical Advice Memoranda on the subject notes, in a
hypothetical involving limited partners in a partnership and
citing *Higgins* and *Whipple*, that

> [e]xpenses incurred by a limited partner are more like
> expenses incurred by a shareholder because both a
> limited partner and a shareholder are merely investing,
> rather than participating, in a trade or business.  A
> limited partner's investment in a partnership is really
> no different than holding corporate stock in that a
> certain cash flow or return is expected from the
> efforts of others.

I.R.S. Technical Advice Mem. 9728002, 1997 WL 381972 (July 11,
1997).

Thus, the Appeals Board's decision appears in direct
conflict with the governing Supreme Court precedent, not to
mention Tax Code interpretations it is bound to follow.  *See*
*Higgins*, 312 U.S. at 218; *Whipple*, 373 U.S. at 202; *cf. Rodriguez*
*de Quijas* v. *Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)
(cautioning that decision makers "should follow the case which
directly controls, leaving to [the Supreme] Court the prerogative
of overruling its own decisions").

Moreover, the Appeals Board's analysis under *Groetzinger* is
incorrect as a matter of law.  So long as *Higgins* is still good
law, continuity and regularity cannot be shown by the mere size

18

of the investment or its profitability. *See Higgins*, 312 U.S. at 218 ("The petitioner merely kept records and collected interest and dividends from his securities, through managerial attention for his investments. No matter how large the estate or how continuous or extended the work required may be, such facts are not sufficient as a matter of law" to make his activities a trade or business).

In short, I decline to give any deference to the 2007 PBGC Appeals Board opinion because I do not find it persuasive.

*3.   Application of Governing Law to the Sun Funds*

Undistracted by an errant agency decision, I turn now to consideration of whether the Sun Funds were engaged in a "trade or business" under governing law.

The parties do not dispute that under the first prong of *Goetzinger*'s two-part test, the primary purpose of the Sun Funds is to make a profit. Consequently, whether the Sun Funds were engaged in a "trade or business" turns on whether the Sun Funds were engaged in activity with "continuity or regularity." It is, however, well settled that merely holding passive investment interests is not sufficiently continuous or regular to constitute a "trade or business." *See, e.g.*, *Cent. States, Se. & Sw. Areas Pension Fund*, 238 F.3d at 895-96 ("[P]ossession of a property, be it stocks, commodities, leases, or something else, without more is the hallmark of an investment. Thus, mere ownership of a

19

property (as opposed to activities taken with regard to the property) cannot be considered in determining whether conduct is regular or continuous.").

The Sun Funds contend that their investments in Sun Scott Brass, LLC were one-time investments and that they served as passive pools of investing funds whose only income was capital gains and dividends. The Pension Fund challenges this characterization. First, the Pension Fund alleges that the Sun Funds played an active role in managing Scott Brass, Inc. after investing in it, taking over the "majority" of Scott Brass, Inc.'s board of director positions, injecting themselves into the daily operation of the corporation, and thereby engaging in Scott Brass, Inc.'s "trade or business." Second, the Pension Fund notes that the Sun Funds received reimbursements and other non-investment income, and therefore contend that they do not fit into the "trade or business" exception for purely passive investments. The Pension Fund argues that the Sun Funds' income, combined with the more active role in managing Scott Brass, Inc., qualify the Sun Funds as a "trade or business" for purposes of the statute.

Even taken in the light most favorable to the Pension Fund, the record establishes that the Sun Funds are not a "trade or business." The Sun Funds do not have any employees, own any office space, or make or sell any goods. They each made a single

20

investment in Sun Scott Brass, LLC.  The tax returns for each fund list only investment income in the form of dividends and capital gains.

Similarly, although Scott Brass, Inc. was required to give weekly updates and reports to employees of Sun Capital Advisors pursuant to consulting and management agreements, that does not mean that the Sun Funds themselves were actively managing the business or otherwise performing more than the type of management and oversight found not to be a "trade or business" in *Higgins* and *Whipple*.

That the Sun Funds elected members of the boards of directors of Scott Brass Holding Corp., and in turn Scott Brass, Inc., does not make them actively involved in the management of Scott Brass, Inc. because they performed those acts only as shareholders.  *Cf. Bell* v. *Comm'r*, 1998 WL 155448, at *10 (T.C. Apr. 6, 1998) ("A shareholder is not engaged in the trade or business in which the corporation is engaged unless the shareholder engages in such trade or business apart from affiliation with the corporations.").

Other examples offered by the Pension Fund to demonstrate alleged control and management by the Sun Funds are unavailing. Employees of Sun Capital Advisors, not of the Sun Funds (which has no employees), interviewed potential CFO candidates (though the CEO of Scott Brass, Inc. ultimately made the hiring decision)

21

and gave advice on budgets, union negotiations, and other matters within the scope of their management and consulting agreements.

The Pension Fund contends that the Sun Funds' income was not pure investment income because they received investment reimbursements directly, and their general partners collected additional non-investment fees.  This contention is insupportable.  First, the tax returns filed by the Sun Funds each show that the only income for each fund was from capital gains or dividends, the two types of investment income.  Second, and more fundamentally, investment reimbursements are not considered income at all.  *See, e.g.*, *Muegge* v. *Comm'r*, 2000 WL 1056473, at *4 (T.C. Aug. 2, 2000) ("A reimbursement is in the nature of a repayment of borrowed funds, which is not taxable.").

Finally, the management and consulting fees were paid through a contractual arrangement between the management companies of the general partners and Scott Brass Holding Corp., and did not involve the Sun Funds themselves.  That the general partner of each fund was receiving non-investment income does not mean that the Sun Fund itself was engaged in the full range of the general partner's activities.

It is of no moment that the Management Agreements were signed by the same person representing both parties in the transaction.  It is a basic principle of corporate law that officers holding dual posts can "wear different hats" when

working for each. *Cf., e.g., Yankee Gas Servs. Co.* v. *UGI Utils., Inc.*, 616 F. Supp. 2d 228, 265 (D. Conn. 2009) (noting "the presumption is that dual officers can and do wear different hats when working for the parent and when working for the subsidiary"). Though a theoretical shareholder might be able to claim a breach of fiduciary duty arising from such a transaction, such a dual role does not convert the Sun Funds' investment activities into a "trade or business" under the statute.

Because I find that neither of the Sun Funds is a "trade or business," I do not reach, nor do I decide, the issue of "common control."

C.  Partnership Liability

The Pension Fund makes the creative (although ultimately unpersuasive) argument that even if the plaintiff Sun Funds are not trades or businesses, they should nevertheless be jointly and severally liable as partners of Sun Scott Brass, LLC.[2] The Pension Fund argues that ERISA, MPPAA, and related federal tax regulations do not recognize limited liability companies and that Sun Scott Brass, LLC should be considered an unincorporated organization, therefore, by default, a partnership whose liabilities extend to its partners: the plaintiff Sun Funds. *Cf.*

---

[2] Because I find, as a threshold matter, that the Sun Funds cannot be held liable for the debts of Sun Scott Brass, LLC, I do not reach or decide the question whether Sun Scott Brass, LLC can be held liable for the withdrawal liability incurred by Scott Brass, Inc.

23

<u>Add. Pg. 25</u>

*Pension Benefit Guar. Corp.* v. *East Dayton Tool & Die Co.*, 14 F.3d 1122, 1227 (6th Cir. 1994) ("ERISA provide[s] joint and several liability for partners where partnership debts exist.")

This argument requires some interpretive gymnastics and doesn't quite stick upon its landing. ERISA requires that the regulations governing the ambit of the phrase "trades or businesses . . . under common control" be "consistent and coextensive with regulations" of the Tax Code. 29 U.S.C. § 1301(b). However, the Tax code does not define, nor does it recognize, so-called hybrid entities such as limited liability companies and limited liability partnerships. *See generally* 26 U.S.C. § 7701; *see also Littriello* v. *United States*, 484 F.3d 372, 376 (6th Cir. 2007), *cert. denied*, 128 S. Ct. 1290 (2008)("[T]he hybrid entities [limited liability companies and limited liability partnerships and the like] . . . still are not[] explicitly covered by the definitions set out in § 7701."). Instead, the IRS, considers such an entity an unincorporated organization and affords it the option to "elect its classification for Federal tax purposes . . . as either an association (and thus a corporation . . .) or a partnership." 26 C.F.R. § 301.7701-3. Sun Scott Brass, LLC's limited liability agreement elects to "be treated as a partnership for federal income tax purposes . . . ."

24

From this, the Pension Fund reasons that Sun Scott Brass, LLC should be treated as a partnership, not only for purposes of the meaning of "trades or businesses . . . under common control" or the Federal tax law, but also for other purposes, such as imputing one partner's liability to another in spite of Sun Scott Brass, LLC's chosen corporate form.  This reasoning stands in direct conflict with the plain language of the regulations and the case law governing corporate liability.

The federal tax regulation that the Pension Fund relies on specifically limits its own application to "Federal tax purposes."  26 C.F.R. § 301.7701-3.  Likewise, the election in Sun Scott Brass, LLC's limited liability agreement to be treated as a partnership is expressly limited to "federal income tax purposes and, if applicable, state income or franchise tax purposes."  The Pension Fund cites no authority which might justify extending the federal tax law's understanding of corporate forms into the realm of imputed liability.  In fact, it is long-settled that state law, and not federal law, governs the bounds of corporate liability in the absence of a conflicting federal incorporation statute.  *Anderson* v. *Abbott*, 321 U.S. 349, 365 (1944) ("[L]imitation on the liability of stockholders of . . . corporations . . . [is] enforceable in federal courts under the rule of *Erie R. Co.* v. *Tompkins*."); *In re Aoki*, 323 B.R. 803, 811

25

(BAP 1st Cir. 2005) ("The existence and legal characteristics of a corporation are governed by state law.").

In the absence of supervening federal authority, Delaware state law, not federal law, governs, and as members of a limited liability company, the Sun Funds "shall not be obligated personally for any . . . debt, obligation or liability of the limited liability company solely by reason of being a member . . . ." 6 Del. C. § 18-303(a). Therefore, the plaintiff Sun Funds are not be responsible for withdrawal liability as partners of Sun Scott Brass, LLC, if indeed, Sun Scott Brass, LLC itself bears any responsibility for the withdrawal liability.

D.  Evade or Avoid Liability Analysis

Because the Sun Funds are not "trades or businesses" within the meaning of § 1301 and are not liable as partners of Sun Scott Brass, LLC, the Pension Fund's pursuit of withdrawal liability must stand or fall on its "evade or avoid" claim under § 1392(c). The MPPAA provides that "[i]f a principal purpose of any transaction is to evade or avoid liability under [the MPPAA], this part shall be applied and liability shall be determined and collected without regard to such transaction." 29 U.S.C. § 1392(c). Thus, if a party[3] can be shown to have (1) completed a

---

[3]  The parties disagree whether § 1392(c) is limited to employers, who must be a "trade or business," or if it may be applied more broadly. I am persuaded by the caselaw cited by the Pension Fund that § 1392(c) was not intended to be drawn as narrowly as the Sun Funds would have it. *See Bd. of Trs., Sheet*

26

transaction, (2) with the "principal purpose" of avoiding
withdrawal liabilities, a court can ignore that transaction in
determining the withdrawal liability owed.

Neither "transaction" nor "evade or avoid" are defined in
the statute.  Courts have, instead, interpreted them according to
their plain meaning in the context of the statutory purpose.
*See, e.g.*, *SUPERVALU, Inc*. v. *Bd. of Trs. of Sw. Pa. and W. Md.*
*Area Teamsters and Employers Pension Fund*, 500 F.3d 334, 340-41
(3d Cir. 2007).  The adjective "principal" means "most important,
consequential, or influential."  Webster's Third New Int'l
Dictionary 1802 (1986).  The noun "purpose" means "an object,
effect, or result aimed at, intended, or attained."  *Id.* at 1847.
The noun "transaction" means "an act, process, or instance of
transacting," and the verb "transact" means "to prosecute
negotiations" or "carry on business."  *Id.* at 2425.  The verb

---

*Metal Workers' Nat'l Pension Fund* v. *Illinois Range, Inc.*, 186
F.R.D. 498, 503 (N.D. Ill. 1999) ("Extending liability beyond
employers is consistent with Congress's intent as demonstrated by
the language Congress used in drafting the act.  When Congress
sought to limit liability to a narrow group of parties, it so
indicated in its choice of terms.  *See* 29 U.S.C. § 1381
(liability limited to 'employer').  However, Congress' choice of
terms was not so narrow in the jurisdictional section, thus
suggesting that Congress intended ERISA liability to be imposed
on a broader group than just employers.  *See* 29 U.S.C. § 1451
(liability may be imposed on 'any party').")*; IUE AFL-CIO Pension*
*Fund* v. *Herrmann*, 9 F.3d 1049, 1056 (2d Cir. 1993) ("Reading
sections 1451(a)(1) and 1392(c) together, if a pension fund . . .
is adversely affected by the acts of *any party* who has attempted
to 'evade or avoid liability' under the MPPAA . . . then the
MPPAA shall be applied 'without regard to such transaction.'")
(emphasis added).

27

"evade" means "to manage to avoid the performance of (an obligation)" or "to get around (an intellectual obstacle)." *Id.* at 786. The verb "avoid" means "to keep away from" or "to prevent the occurrence or effectiveness of." *Id.* at 151. Thus, under the plain meaning of the text, a person or entity violates § 1392(c) when it carries out a business transaction whose most important goal is getting around or preventing withdrawal liability.

The transaction at issue is the decision by the Sun Funds to invest in Sun Scott Brass, LLC in a 70%/30% ratio. The Pension Fund argues that the Sun Funds' "principal purpose" in dividing the ownership of Scott Brass, Inc. in this manner was to "evade or avoid" its withdrawal liability, which only attaches to entities with a greater than 80% interest in the employer who accrued the withdrawal liability. *See* 29 U.S.C. § 1301(b)(1) ("[T]rades or businesses . . . under common control shall be treated as . . . a single employer."); 26 C.F.R. § 414(b)(1) (common control may be satisfied by a chain of organizations connected through ownership of a controlling interest); 26 C.F.R. § 414(b)(2) (a controlling interest requires ownership of either stock or profit and capital interest totaling 80%). Therefore, the Pension Fund requests that this court ignore the Sun Funds'

70%/30% investment split and aggregate the two funds' ownership
into one 100% ownership piece, attributable to Sun Fund IV.[4]

The Sun Funds argue that their purpose in dividing their
ownership of Scott Brass, Inc. was threefold:  (1) Fund III was
nearing the end of its shelf-life[5] and could afford to invest
30%; (2) splitting the investment between multiple funds
decreased the risk to each fund; and (3) on advice from their
attorney, the Sun Funds could minimize their exposure to
potential future withdrawal liability by keeping any one Fund's
ownership below 80%.  The Sun Funds dispute that their "primary
purpose" was to avoid withdrawal liability, but concede that they
did consider the potential to lessen their exposure to liability
in determining the percentage split of the Sun Funds' investment
in Scott Brass, Inc.

On the one hand, the Sun Funds point to numerous facts in
the record that suggest that the "primary purpose" of their
investment was not to avoid withdrawal liability.  For example,
as profit-seeking investment businesses it would not be in the
interest of the Sun Funds to invest in companies they thought

_____

[4]  Sun Fund IV was the larger of the two investment funds, and
concedes that it had sufficient funds to obtain 100% of the
membership interest in Sun Scott Brass, LLC at the time of the
investment.

[5]  Each fund took limited partner investments for a period of six
years, before closing to additional investments for operation
over an additional four years.

were going to fail and in doing so potentially subject themselves to withdrawal liability.  Likewise, Scott Brass, Inc. continued to pay into the Pension Fund for approximately two years after the Sun Funds invested in it and up until bankruptcy, supporting the Sun Funds' contention that they did not divide their interest in Sun Scott Brass, LLC primarily to "evade or avoid" withdrawal liability.  *Cf. Dorn's Transp., Inc.* v. *Teamsters Pension Trust Fund of Philadelphia*, 787 F.2d 897, 902 (3d Cir. 1986) ("[W]hen the seller enters a transaction to escape liability, but the buyer had no intention of taking subsequent actions that will reduce the payments owing to the Plan, it does not appear that a 'principal purpose of the transaction' as a whole is to escape liability.").  The other considerations to which the Sun Funds point — the investing shelf life of Sun Fund III and risk-spreading by diversifying assets — are also valid alternative explanations for the decision to split the Sun Funds' investment 70%/30%.

On the other hand, the Sun Funds do not deny that they considered legal advice that they could minimize their chances of facing withdrawal liability in the future if they limited their investments to less than the 80% threshold.  The Pension Fund points to deposition testimony and an email that a jury could read to support the notion that the "principal purpose" of the 70%/30% split was to "evade or avoid" withdrawal liability.  One

30

<u>Add. Pg. 32</u>

of the limited partners of Sun Fund IV's general partner and an
employee of Sun Capital Advisors, Inc., described the investment
ratio of Sun Fund IV and Sun Fund III as follows: "Fund IV;[sic]
$2.1mm.  Fund III: $0.9mm.  Total investment: $3mm (on the nose).
*Did this due to unfunded pension liability*." (emphasis added).

    With a wooden reading of the statute, this might be the end
of the summary judgment practice, because the email alone could
be considered sufficient to create a genuine issue of material
fact for trial.  However, some significant problems are presented
by the Pension Fund's theory of liability under 29 U.S.C. §
1392(c).

    Most fundamentally, it is not clear that Congress intended
29 U.S.C. § 1392(c) to apply in this situation at all.
Statements from the legislative history suggest that the focus of
the statute was on "essentially fraudulent maneuvers lacking in
economic substance" by employer-sellers, and not by outside
investors:

> We intend that employers not be able to evade or avoid
> withdrawal liability through changes in identity, form,
> or control, or through transactions which are less than
> bona fide and arm's length.  Hence, for example, a
> building and construction industry employer—or for that
> matter any employer contributing to a plan—will not be
> able to evade withdrawal liability by going out of
> business and resuming business under a different
> identity.

*Cuyamaca Meats, Inc.* v. *San Diego & Imperial Counties Butchers' &
Food Employers' Pension Trust Fund*, 827 F.2d 491, 499 (9th Cir.

31

1987) (quoting 126 Cong. Reg. 23038 (1980) (statement of Rep. Frank Thompson)).

The example given by Representative Thompson of an employer going out of business then resuming business under a new name evidences a concern about evasion by sellers, not forward-looking financial planning by investors like the Sun Funds. If the purpose of ERISA is to ensure that employees will get their pensions, and the purpose of the MPPAA was to change the inclination of employers to withdraw from pension funds, then it is logical for the focus of § 1392(c) likewise to focus on the employer-seller, not an outside investor. This is why the Eighth Circuit has said that the congressional purpose behind ERISA is not implicated when a pension fund seeks to pierce the corporate veil to collect unpaid contributions. *See Greater Kansas City Laborers Pension Fund,* 104 F.3d at 1055 ("Although the underlying congressional policy behind ERISA favors the disregard of the corporate entity in situations where employees are denied their pension benefits, such policy interests are not implicated in the present case, which does not involve an individual pensioner's claim for benefits; rather, it involves a pension fund's attempt to collect unpaid contributions.").

The idea that § 1392(c) is narrower than the Pension Fund alleges is also supported by the language of the statute itself. If the Pension Fund is correct that the statute was meant to

apply to investors like the Sun Funds, then the language of the
statute does not provide a meaningful remedy.  The sole remedy of
29 U.S.C. § 1392(c) directs a court to ignore the transaction in
determining liability.  *See* 29 U.S.C. § 1392(c) ("[L]iability
shall be determined and collected without regard to such
transaction.").  However, in a case like the one before me, where
the employer-seller has gone bankrupt, if I were to ignore the
investor-buyers' transaction, the investment in the first
instance, the Pension Fund would be left with nothing because the
plain terms of § 1392(c) sever any connection between the
insolvent employer and the buyer.  Clearly, such a result would
conflict with Congress' stated goals of ensuring that promised
pension plans would be financially solvent and available to
private sector employees who have earned them.

To be sure, with some imaginative intervention, a court
might undertake to reach back and rearrange the investors'
proportionate underlying shares in order to create a circumstance
in which one of the Sun Funds is deemed to have an 80% interest
and thereby make that Sun Fund statutorily liable.  But that
intervention would require a disregard of business organization
formalities in the absence of some recognized grounds for doing
so.

The language of the statute further suggests that it is
aimed at sellers, not investors, by its use of the terms "evade

33

or avoid" in the present tense.  It would be unlikely for an investor purchasing a business to be doing so with the intent at the time of investment that the business fail, or with knowledge that such failure was imminent.  Thus, at the time of purchasing the business, all that likely can be said about the investor's intentions with regard to withdrawal liability is that the buyer hopes to minimize its chances of someday being liable for them. But the employer-seller, unlike the buyer, is in a position actively to evade or avoid liability at the time of the transaction.  As a practical matter, the employer-seller was plainly the object of Congress' scrutiny when passing § 1392(c). *Cf. Dorn's Transp., Inc.*, 787 F.2d at 902 ("[W]hen the seller enters a transaction to escape liability, but the buyer had no intention of taking subsequent actions that will reduce the payments owing to the Plan, it does not appear that a 'principal purpose of the transaction' as a whole is to escape liability.").

Perhaps these concerns explain the dearth of caselaw on point.  I have been unable to find any case that reads the statute to achieve what the Pension Fund requests here.  The only case the Pension Fund cites, *SUPERVALU, Inc.*, is not on point. 500 F.3d at 334-37.  There, SUPERVALU was a contributing employer to a multiemployer pension plan.  The collective bargaining agreement that SUPERVALU had with the Teamsters required SUPERVALU to contribute to the pension plan through January 31,

2003.  At the beginning of 2002, SUPERVALU decided to close a
facility covered by the collective bargaining agreement, an
action that would trigger withdrawal liability under ERISA.  *Id.*
at 337.  SUPERVALU negotiated with the Union, and the parties
agreed to substitute a new collective bargaining agreement for
the existing one and effectuate SUPERVALU's withdrawal from the
pension fund prior to the end of the pension plan's 2001-2002
year so that SUPERVALU would not incur withdrawal liability for
the 2002-2003 year.  *Id.* at 337-338.  As consideration for the
new agreement, SUPERVALU made additional payments directly to
employees.  *Id.* at 338.

In a later arbitration, the arbitrator found that the
"principal purpose" of this transaction was to "evade or avoid"
withdrawal liability in violation of 29 U.S.C. § 1392(c).  *Id.* at
339.  The Third Circuit affirmed the arbitrator's decision,
finding that "the only reason that SUPERVALU chose to renegotiate
the collective bargaining agreements less than a month before the
facility closed was to bring its withdrawal date within the
2001-2002 plan year in order to avoid withdrawal liability for
the 2002-2003 plan year. . . . Therefore, SUPERVALU acted with a
principal purpose of escaping withdrawal liability in violation
of § [1392(c)]."  *Id.* at 341-42.

This case is distinguishable from *SUPERVALU, Inc.*  In that
case, the sole purpose of the new collective bargaining agreement

35

was to avoid withdrawal liability.  The illicit transaction took place when withdrawal was pre-determined, and the parties were negotiating with the knowledge and anticipation that withdrawal would occur.  Here, however, the allegedly illicit transaction took place in a very different context.  The Sun Funds decided to split their investments in Sun Scott Brass, LLC, 70%/30% at the beginning of their investment in the company, two years before it went bankrupt, with the hope that the company would have future success and return a profit on their investment.  While the record does contain evidence that the Sun Funds considered potential withdrawal liability when structuring their initial investments, that consideration was not a principal purpose of the investment in any way approximating the transaction in *SUPERVALU Inc.*  Here, there was no expectation of withdrawal, only the ever present future risk of it.  Thus, the decision to invest less-than-controlling proportions (that is, less than 80% ownership by any one entity) was aimed not at avoiding or evading a known or impending withdrawal liability, but rather at minimizing the risk of an uncertain, unplanned future withdrawal, among other considerations.

A transaction that "evades or avoids" withdrawal liability when withdrawal is a pre-determined certainty is readily distinguishable from a transaction that reduces a prospective, uncertain future risk of withdrawal liability.  If it were

36

otherwise, nearly any decision whether or not to invest, and in what proportions, could be construed as a transaction to "evade or avoid" withdrawal liability.  Congress could not have intended an interpretation with such broad-sweeping results, because one of its primary concerns with ERISA and the MPPAA was to ensure the financial stability of pension plans, and, correspondingly, provide incentives to investment.  If an investor has a large capital supply, but decides to obtain less than an 80% share in a company, a court, without explicit legislative direction, should not construe that decision as primarily intended to "evade or avoid" withdrawal liability.  If it did so, investors would be disincentivized from providing capital for companies subject to multiemployer pension plan obligations out of concern that they will be subject to an indeterminate amount of withdrawal liability at an indeterminate future time.  This result clearly conflicts with the congressional purpose of ensuring financially sound multiemployer pension plans.  *Cf.* 29 U.S.C. § 1001a (MPPAA congressional policy statement).  If Congress chooses to realign incentives in this area in such a counterintuitive fashion, it must do so with a clarity that the current statute does not provide.

Both the plain meaning of the statute and the policies underlying it counsel that 29 U.S.C. § 1392(c) was not meant to apply to the situation in this case.  Consequently, I have

granted the Sun Funds' motion for summary judgment finding that they did not attempt to "evade or avoid" liability in violation of 29 U.S.C. § 1392(c).

### IV.  CONCLUSION

For the foregoing reasons, I have granted the Sun Funds' motion for summary judgment (Dkt. No. 76), and have denied the Pension Fund's cross-motion for summary judgment (Dkt. No. 82). The Clerk shall enter judgment for the Plaintiffs accordingly.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

Add. Pg. 40

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SUN CAPITAL PARTNERS III, LP, SUN )
CAPITAL PARTNERS III QP, LP, and )
SUN CAPITAL PARTNERS IV, LP, )
                                  )
        Plaintiffs/              )
        Counter-Defendants,      )    CIVIL ACTION NO.
                                  )    10-10921-DPW
v.                                )
                                  )
NEW ENGLAND TEAMSTERS AND         )
TRUCKING INDUSTRY PENSION FUND,   )
                                  )
        Defendant/               )
        Counter-Plaintiff.       )
                                  )

**<u>JUDGMENT</u>**

WOODLOCK, District Judge

    In accordance with this Court's Memorandum and Order dated October 18, 2012, granting the Sun Funds' motion for summary judgment (Dkt. No. 76), for the reasons stated therein, it is hereby ORDERED, ADJUDGED AND DECREED:

    **Judgment for the Plaintiffs against the Defendant.**

BY THE COURT,

/s/ Jarrett Lovett
Deputy Clerk

DATED: October 18, 2012

<u>Add. Pg. 41</u>

**PBGC**
Protecting America's Pensions

**Pension Benefit Guaranty Corporation**
1200 K Street, N.W., Washington, D.C. 20005-4026

September 26, 2007

Subject:    Company "A" ███████████████████
            Pension Plan

            Date of Plan Termination: ████████████
            Date of Trusteeship: ████████████

Dear

## I. INTRODUCTION

By letter dated December 9, 2005, the Pension Benefit Guaranty Corporation ("PBGC") determined that: (1) Company "B" (the "Fund") had a parent-subsidiary controlled group relationship with Company "C" ███████████████ sponsor of the "A" ██(the "Plan"), as of the Plan's termination date of ██████████ ("DOPT"); (2) the Fund owns or has an 80% controlling interest in Company "D" Company "E" , Company "F" ████████████████ and ████████ Company "G" ██████████(the "Other Companies") as of DOPT; and (3) "C" ████████████ was a member of brother-sister controlled group with the Other Companies. Accordingly, PBGC determined that: (1) the Fund, as well as the Other Companies, were members of a controlled group pursuant to 29 U.S.C. § 1301 (a)(14); (2) those entities are jointly and severally liable to PBGC under 29 U. S. C. § 1362(b)(1) for the unfunded benefit liabilities of the Plan; and (3) the amount of the liability was $3,234,699.00 as of DOPT, plus interest in the amount of $772,987.00 for the period between November 30, 2001 and December 9, 2005.[1]

---

[1] PBGC's regulation at 29 Code of Federal Regulations ("C.F.R.") § 4062.7, which incorporates by reference section 6601 of the Internal Revenue Code, establishes the applicable interest rate.

-2-

On June 7, 2006, you filed a timely appeal of PBGC's determination letter on behalf of your client, [Company "H"] [ ], the Fund's management company.[2] For the reasons stated in this decision, the Appeals Board has denied your appeal with regard to the Fund's liability for the unfunded benefit liabilities of the Plan. Accordingly, the Appeals Board has sustained PBGC's determination that, under ERISA: (1) the Fund was under common control with [ "C" ] as of DOPT; (2) the Fund and [ "C" ] are jointly and severally liable to the PBGC for the liability imposed by Section 4062 of ERISA, 29 U.S.C. § 1362, with respect to the Plan; and (3) the liability is for the above-stated amount, plus additional interest that has accrued since December 9, 2005. With respect to PBGC's determination that the Other Companies also are jointly and severally liable under Section 4062 of ERISA, the Board granted your appeal.

## II. BACKGROUND

## A. Facts

[ "C" ]

[ "C" ] a Delaware corporation, was the Plan's sponsor. Originally established in [ ], [ "C" ] manufactured [ ] In [ ] [ "C" ] established the Plan to provide retirement benefits for certain of its employees.[3]

Prior to [ ] [ "C" ] stock was publicly traded. On [ ] [Company "I"] (which is unrelated to [ "H" ] or the Fund) purchased all outstanding shares of [ "C" ] stock, pursuant to an acquisition proposal by [ ]. [Company "J"] [ "I" ], which was 100% owned by [Company "L" ], was merged into [ "C" ] upon completion of the sale.

On [ ] [Company "M"] consummated the acquisition of [ "L" ] [ "C" ] [ ] Form 10-K filing with the Securities and Exchange Commission ("SEC") provides the following information concerning this acquisition:[4]

[Company "M"] a corporation formed by [ "B" ] [ ] (together with its

---

[2] The Appeals Board had previously granted you, pursuant to 29 C.F.R. § 4003.4, an extension of time until June 8, 2006 to file your appeal.

[3] The Plan, which initially was called the Pension Plan for Employees of [ "C" ] changed its name effective [ ].

[4] Selected pages of this Form 10-K filing with the SEC are enclosed.

-3-

affiliates, ⬛ "H" ⬛ , was organized as a holding company to effect the acquisition of all of the outstanding common stock of ⬛ "L" ⬛ . . . . The purchase price, including transaction fees and expenses, of approximately $175.2 million was financed with a $25 million capital contribution from ⬛ "H" ⬛ (including rollover ownership interests of certain members of management), approximately $15 million in proceeds from ⬛ "M" ⬛ issuance of $29.25 million of 13 3/4% Senior Discount Debentures, issuance of $100 million of 10 5/8% Senior Subordinated Notes of ⬛ "C" ⬛ and borrowings of $33.6 million under a bank credit facility . . . of ⬛ "C" ⬛.

### *The Fund*

The Fund, a limited partnership, was established under Delaware law by its general partner, ⬛ Company "N" ⬛ and independent institutional investors. The Fund's establishment is documented by the October 7, 1994 "Agreement of Limited Partnership of ⬛ "B" ⬛ ("Partnership Agreement"), which was executed by ⬛ "N" ⬛ and the Fund's limited partners through their representatives.

Section 6.1(b) of the Partnership Agreement delegated "full control" over the business and affairs of the partnership" to ⬛ "N" ⬛ ⬛ "N" ⬛ has a 1% capital interest and 20% carried interest in all profits realized by the Fund. In addition to ⬛ "N" ⬛ the Fund has 32 limited partners.

The Partnership Agreement describes the Fund's purpose as follows:

> The Partnership is organized for the principal purposes of (i) creating and realizing long-term capital gains primarily from investments in United States industrial businesses, including without limitation, the general buying, selling, holding, and otherwise investing in securities of every kind and nature . . ., (ii) exercising all rights, powers, privileges, and other incidents of ownership or possession with respect to investments held or owned by the Partnership, (iii) entering into, making, and performing all contracts and other undertakings with respect to such investments, (iv) managing and supervising such investments and (v) engaging in such other activities incidental or ancillary thereto as the General Partner deems necessary, advisable or desirable.[5]

---

[5] Partnership Agreement, Sec. 1.3.

-4-

███████████████ █**N**█ hired █**H**█ ████████ to manage the Fund's investments.  As your appeal stated, █**H**█ is a "private equity investment firm" that is in the business of forming and providing services to investment partnerships, or "funds," to which groups of institutional investors make commitments.[6]  As an advisor to those funds, █**H**█ sources investment opportunities, negotiates and consummates the investments, monitors and oversees the investments, and ultimately . . . negotiates the sales of the investments for profit (or losses, as in the case of the Company)."[7]

### *Bankruptcy Filing and the Plan's Termination*

On ████████ █**C**█████ filed for Chapter 11 bankruptcy in Delaware.  Subsequently, all assets of █**C**█ were sold in two separate transactions that closed on ████████ ████████[8] ████████████ also was the date when █**C**█ ceased business operations and terminated all of its employees.  Although the purchasers of █**C**█████ assets hired a substantial number of its former employees, they did not assume the liabilities associated with the Plan.

On ████████ PBGC issued a Notice of Determination that the Plan should be terminated pursuant to 29 U.S.C. § 1342(a)(1) and (2).  Subsequently, PBGC and █**C**█████ (as Plan Administrator) entered into an agreement that terminated the Plan, appointed PBGC as trustee, and established ████████ as the DOPT under 29 U.S.C. § 1348.  As a result of this agreement, which took effect on ████████ PBGC became trustee of the Plan.

**B. █**H**█ Appeal**

In your June 7, 2006 appeal, you asserted that the following grounds exist for changing PBGC's determination:

---

[6]  Appeal, p. 6.

[7]  *Id.*  Additionally, your appeal stated at page 6 that the "profits and losses of each fund are shared by the limited partner investors and a general partner entity affiliated with █**H**█ ██  Your appeal did not explain, however, how █**H**█ and █**N**█ are affiliated.

[8]  On ████████ the Fund deducted ████████ of capital losses on its ████ U.S. Return of Partnership Income (Form 1065), Schedule D, for its investment in █**C**█████  Your appeal further states that: (1) the net proceeds from the asset sale were not sufficient to pay the claims of the Company's secured creditors in full; (2) with the sale of the Company's assets, the Fund lost all of its ████████████ and (3) the holders of █**C**█ and █**M**█████ unsecured subordinated debt also lost their entire investment.

<u>Add. Pg. 45</u>

-5-

- The Fund is not conducting a "trade or business" and therefore cannot be in `"C"` controlled group;

- PBGC incorrectly determined that the Fund and the Other Companies are in `"C"` Controlled Group;

- PBGC erred in its determination that the Fund and any of the Other Companies are liable for the Termination Payment.

You also argued the following:

A controlled group determination in the instant case would be directly contrary to long-standing legal precedent. ...the Fund cannot be a member of a parent-subsidiary controlled group of trades or businesses under ERISA because the Fund is not conducting a "trade or business." The Fund is a passive investment vehicle that has no employees, no involvement in the day-to-day operations of its portfolio investments and no income other than passive investment income such as dividends, interest and capital gains. The Fund cannot be a trade or business because, as the Supreme Court has clearly held, "investing is not a trade or business."

. . . There is no legal basis on which the PBGC could sustain an argument that it is entitled to deference in broadly interpreting and applying its regulations. ERISA commits interpretive authority here to the Treasury Department, not to the PBGC, and the Treasury Department's actions represent a deliberate decision by that agency to leave in place the Supreme Court's long-standing definition of the phrase "trade or business" - a definition that has been ratified by Congress. If the PBGC determines that it is desirable to expand the controlled group rules to include private equity funds (such as the Fund) and their portfolio investments (such as the Other Companies), it should do so prospectively and openly by seeking a legislative change or (if it believes it has the authority to do so) by issuing new regulations after the required notice and comment period.[9]

### III. DISCUSSION

#### A. Controlled Group Liability

ERISA § 4062(a) [29 U.S.C. § 1362(a)] provides that liability for an underfunded single-employer pension plan upon its termination

---

[9] Appeal pp. 2-3.

-6-

is incurred by any "person" who is, on the termination date, a contributing sponsor of the pension plan or a member of the sponsor's controlled group. That section further states that the liability of all such persons is "joint and several." A "controlled group" means, with respect to any person, "a group consisting of such person and all other persons under common control with such person."[10] ERISA § 4001(b)(1) [29 U.S.C. § 1301(b)(1)] provides that "all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer."

To impose termination liability on an organization other than the one originally obligated, two conditions must be met: (1) the organization must be under "common control" with the obligated organization and (2) the organization must be a "trade or business."[11]

You contend that PBGC lacks the authority to interpret 29 U.S.C § 1301(a)(14)(B) relating to controlled group determinations because "Congress . . . granted interpretive authority over . . . [29 U.S.C. § 1301(a)(14)(B)] to the Treasury Department." We disagree. ERISA § 4001(a)(14)(B) [29 U.S.C. § 1301(a)(14)(B)] states that "the determination of whether two or more persons are under 'common control' shall be made under regulations of [PBGC] which are consistent and coextensive with regulations prescribed by the Secretary of the Treasury under subsections (b) and (c) of . . . [IRC] 414". Thus, the only restriction ERISA imposes on PBGC's authority to interpret 29 U.S.C. § 1301(a)(14)(B) is that its regulations must be consistent and coextensive with the applicable regulations issued under Internal Revenue Code ("IRC") section 414.[12] Accordingly, PBGC does have interpretive authority with respect to 29 U.S.C. § 1301(a)(14)(B). *See* 29 U.S.C. § 1302(b), which establishes the powers of PBGC to administer Title IV of ERISA, and, in particular, 29 U.S.C. § 1302(b)(3), which authorizes PBGC to issue regulations to carry out the purposes of Title IV.

You also assert that PBGC "lacks authority to adjudicate this case under ERISA in any fashion contrary to the judicial definition of" trade or business in the federal income tax context. You state that this definition excludes investment activities.

Again, we disagree. As several courts have noted, interpretations under the IRC are not determinative of whether an entity is a trade or

---

[10] *See* 29 U.S.C. § 1301(a)(14)(A); 29 C.F.R. § 4001.2 (definition of "controlled group").

[11] 29 U.S.C. § 1301(a)(14)(B); Treas. Reg. § 1.414(c)-2(a).

[12] *See* 29 C.F.R. § 4001.3(a)(1).

-7-

business under ERISA.[13] Moreover, in this case, PBGC's determination does not involve an interpretation of "trade or business" that differs from the "judicial definition" in the tax context.    As detailed below, PBGC's determination is consistent with the "trade or business" test articulated in *Commissioner v. Groetzinger*,[14] a tax court case, as well as with judicial decisions that have applied the *Groetzinger* test in determining liability under ERISA.[15]

## B.    Common Control

ERISA § 4001(a)(14)(A),(B) [29 U.S.C. § 1301(a)(14)(A),(B)] provides that a "controlled group" consists of two or more "persons" under common control.[16]  ERISA § 4001(b)(1) [29 U.S.C. § 1301(b)(1)] states that "all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer."  The above-cited ERISA provisions also state that the determination of whether two or more "persons" are under common control shall be "consistent and coextensive" with regulations under sections 414(b) and 414(c) of the Internal Revenue Code.[17]

The applicable regulation for determining "common control" is Treasury Reg. § 1.414(c)-2.  Treas. Reg. § 1.414(c)-2 defines "common control" as one or more chains of organizations: (1) "connected through ownership of a controlling interest[18] with a common parent organization . . . where the common parent organization owns a controlling interest in each of the organizations" (i.e., a parent-subsidiary relationship) or (2) where "the same five or fewer persons who are individuals, estates, or trusts own a controlling interest in each organization . . . [and] such

---

[13] *PBGC v. Center City Motors*, 609 F. Supp. 409, 411 (S.D. Cal. 1984) (citing *United Steelworkers of America, etc. Local 4805 v. Harris & Sons Steel Co.*, 706 F.2d 1289, 1299 (3rd Cir. 1983)).

[14] 480 U.S. 23 (1987).

[15] *See, e.g., Central States, Southeast & Southwest Pension Fund v. Personnel, Inc.*, 974 F.2d 789, 794 (7th Cir. 1992) ("*Personnel*") (stating that "[a]lthough the Groetzinger court considered a provision of the tax code, we find its definition helpful in . . . [determining whether an activity is a] trade or business").

[16] *See also* 29 C.F.R. § 4001.3 (PBGC regulation defining "trade or business under common control" and "controlled group").

[17] IRC § 414(b) defines "Employees of Controlled Group of Corporations" and IRC § 414(c) "Employees of Partnerships, Proprietorships, etc., Which Are Under Common Control."  *See also* 29 C.F.R. § 4001.3 (PBGC regulation).

[18] In the case of a partnership, "controlling interest" is ownership of at least 80 percent of the voting shares of and 80 percent of the profits, interest, or capital interest of a partnership.  Treas. Reg. § 1.414(c)-2(b)(2).

-8-

ownership is identical with respect to each such organization, such persons are in effective control[19] of each organization" (i.e., a brother-sister relationship).

Your appeal does not dispute PBGC's determination that a parent-subsidiary relationship exists between the Fund and `▪c▪` based on the Fund's 96.3% stock interest in `▪M▪` (parent to `▪c▪`, but you contend that the Fund cannot be a member of `▪c▪` controlled group because it is not a trade or business. You also contend, based upon factual and legal grounds, that no brother-sister controlled group exists between the Fund and the Other Companies.

Without analyzing the legal arguments you made, the Appeals Board determined the records in PBGC's possession are insufficient to establish that a brother-sister controlled group relationship existed between `▪c▪` and any of the Other Companies. Thus, we granted your appeal with respect to the liability of the Other Companies. However, as detailed below, the Appeals Board found that the Fund is a member of `▪c▪` controlled group.

## C. Trade or Business

Under ERISA § 4001(b)(1) [(29 U.S.C. § 1301(b)(1)], "all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer." Congress's intent for enacting 29 U.S.C. § 1301(b)(1) was to prevent employers from avoiding liability "by fractionalizing their business operations."[20]

While you acknowledge that a parent-subsidiary relationship exists between the Fund and `▪c▪` you assert that the Fund is not an employer under ERISA § 4001(b)(1) [29 U.S.C. § 1301(b)(1)] because the Fund is not conducting a trade or business. You also assert that the "Fund is a passive investment vehicle that has no employees, no involvement in the day-to-day operations of its investments and no income other than passive investment income such as dividends, interest and capital gains." We address these assertions below.

---

[19] "Effective control" is demonstrated by ownership of at least 50 percent of the combined voting power of all the voting stock of a corporation and by ownership of at least 50 percent of the profits, interest, or capital interest of a partnership.  Treas. Reg. § 1.414(c)-2(c)(2).

[20] *PBGC v. Don's Trucking Co.,* 309 F.Supp. 2d 827, 831 n.7 (E.D. Va. 2004), *aff'd, PBGC v. Beverly,* 404 F.3d 243 (4th Cir. 2005). *See also Personnel,* 974 F.2d at 794; *PBGC v. Ctr. City Motors, Inc.,* 609 F.Supp. 409, 411 (S.D. Cal. 1984).

-9-

*The Fund's Relationship with* ▪N▪

In analyzing whether or not the Fund is a "trade or business," the Appeals Board concluded that it is appropriate to consider the duties and responsibilities delegated to and assumed by ▪N▪ who is the designated "General Partner" under the Partnership Agreement. We further took into account that, as a matter of law, an agency relationship exists between the Fund and ▪N▪ Under the Delaware Revised Uniform Partnership Act ("DRUP Act"), "each partner is an agent of the partnership for the purpose of its business, purposes or activities."[21] DRUP Act § 17-403 provides that a general partner has the rights and powers to manage and control the business and affairs of the limited partnership" subject to the DRUP Act and the partnership agreement.[22]

As discussed above on page 3, the Partnership Agreement delegates "full control over the business and affairs of the partnership" to ▪N▪ [23] Thus, pursuant to the DRUP Act and the Partnership agreement, an agency relationship exists between the Fund and ▪N▪ [24]

In your appeal, you contend that ▪H▪ (i.e., the Fund's management company), not ▪N▪ (the general partner), was responsible for the day-to-day management of the Fund. However, according to the terms of the Partnership Agreement: "The appointment of a Management Agent shall not in any way relieve the General Partner of its responsibilities and authority vested pursuant to Section 6.1 or relieve the General Partner of any of its fiduciary duties to the Partnership and its Partners."[25] In addition, ▪N▪ in its Management Agreement with ▪H▪ reserved the right to make "all decisions, consents, and other determinations (including, without limitation, decisions, consents and other determinations relating to the acquisition and disposition of Fund investments, distributions by the Fund of cash and other securities and

_____

[21] 6 Del. C. § 15-301 (2007).

[22] 6 Del. C. § 17-403 (2007).

[23] *See* Partnership Agreement, Sec. 6.1.

[24] *See e.g.*, 6 Del. C. § 15-301 (2007); *Am. Title Ins. Co. v. E. W. Fin. Corp.*, 16 F.3d 449, 456 (1st Cir. 1994); *Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990); RESTATEMENT (SECOND) OF AGENCY § 1, 212 (2006).

[25] Partnership Agreement, Sec. 5.1. We note that Section 6.1 of the Partnership Agreement vested the General Partner with a wide range of powers, including "the power on behalf and in the name of the Partnership to carry out any and all of the objectives and purposes of the Partnership and to perform all acts and enter into and perform all contracts and other undertakings which the General Partner deems necessary or advisable or incidental thereto, including the power to acquire and dispose of any security (including marketable securities)."

-10-

amendments to the Fund Agreement)."[26]

Based on the terms of the Management Agreement and the Partnership Agreement, `"N"` hired `"H"` to assist in managing the Fund's investments but did not relinquish all management responsibilities. While these documents establish that `"N"` hired `"H"` to assist in providing investment and management services, it does not establish that such activities were only conducted by `"H"`. Thus, the Appeals Board concluded that `"N"` participated in the Fund's investment activities, and also received compensation (i.e., 20% of all net profits realized) in exchange for its services. Because `"N"` is the Fund's agent, all of `"N"` acts within the scope of such agency are attributable to the Fund.[27]

### Application of "Trade or Business Test" to the Fund

Although the term "trade or business" is not defined in ERISA, the IRC, or regulations issued by the Treasury Department, courts generally construe the term in accordance with the statute's purpose and use the test articulated in *Commissioner v. Groetzinger*, 480 U.S. 23 (1987), for purposes of distinguishing trades or businesses from purely personal activities or investments.[28]

The *Groetzinger* test has two prongs: (1) whether a taxpayer is engaged in an activity with "the primary purpose of income or profit" and (2) whether the act is conducted with "continuity and regularity".[29]

The first factor of the *Groetzinger* test is a subjective test that looks at the taxpayer's intent (i.e., whether the taxpayer entered into the activity with a profit motive). For purposes of determining the taxpayer's intent, courts evaluate a myriad of factors including the tax benefits obtained by the taxpayer and the circumstances surrounding the inception of the activity.[30]

The second factor is an objective test that looks at how much time the taxpayer typically engages in the activity. Although there is no bright-line test for the amount of time that a taxpayer must spend engaging in the activity, such activity must be conducted with regularity.[31]

---

[26] Management Agreement, Pg. 1.

[27] *See Id.*

[28] *See Personnel,* 974 F.2d at 794.

[29] *Groetzinger*, 480 U.S. at 35.

[30] *Id*. at 33-35.

[31] *Groetzinger*, 480 U.S. at 33-35.

You state in your appeal that "N" the general partner of the Fund, and various independent institutional investors created the Fund for "the principal purposes of . . . creating and realizing long-term capital gains from investments . . . including . . . the general buying, selling, holding, and otherwise investing in securities of every kind and nature."[32]

In addition, on the Fund's 1998 through 2002 U.S. Partnership Return of Income (Form 1065) that you provided with your appeal, the Fund reported that its principal business activity is "investment advisory" and its principal service is "investment services."[33] Furthermore, the Partnership Agreement provided that "N" could receive compensation in exchange for investment advisory and management services, including consulting fees, management fees, and carried interest (i.e., 20% of the net profits realized by the Fund).[34] Based on the Fund's tax returns and language in the Partnership Agreement, the Appeals Board concluded that the Fund meets the profit motive requirement described in *Groetzinger*.

Although the Fund engaged in investment activities, such activities must be conducted with regularity in order to meet the second prong of the *Groetzinger* test. While PBGC's records do not contain any documentation detailing how much time "N" devoted to managing the Fund's portfolio, based on the size of the Fund's portfolio (e.g., in [redacted] the Fund reported $469,549,711 in investments in other companies), the profits generated as a result of such investments (e.g., $207,203 in total investment income reported in [redacted], as well as the fees paid to "H" (e.g., $7,043,500 in management fees reported in [redacted], the Appeals Board concluded that "N" management of the Fund's investments was conducted with regularity and thus the Fund, through activities of its agent "N" meets the second prong of the *Groetzinger* test.[35]

You also assert in your appeal that the Fund is not engaged in a trade or business because "investment activities do not constitute a trade or business." Essentially, you argue that the Fund is a passive investor. You state that "[i]n the income tax context, it is universally accepted that passive investment activities do not constitute a trade or business," and you cite several cases, most

---

[32] *See* Partnership Agreement, Sec. 1.3; Appeal pg. 6.

[33] We note that one of the IRS's "Principal Business or Professional Activity Codes" for Partnerships is Code 523900, "Other Financial Investment Activities (including portfolio management & investment advice)." *See* 2006 Instructions for Schedule 1065, "U.S. Return of Partnership Income." The Fund's tax returns list "523900" as the "Business code number."

[34] *See* Partnership Agreement, Sec. 3.2(c)(iii).

[35] *See* [redacted] U.S. Return of Partnership Income (Form 1065).

-12-

notably *Higgins v. Commissioner*, 312 U.S. 212 (1941), *Whipple v. Commissioner*, 373 U.S. 193 (1963), and *Zink v. United States*, 929 F.2d 1015 (5th Cir. 1991). Although those cases do not generally characterize passive investment activities as a trade or business, such characterizations, when read in context with the facts of each case, refer to individuals managing their own personal investments rather than to partnerships, like the Fund, whose purpose is to acquire, hold, and sell securities and other investment interests in United States industrial businesses.

In *Higgins*, an individual taxpayer deducted expenses in connection with the management of his investments in stocks and bonds. The Court held that the taxpayer's investment activities did not constitute a trade or business because the taxpayer "merely kept records and collected interest and dividends from his securities."[36]

The Fund, unlike the taxpayer in *Higgins,* is not: (1) an individual acting on his own behalf; (2) merely keeping records and collecting dividends and interest from investments; and (3) solely receiving a return as an passive investor. Instead, the Fund is a "trade or business" because it regularly is involved in investment activities of a much more active nature than those in *Higgins.* This is reflected in the responsibilities of its agent, |•N• | who: (i) provides investment advisory and management services to others (i.e., its partners); (ii) hires a third-party (i.e., |•H•|) to assist in selecting and purchasing potential investments (e.g., the Other Companies) and in distributing the net profits and losses from these companies to itself and limited partners; and (iii) receives compensation for such services (e.g., 20% of all realized profits from the Fund's investments).

In *Whipple*, an individual taxpayer, who owned a controlling interest in and managed several corporations, deducted a bad debt relating to a loan that he had made to one of the corporations, a soft drink bottling company. The Court held that the taxpayer was not entitled to the deduction because the debt was not in connection with activities the tax law recognizes as trades or businesses.[37] The Court characterized the debt as a non-business bad debt because the taxpayer "was not engaged in the business of money lending, of financing corporations, of bottling soft drinks, or any combination of the three."[38]

In addition, the Court stated that although the taxpayer's activities in the corporation, to which he loaned money, may have produced:

---

[36] *Higgins,* 312 U.S. at 218.

[37] *Whipple,* 373 U.S. at 201-204.

[38] *Whipple,* 373 U.S. at 193.

-13-

income, profit or gain in the form of dividends or enhancement in the value of an investment . . . [such a] return is distinctive to the process of investing . . . [which can be] distinguished from the trade or business of the taxpayer himself . . . [and] the product of the . . . [taxpayer's] services arise not from his own trade or business but from that of the corporation.[39]

The facts in *Whipple* are distinguishable because the Fund, as evidenced by its tax returns and Partnership Agreement, was directly and substantially involved in a recognized business activity (i.e., providing investment advisory and management services) for the benefit of several other entities (i.e., its general and limited partners). Thus, the Fund's activities differed from those of the taxpayer in *Whipple*, who had incurred personal investment losses on loans that the Court decided had not arisen from his own trade or business activities.[40]   Furthermore, in contrast to the taxpayer in *Whipple*, **"N"** as the Fund's agent was entitled to compensation for investment advisory and management services it performed.

In *Zink*, a husband and wife invested in an airplane component business and deducted research and experimentation expenses pursuant to IRC § 174(a)(1). The Court disallowed the deduction because the taxpayers' did not "participate . . . in the actual activities of developing or marketing aircraft components or . . . exercise any control over those activities other than the right to yank their investments.[41] Accordingly, their activities in connection with . . . [such] products never surpassed those of investors" and did not constitute a trade or business.[42]

Unlike the taxpayers in *Zink*, the Fund, a business entity (partnership), was formed to select, acquire, dispose of, and manage investments (trades or businesses) on behalf of its partners, and did so through its agent, **"N"**   Indeed, with respect to **"C"**   the Fund – through a series of complex financial transactions including the issuance of over $   in debt instruments – acquired a controlling (96.3%) interest in **"C"**   stock. This put the Fund in the position where it, through **"N"**   could exercise control over **"C"**   management. Such control with respect to management is consistent with the Fund's stated purposes, which includes "exercising all rights, powers, privileges, and other incidents of ownership or possession with respect to investments held or owned by the Partnership" and "managing and supervising such investments."

---

[39] *Id.* at 202.

[40] *Whipple,* 373 U.S. at 202.

[41] *Zink*, 929 F.2d at 1023.

[42] *Id.*

-14-

Thus, the "passive" investment activities described in *Higgins*, *Whipple*, and *Zink*, as well as the other cases you cite, are distinguishable from the much more active involvement of the Fund (through ▪N▪ with respect to its investments. We further concluded, for the reasons discussed above, that the Fund's delegation of many of its management functions to other entities, which in ▪C▪ case occurred through its Management Agreement with ▪H▪ does not establish that the Fund was merely a "passive investor." Accordingly, the Appeals Board, having fully analyzed the holdings in the court cases you cite in your appeal, decided that the Fund is a trade or business for purposes of controlled group liability under ERISA.

D.    **Assessment of Interest**

Your appeal asserts that, if the Appeals Board finds the Fund liable under 29 U. S. C. § 1362(b)(1), PBGC should not assess interest on that liability for the period between ▬▬▬▬▬▬ through ▬▬▬▬▬ due to PBGC's delay. You state that the Fund should not incur interest for that period because: (1) PBGC had known about the ownership of ▪C▪ ▬▬▬▬ stock and the Fund's belief it is not in ▪C▪ controlled group since at least ▬▬▬▬▬▬ (2) PBGC did not notify the Fund of PBGC's controlled group determination before issuing the ▬▬▬▬▬ letter; (3) the Fund, based on legal precedent regarding the "trade or business" issue, "reasonably" believed during this period that it was not liable to PBGC; and (4) you did not receive the procedures for appealing that determination until ▬▬▬▬▬▬▬.

ERISA § 4062(b) and PBGC's regulation at 29 C.F.R. § 4062.7 establish the applicable liability for interest under 29 U. S. C. § 1362(b)(1). ERISA § 4062(b) and PBGC's regulation do not provide for the abatement of interest for reasons of delay, or on any other grounds. The Appeals Board must follow ERISA and PBGC's regulations, and accordingly your request that PBGC not assess interest is denied.

E.    **Request for Hearing**

PBGC's Rules for Administrative Review of Agency Decisions provide, at 29 C.F.R. § 4003.55, that the opportunity to appear before the Appeals Board "will be permitted at the Board's discretion." In general, the Appeals Board will permit an opportunity for a hearing before the Board if the Board determines that there is a dispute as to a material fact. Because there is no dispute as to the material facts in this case, the Appeals Board denied your request for an oral hearing.

## IV. DECISION

Based on the foregoing facts and authorities, the Appeals Board decided that, under Title IV of ERISA, ▪C▪ was under common control with the Fund as of the date the Plan terminated. Accordingly, the Fund and ▪C▪ are jointly and severally liable to PBGC under

-15-

29 U. S. C. § 1362(b)(1) for the $3,234,699.00 in unfunded benefit liabilities of the Plan as of DOPT, plus applicable interest. Pursuant to 29 C.F.R. § 4003.59, your client has exhausted its administrative remedies and may seek judicial review of this decision.

Sincerely,

*Charles Vernon*

Charles Vernon
Chair, Appeals Board

Enclosure: Selected Pages of Form 10-K dated April 2, 1999.