# 12-2312

_____

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
_____

**SUN CAPITAL PARTNERS III, LP; SUN CAPITAL PARTNERS III QP, LP; SUN CAPITAL PARTNERS IV, LP,**

*Plaintiffs-Appellees*,

**v.**

**NEW ENGLAND TEAMSTERS & TRUCKING INDUSTRY PENSION FUND**

*Defendant-Appellant.*

_____

On Appeal from the United States District Court
For the District of Massachusetts
_____

## BRIEF OF AMICUS CURIAE
## PENSION BENEFIT GUARANTY CORPORATION
## IN SUPPORT OF APPELLANT REQUESTING REVERSAL

JUDITH R. STARR
General Counsel
ISRAEL GOLDOWITZ
Chief Counsel
KAREN L. MORRIS
Deputy Chief Counsel
ERIC FIELD
Assistant Chief Counsel
CRAIG T. FESSENDEN
BETH A. BANGERT
Attorneys
PENSION BENEFIT GUARANTY CORP.
Office of the Chief Counsel
1200 K Street, N.W.
Washington, D.C.  20005-4026
(202) 326-4020, ext. 6767 (telephone)
(202) 326-4112 (facsimile)
*Attorneys for Amicus Curiae,*
*Pension Benefit Guaranty Corporation*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amicus curiae Pension Benefit Guaranty Corporation submits the following as their Corporate Disclosure Statement.  The Pension Benefit Guaranty Corporation is a wholly-owned United States government corporation created by Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1301-1461 (2006 Supp. V 2011), and an agency of the United States government under 28 U.S.C. § 451.

/s/Craig T. Fessenden
Craig T. Fessenden
Attorney
Pension Benefit Guaranty Corporation

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................. 1

STATEMENT OF INTEREST ............................................................ 2

ARGUMENT ..................................................................................... 4

    I.    PBGC's Interpretation of "Trade or Business" is Entitled to Deference and the Majority of Courts Considering the Issue have Followed its Interpretation ...................................................................... 4

        A.    PBGC's Determination that A Private Equity Fund, Like   the Sun Funds, may be a "Trade or Business" Under ERISA was not Plainly Erroneous or Inconsistent With PBGC Regulations ................................................. 5

        B.    The Majority of Courts Considering Whether an Entity is a "Trade or Business" Agree with PBGC that Income Tax Cases are Irrelevant ............................................................ 8

    II.    The Sun Funds Held Scott Brass for the Purpose of Earning Profit for its Investors and Partners and Exercised Regular Control Over the Company Through Their General Partners ..................................... 14

CONCLUSION ................................................................................ 16

# TABLE OF AUTHORITIES

## Cases Cited

*Auer v. Robbins,*
    519 U.S. 452 (1997) ..................................... 6

*Beck v. Pace Int'l Union,*
    551 U.S. 96 (2007) ..................................... 8

*Berkshire Hathaway, Inc. v. Textile Workers Pension Fund,*
    874 F.2d 53 (1st Cir. 1989) .......................... 8

*Board of Trustees of the Western Conference of Teamsters Pension Trust Fund v. Lafrenz,*
    837 F.2d 892 (9th Cir. 1988) ...................... 5, 9, 13, 14

*Board of Trustees Sheet Metal Workers' National Pension Fund v. Palladium Equity Partners,*
    722 F.Supp.2d 854 (E.D. Mich. 2010) ................ 3, 9, 12

*Carpenters Pension Trust Fund for Northern California v Lindquist,*
    No 11-16943, 2012 WL 5866047 (9th Cir. Nov. 13, 2012) ...... 13

*Central States, Southeast and Southwest Areas Pension Fund v. Chatham Properties,*
    929 F.2d 260 (6th Cir. 1991) ...................... 1, 5

*Central States, Southeast and Southwest Areas Pension Fund v. Creative Development Company,* 232 F.3d 406 (5th Cir. 2000) .................. 5

*Central States, Southeast and Southwest Areas Pension Fund v. Ditello,*
    974 F.2d 887 (7th Cir. 1992) ...................... 5, 9, 10

*Central States, Southeast and Southwest Areas Pension Fund v. Fulkerson,*
    238 F.3d 891 (7th Cir. 2001) ...................... 9

*Central States, Southeast and Southwest Areas Pension Fund v. Johnson,*
    991 F.2d 387 (7th Cir. 1993) .......................................................... 5

*Central States, Southeast and Southwest Areas Pension Fund v. O'Neill,*
    620 F.3d 766 (7th Cir. 2010) ........................................................ 8

*Central States, Southeast and Southwest Areas Pension Fund v. SCOFBP,*
    668 F.3d 873 (7th Cir. 2011) ................................................... 9, 11

*Central States Southeast and Southwest Areas Pension Fund v. Slotsky,*
    956 F.2d 1369 (7th Cir. 1992) ...................................................... 9

*Central States, Southeast and Southwest Areas Pension Fund v. White*,
    258 F.3d 636 (7th Cir. 2001) ........................................................ 9

*Commisioner v. Groetzinger,*
    480 U.S. 23 (1987) ...................................................................... 7

*Connors v. Incoal Inc.,*
    955 F.2d 245 (D.C. Cir. 1993) ............................................... 5, 10

*Connors v. Ryan's Coal Co., Inc.,*
    923 F.2d 1461 (11th Cir. 1991) .................................................... 5

*Coeur Alaska, Inc. v. Southeast Alaska Conservative Council,*
    557 U.S. 261 (2009) .................................................................... 6

*Harrell v. Eller Maritime Co.,*
    No.8:09-cv-1400-T-27AEP,
    2010 WL 3835150 (M.D. Fla. Sept. 30, 2010) ................................ 9, 12, 13

*IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.,*
    788 F.2d 118 (3d Cir. 1986) ........................................................ 5

*Mason and Dixon Tank Lines, Inc. v. Central States Se. and Sw. Areas Pension
Fund,*
    852 F.2d 156 (6th Cir. 1988) ................................................... 1, 3

*McDougall v. Pioneer Ranch Limited Partnership*,
    494 F.3d 571 (7th Cir. 2007) ................................................................. 9, 10

*Mead Corp. v. Tilley*,
    490 U.S. 714 (1989) ................................................................. 8

*Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*,
    513 U.S. 414 (1995) ................................................................. 3

*Penn Cent. Corp. v. Western Conference of Teamsters Pension Trust Fund*,
    75 F.3d 529 (9th Cir. 1996) ................................................................. 8

*Pension Benefit Guar. Corp. v. Center City Motors, Inc.*,
    609 F.Supp. 409 (S.D. Cal. 1984) ................................................................. 9

*Pension Benefit Guaranty Corp. v. LTV Corp.*,
    496 U.S. 633(1990) ................................................................. 2, 8

*Pension Benefit Guaranty Corp. v. Ouimet Corp.*,
    630 F.2d 4 (1st Cir. 1980) ................................................................. 1, 3, 5

*Pension Benefit Guaranty Corp. v. R. A. Gray & Co.*,
    467 U.S. 717 (1984) ................................................................. 3

*Teamsters Joint Council No. 83 v. CenTra, Inc.*,
    947 F.2d 115 (4th Cir. 1991) ................................................................. 5

*Textile Workers Pension Fund v. Standard Dye & Finishing Co.*,
    725 F.2d 843, (2d Cir. 1984) ................................................................. 2

*United and Commercial Food Workers Union v. Progressive Supermarkets*,
    644 F.Supp. 633 (D.N.J. 1986) ................................................................. 9

*United States v. Cleveland Indians Baseball Co.*,
    523 U.S. 200 (2001) ................................................................. 7

*Vaughn v. Sexton*,
    975 F.2d 498 (8th Cir. 1992) ................................................................. 5

## <u>United States Code Cited</u>

Title 29

      Section 1301-1461 ................................................................ 2

      Section 1301(a)(14)(B) ...................................................... 5

      Section 1301(b)(1) ......................................................... 3, 5

      Section 1322(a) ................................................................... 3

      Section 1381 ........................................................................ 3

      Section 1391 ........................................................................ 3

      Section 1426 ........................................................................ 3

      Section 1431 ........................................................................ 3

## <u>Other Authorities Cited</u>

26 C.F.R. Section 1.414 ............................................................ 6

29 C.F.R.

      Section 4001.2 ................................................................... 6

      Section 4001.3 ................................................................... 6

      Section 4003.59 ................................................................. 6

2012 PBGC Annual Report,
    *available at* http://www.pbgc.gov/documents/2012-annual-report.pdf ........ 2

Multiemployer Pension Plans Report to Congress Required by the Pension
Protection Act of 2006, *available at*
http://www.pbgc.gov/documents/pbgc-report-multiemployer-pension-plans.pdf .. 2

S.Rep. No. 383, 93d Cong., 2d Sess. 43,
    reprinted in 1974 U.S.Code Cong. & Admin.News 4639, 4890, 4928 ........ 3

H.R. Rep. No. 807, 93d Cong., 2d Sess. 50,
    reprinted in 1974 U.S.Code Cong. & Admin.News 4670, 4716 ................... 3

# PRELIMINARY STATEMENT

Under Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"), trades or businesses under common control with an employer contributing to a multiemployer plan are jointly liable for that employer's withdrawal liability.[1]  Congress wrote these provisions broadly to protect pension plan solvency and the federal pension insurance system administered by the Pension Benefit Guaranty Corporation ("PBGC").

Scott Brass, Inc. ("Scott Brass") withdrew from the New England Teamsters and Trucking Industry Pension Fund and owes withdrawal liability.  Sun Capital Funds III and IV (the "Sun Funds"), through holding companies, owned 100% of Scott Brass and controlled its management team.  The Sun Funds were entitled to dividends, capital gains, and interest from Scott Brass; their general partner received management and consulting fees for services provided to Scott Brass.  On these facts, the Sun Funds would likely be a "trade or business" under PBGC's interpretation of its controlled group regulation. Is PBGC's interpretation plainly erroneous or inconsistent with its regulation and decades' worth of case law?

---

[1] E.g., *Central States Se. and Sw. Areas Pension Fund v. Chatham Properties*, 929 F.2d 260, 264 (6th Cir. 1991), *citing Pension Benefit Guaranty Corp. v. Ouimet Corp.*, 630 F.2d 4 (1st Cir. 1980); *see also Mason and Dixon Tank Lines, Inc. v. Central States Se. and Sw. Areas Pension Fund*, 852 F.2d 156, 159 (6th Cir. 1988).

## STATEMENT OF INTEREST

PBGC, the United States government agency responsible for administering and enforcing Title IV of ERISA, including the provisions added by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"),[2] files this brief as *amicus curiae* under Federal Rule of Appellate Procedure 29(a).

PBGC insures about 1,450 multiemployer plans covering about 10.3 million participants.[3]  PBGC provides about $115 million in annual financial assistance to 49 insolvent multiemployer plans, and its multiemployer insurance fund has a negative net position of $5.237 billion.[4]

Congress designed MPPAA to address gaps in ERISA related to multiemployer plans, including liabilities left behind by withdrawn employers.[5] Under MPPAA, a withdrawn employer must pay withdrawal liability—its

---

[2]  29 U.S.C. § 1301-1461 (2006 & Supp. V 2011); *see generally PBGC v. LTV Corp.*, 496 U.S. 633, 636-39 (1990).

[3]  Pension Benefit Guaranty Corporation, 2012 PBGC Annual Report, at 33, available at http://www.pbgc.gov/documents/2012-annual-report.pdf.

[4] PBGC Annual Report at 33.  Many multiemployer plans are under great financial strain. *See* Multiemployer Pension Plans Report to Congress Required by the Pension Protection Act of 2006 (Jan. 22, 2013), at 7, available at http://www.pbgc.gov/documents/pbgc-report-multiemployer-pension-plans.pdf.

[5]  *Textile Workers Pension Fund v. Standard Dye & Finishing Co.,* 725 F.2d 843, 847-49 (2d Cir. 1984).

allocable share of the plan's unfunded vested benefits—so that its liabilities do not shift to remaining employers, and ultimately to PBGC upon plan insolvency.[6]

All trades or businesses under common control with the direct employer are part of its controlled group.[7] Members of the controlled group are jointly and severally liable for withdrawal liability.[8] Congress established controlled group liability primarily to prevent employers from escaping their ERISA and MPPAA obligations by operating through separate entities.[9]

When a multiemployer plan becomes insolvent, benefits must be reduced to the PBGC-guaranteed level and PBGC provides the plan with financial assistance to meet those guaranteed obligations.[10] A plan's ability to reach controlled group members to satisfy withdrawal liability helps forestall plan insolvency, benefit reductions, and claims on the PBGC insurance fund.

---

[6] 29 U.S.C. §§ 1381, 1391. *See generally Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414, 417 (1995); *Pension Benefit Guaranty Corp. v. R. A. Gray & Co.*, 467 U.S. 717, 722-23 (1984).

[7] 29 U.S.C. § 1301(b)(1).

[8] Id; *see Ouimet*, 630 F.2d at 11.

[9] *Mason and Dixon Tank Lines, Inc.*, 852 F.2d at 159, *citing* S.Rep. No. 383, 93d Cong., 2d Sess. 43, *reprinted in* 1974 U.S.Code Cong. & Admin.News 4639, 4890, 4928; H.R. Rep. No. 807, 93d Cong., 2d Sess. 50, *reprinted in* 1974 U.S.Code Cong. & Admin.News 4670, 4716.; *Bd. of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Palladium Equity Partners, LLC,* 722 F. Supp. 2d 854, 858 (E.D. Mich. 2010).

[10] 29 U.S.C. §§ 1322a, 1426, 1431. PBGC's multiemployer guarantee is generally $12,870 with 30 years of service.

If affirmed, the District Court's decision would create an unintended loophole in controlled group liability; it would allow investment funds that purchase contributing employers categorically to escape withdrawal liability. And as ownership structures similar to that of the Sun Funds increase—without responsibility for withdrawal liability—multiemployer plans' financial condition would be further eroded.

## ARGUMENT

I.    **PBGC's Interpretation of "Trade or Business" is Entitled to Deference and the Majority of Courts Considering the Issue have Followed its Interpretation.**

The District Court's holding is erroneous in two ways. First, contrary to Supreme Court precedent, it gave no deference to PBGC's interpretation of its own regulation. Second, the District Court departed from a long line of controlled group withdrawal liability cases. It did so by relying on tax cases that narrowly construed "trade or business" to prevent income tax avoidance. That context is irrelevant to controlled group liability under Title IV of ERISA.

4

A.  **PBGC's Determination that A Private Equity Fund, Like the Sun Funds, may be a "Trade or Business" Under ERISA was not Plainly Erroneous or Inconsistent With PBGC Regulations.**

Under Title IV of ERISA, all "trades or businesses" under "common control" are treated as a single employer for withdrawal liability purposes.[11]  And each trade or business under common control is jointly and severally liable for withdrawal liability.[12]  Title IV directs controlled group determinations to be made under PBGC regulations, which must be consistent and coextensive with regulations prescribed for similar purposes under section 414(c) of the Internal Revenue Code ("Code").[13]

---

[11] 29 U.S.C. § 1301(b)(1).

[12] *See Cent. States Se. & Sw. Areas Pension Fund v. Creative Development Company*, 232 F.3d 406, 409 (5th Cir. 2000); *Cent. States Se. & Sw. Areas Pension Fund v. Johnson*, 991 F.2d 387, 388 (7th Cir. 1993); *Connors v. Incoal, Inc.*, 995 F.2d 245, 248-49; *Cent. States Se. & Sw. Areas Pension Fund v. Ditello*, 974 F.2d 887, 889 (7th Cir. 1992); *Vaughn v. Sexton,* 975 F.2d 498, 504 (8th Cir. 1992); *Teamsters Joint Council No. 83 v. CenTra, Inc.*, 947 F.2d 115, 120-21 (4th Cir. 1991); *Chatham Properties*, 929 F.2d at 264; *Connors v. Ryan's Coal Co., Inc.*, 923 F.2d 1461, 1464 (11th Cir. 1991); *Bd. of Trustees of Western Conf. of Teamsters Pension Trust Fund v. LaFrenz*, 837 F.2d 892, 893-5 (9th Cir. 1988); *IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.,* 788 F.2d 118,127 (3d Cir. 1986); *Ouimet Corp.*, 630 F.2d at 11.

[13] 29 U.S.C. §§ 1301(a)(14)(B), 1301(b)(1).  IRS administers the Code's provisions for tax qualification of pension plans but has no role in determining liability to PBGC for terminated single-employer plans or withdrawal liability to multiemployer plans.  Likewise, PBGC administers Title IV of ERISA, including its withdrawal liability provisions, but has no role in administering the Code's provisions for tax qualification.

PBGC's controlled group regulations cross-reference regulations prescribed under Code sections 414(b) and (c) to define "common control."[14]  Treasury regulations under these sections specify that "common control means one or more chains of organizations conducting trades or businesses connected through ownership of a controlling interest with a common parent organization."[15]  These regulations are consistent, but neither defines the term "trade or business."

In its role as the agency that polices controlled group liability, PBGC has interpreted the term administratively for Title IV purposes.  This interpretation is entitled to deference unless it is plainly erroneous or inconsistent with PBGC's own regulations.[16]  PBGC's Appeals Board (the "Board") has interpreted the regulatory term "trade or business" in a single-employer plan context.[17]  In a decision dated September 26, 2007 (the "Board's Decision"), determining whether a private equity fund was jointly and severally liability for its portfolio company's

---

[14] 29 C.F.R. §§ 4001.2, 4001.3 (2012).

[15] 26 C.F.R. § 1.414(b),(c) (2012).

[16] *Coeur Alaska, Inc. v. Southeast Alaska Conservative Council*, 557 U.S. 261, 277-78 (2009) (*citing Auer v. Robbins*, 519 U.S. 452, 461 (1997)).

[17] Pursuant to 29 C.F.R. 4003.59, the Board renders final agency decisions on various liability and benefit determinations, which are reviewable by federal district courts as informal adjudications under the Administrative Procedure Act's arbitrary and capricious standard.

termination liability, the Board used a test derived from the Supreme Court's holding in *Commissioner v. Groetzinger*.[18]

Under that test, an entity is engaged in a "trade or business," if (1) engaged in an activity on a continuous and regular basis; (2) for the primary purpose of income or profit.[19] Applying this test, the Board determined that a private equity fund holding a controlling interest in portfolio companies could be a "trade or business" if—either directly or through its member entities—it regularly engaged in the management of the portfolio companies. The Board distinguished such a business organization from an individual, recognizing that ERISA ordinarily does not hold individuals personally liable for investment companies' pension liabilities.

The district court, however, found the Board's Decision unpersuasive and focused instead on inapplicable income tax cases. The Court's reliance on these cases appears to be based on a misreading of ERISA and MPPAA. The district court stated that these statutes "direct courts to look at the tax code and tax caselaw to interpret such terms."[20] But no such instruction exists. And, as the Supreme Court held in *United States v. Cleveland Indians Baseball Co.*, the same words may have different meanings in different statutes depending on their purposes.[21]

---

[18] PBGC Appeals Board Decision, September 26, 2007, Defendant-Appellant Add. Pg. 48; *Comm'r v. Groetzinger*, 480 U.S. 23 (1987).

[19] *Groetzinger*, 480 U.S. at 35.

[20] Defendant-Appellant Add. Pg. 14.

[21] 532 U.S. 200, 213 (2001).

PBGC has decades of experience interpreting Title IV matters and courts have regularly deferred to PBGC's interpretation of Title IV.[22]  This Circuit has found it particularly appropriate to defer to PBGC's interpretation of MPPAA, as "Congress expressly delegated substantial regulatory authority to PBGC relating to withdrawal liability."[23]  And the Supreme Court has regularly relied on PBGC's interpretation of Title IV where it is a "permissible construction of the statute."[24]  Given Congress' stated purpose in establishing controlled group liability, the Board's interpretation of "trade or business" under Title IV is a permissible construction of the statute, and the district court erred in not deferring to PBGC's interpretation.

B.    **The Majority of Courts Considering Whether an Entity is a "Trade or Business" Agree with PBGC that Income Tax Cases are Irrelevant**.

Courts considering this question have long held that entities similar to the Sun Funds are "trades or businesses" under Title IV of ERISA and made this determination using the *Groetzinger*-derived or similar test without reliance on

---

[22]*Central States Se. and Sw. Areas Pension Fund v. O'Neill,* 620 F.3d 766,773 (7th Cir. 2010)*; Penn Cent. Corp. v. Western Conference of Teamsters Pension Trust Fund*, 75 F.3d 529, 534 (9th Cir. 1996); *Berkshire Hathaway, Inc. v. Textile Workers Pension Fund*, 874 F.2d 53, 55 (1st Cir. 1989).

[23]  *Berkshire Hathaway, Inc.,* 874 F.2d at 55.

[24]  *Beck v. Pace Int'l Union,* 551 U.S. 96, 103 (2007); *Mead Corp. v. Tilley,* 490 U.S. 714, 722 (1989); *Pension Ben. Guar. Corp. v. LTV Corp.,* 496 U.S. 633, 648-49 (1990).

unrelated tax cases.[25]  The Seventh Circuit, which has crafted a significant amount of case law on withdrawal liability, has applied this test many times, recognizing that "since the meaning of 'trade or business' varies somewhat from one [Internal Revenue] Code section to another, a suggestion that courts should look anywhere in the Code for guidance is an invitation to mass confusion."[26]  And that court has chosen to "abandon the Internal Revenue Code as an interpretive tool" and to "construe the term 'trade or business' in light of the purpose of MPPAA,"[27] —"to prevent dissipation of assets required to secure vested pension benefits."[28]

For example, in *Central States Southeast and Southwest Areas Pension Fund v. Ditello*, a withdrawn employer's sole shareholders owned commercial real estate leased to the withdrawn employer.[29]  The shareholders argued they were not

---

[25] *LaFrenz*, 837 F.2d 892, 893-5; *Cent. States Se. & Sw. Areas Pension Fund v. Fulkerson*, 238 F.3d 891 (7th Cir. 2001); *Cent. States Se. & Sw. Areas Pension Fund v. White*, 258 F.3d 636 (7th Cir. 2001); *Cent. States Se. & Sw. Areas Pension Fund v. SCOFBP*, 668 F.3d 873 (7th Cir. 2011); *McDougall v. Pioneer Ranch L.P.*, 494 F.3d 571 (7th Cir. 2007); *Ditello*, 974 F.2d 887 (7th Cir. 1992); *Palladium*, 722 F.Supp.2d 854 (E.D. Mich. 2010); *Harrell v. Eller Maritime Co.*, No. 8:09-cv-1400-T-27AEP, 2010 WL 3835150 (M.D. Fla. Sept. 30, 2010); *Pension Ben. Guar. Corp. v. Center City Motors, Inc.*, 609 F.Supp. 409 (S.D. Cal. 1984).
[26] *Ditello*, 974 F.2d at 890 (*citing United and Commercial Food Workers Union v. Progressive Supermarkets*, 644 F. Supp. 633, 638 (D.N.J. 1986)).
[27] *Ditello*, 974 F.2d at 890.
[28] *Id.* (quoting *Cent. States Se. & Sw. Areas Pension Fund v. Slotsky,* 956 F.2d 1369, 1374 (7th Cir. 1992)).
[29] *Id.* at 889.

9

a "trade or business" as used in income tax cases.[30]  The court viewed the leasing

arrangement as a means to avoid withdrawal liability, contrary to the purpose of

MPPAA.[31]  Accordingly, the court found the shareholders to be a "trade or

business."[32]

The D.C. Circuit and Seventh Circuit have also considered highly relevant a

defendant's stated intention in forming the entity in question.[33]  In *Central States*

*v. Pioneer Ranch Limited Partnership*, the Seventh Circuit upheld a district court

decision that a partnership's ranch property, held out to be a vacation home and

retreat, was in fact a "trade or business" under MPPAA.[34]  Crucial to the court's

decision was that the Ranch's partnership agreement stated that the Ranch was to

"engage in the business of farming, ranching, and any agricultural pursuit or

undertaking . . . ."[35]  In *Connors v. Incoal, Inc.,* the D.C. Circuit also found an

entity's stated intention in forming a business highly relevant.[36]  Both courts noted

that "a defendant's stated intention of forming a business is highly relevant

because it constitutes a declaration against interest."[37]  That aptly describes the Sun

---

[30] *Id.*

[31] *Id.* at 890.

[32] *Id.*

[33] *Pioneer Ranch L.P.*, 494 F.3d at 577-578*;Connors v. Incoal Inc.*, 955 F.2d 245, 254 (D.C. Cir. 1993)).

[34] *Pioneer Ranch*, 494 F.3d at 578.

[35] *Id.* at 577.

[36] *Connors*, 955 F.2d at 254.

[37] *Pioneer Ranch*, 494 F.3d at 577-578 (*citing Connors*, 995 F.2d at 254).

Funds' admissions about their business purpose and their control over Scott

Brass's operations.

The Seventh Circuit also considers an entity's use of professionals relevant.

In *Central States, Southeast and Southwest Areas Pension Fund v. SCOFBP,* the

court held that an LLC's investment in real estate ventures it leased qualified it as

a "trade or business" under MPPAA.[38]  The court relied on the fact that the LLC

employed "professionals to provide legal, management and accounting services on

a contract basis," even though they did not hire any permanent employees.[39]  This

organizational structure is very similar to the Sun Funds in relation to their

ownership of Scott Brass.  And, perhaps most tellingly, the *SCOFBP* court

reasoned that "it seems highly unlikely that a formal for profit business

organization would not qualify as a 'trade or business' under the *Groetzinger*

test."[40]

Courts have also found that private equity funds like the Sun Funds could

be "trades or businesses."  The district court in *Board of Trustees Sheet Metal

Workers' National Pension Fund v. Palladium Equity Partners LLC* applied the

*Groetzinger*-derived test in concluding that a private equity fund that operated

---

[38] *SCOFBP*, 668 F.3d at 879.
[39] *Id.* at 877-78.
[40] *Id.* at 878.

similarly to the Sun Funds could be a "trade or business" under MPPAA.[41]  The

court highlighted the fact that the private equity fund, in its investment guidelines,

promoted its "hands-on operating and financial approach" for "[troubled]

companies."[42]  The court also found persuasive the Palladium funds' use of a large

portion of their investments to exert power over the managerial activities of the

company, noting that these funds expressly operate in a way that is "far from

passive investment discussed in the tax cases."[43]

    The court also relied on the PBGC Appeals Board's Decision.  It found the

Board's reasoning consistent with the general rule that investment alone does not

constitute a "trade or business" and took an "investment plus" approach

(investment with something more).  Ultimately, in denying Palladium's motion for

summary judgment under the *Groetzinger*-derived test, the court found that,

through its limited partners, the fund exerted power over financial and managerial

activities of the portfolio company.

    A private equity fund's indirect involvement in management decisions may

also make it a "trade or business," as the court held in *Harrell v. Eller Maritime

Company*.[44] The district court rejected a holding company's claim that it was

merely a vehicle for passive investment, and found that its influence on

---

[41] *Palladium*, 722 F.Supp.2d at 870.
[42] *Id.*
[43] *Id*.
[44] *Harrell*, 2010 WL 3835150, at *5.

management decisions, even in the absence of direct management of the operating

company's personnel, was enough to make it a "trade or business."[45]  The holding

company's control over the operating company in *Harrell* was far less than the Sun

Funds' control over Scott Brass.  In fact, the court found the holding company to

be a "trade or business" even though it maintained only a 50% interest in the

operating entity, and was not the only party able to exert influence in management

decisions.[46]

The Ninth Circuit has taken an even broader approach in defining "trade or

business" under MPPAA.  In *Carpenters Pension Trust Fund for Northern*

*California v. Lindquist,* the court declined to use the *Groetzinger*-derived test.[47]

The court instead relied on its previous decision in *Board of Trustees of the*

*Western Conference of Teamsters Pension Trust Fund v. Lafrenz*, in which it held

that a truck leasing operation qualified as a trade or business.[48]  In *LaFrenz,* the

court held that there is no requirement in ERISA for a "trade or business" to have

---

[45] *Id.* at 4.
[46] *Id.*
[47] *Carpenters Pension Trust Fund for Northern California v Lindquist*, No 11-16943, 2012 WL 5866047 (9th Cir. Nov. 13, 2012).
[48] *Board of Trustees of the Western Conference of Teamsters Pension Trust Fund v. Lafrenz*, 837 F.2d 892 (9th Cir. 1988).

13

employees.[49]  And the court also noted the statute does not differentiate between active and passive investments.[50]

Accordingly, entities that are not operating companies−but that own operating companies and exist for the purpose of making a profit−are "trades or businesses" if they have regular influence and control over the operating company.

## II.	The Sun Funds Held Scott Brass for the Purpose of Earning Profit for its Investors and Partners and Exercised Regular Control Over the Company Through Their General Partners.

Sun Capital Partners/Advisors Inc. ("Sun Capital") seeks out and assembles groups of highly sophisticated and high-net worth investors for its ventures.[51] Sun Capital's funds, including the Sun Funds, operate by acquiring controlling interests in companies and appointing a Sun Capital management team; in the case of Scott Brass, the Sun Funds acquired 100% combined control.[52]

The Sun Funds hold themselves out as a "venture operating company . . . actively involved at all times in its portfolio companies."[53]  And through their General Partners, the Sun Funds manage the operations of their portfolio companies.[54]

---

[49] *Id.* at 895.
[50] *Id.*
[51] Defendant-Appellant's Brief at 5, *citing (*Sealed App. pp. 181-264)
[52] *Id* at 6-8.
[53] *Id.* at 4.
[54] *Id.* at 4-8.

If the Sun Funds were hands-off, as they claim, it is unclear how they could attract investors to purchase distressed companies like Scott Brass. Reasonable investors would not likely provide capital to the Sun Funds if the Sun Funds did not have the authority to impose changes necessary for the troubled company's turnaround.

In fact, the Sun Funds are far from a passive investor; they used their 100% ownership to exercise total control over Scott Brass. As evidence of this, the "majority of Scott Brass's Board of Directors were employed by and directly reported to" Marc Leder and Rodger Krouse, Sun Capital Partners/Advisors Inc.'s co-CEOs, and sole members of the Limited Partner Committees of Sun Capital Advisors III, LP and Sun Capital Advisors IV, LP—the Sun Funds' general partners.[55] In exchange for management services, the general partners of the Sun Funds are entitled to substantial fees.[56]

Under these facts, the Sun Funds clearly held Scott Brass for profit. And its general partners received professional fees, in addition to investment income from its management of the portfolio company. The Sun Funds' ability to direct this additional profit to its general partners directly results from its complete controlling interest in the portfolio company. By contrast, a truly passive equity

---

[55] *Id.* at 7-8.
[56] *Id.* at 6.

15

investor receives investment income (or losses) on its ownership interest, but does not also receive management fees.

## CONCLUSION

The District Court's ruling is contrary to PBGC's interpretation of its own regulation and decades' worth of case law. This Court should therefore reverse the judgment and remand the case to the District Court.

Dated: February 5, 2013                Respectfully submitted,

/s/ Craig T. Fessenden
JUDITH R. STARR
General Counsel
ISRAEL GOLDOWITZ
Chief Counsel
KAREN L. MORRIS
Deputy Chief Counsel
ERIC FIELD
Assistant Chief Counsel
CRAIG T. FESSENDEN
BETH A. BANGERT
Attorneys

PENSION BENEFIT GUARANTY
CORPORATION
Office of Chief Counsel
1200 K Street, N.W.
Washington, D.C. 20005
(202) 326-4020 Ext. 3678
(202) 321-4112 (facsimile)

Attorneys for the Pension Benefit Guaranty
Corporation

16

**CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a)**

I,  Craig T. Fessenden, hereby certify that:

1.      This brief complies with the type-volume limitation of F.R.A.P. 32(a)(7)(B) because it contains 4,439 words, excluding the parts of the brief exempted by F.R.A.P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word Times New Roman 14 point type.


   s/Craig T. Fessenden
Craig T. Fessenden
Attorney
Pension Benefit Guaranty Corporation

February 5, 2013
Date

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of February, 2013, the foregoing Brief of

Amicus Curiae was filed with the court electronically and served on the following

by the method listed:

| | |
|---|---|
| Theodore J. Folkman, Esq.<br>Murphy & King<br>One Beacon Street, 21st Floor<br>Boston, MA 02108<br><br>**Served by CM/ECF**<br>*Counsel for Plaintiff-Appellee* | Jeffrey S. Quinn, Esq.<br>Marla Tun, Esq.<br>John F. Hartmann, Esq.<br>Kirkland & Ellis, LLP<br>230 N. LaSalle Street, Suite 2400<br>Chicago, IL 60654<br><br>**Served via CM/ECF**<br>*Counsel for Plaintiff-Appellee* |
| Catherine M. Campbell, Esq.<br>Renee J. Bushey, Esq.<br>Melissa A. Brennan, Esq.<br>Feinberg, Campbell & Zack, PC<br>177 Milk Street, Suite 300<br>Boston, MA 02109<br><br>**Served via CM/ECF**<br>*Counsel for Defendant-Appellant* | |

s/Craig T. Fessenden
Craig T. Fessenden
Attorney
Pension Benefit Guaranty Corporation

# ADDENDUM

# **ADDENDUM**
# **TABLE OF CONTENTS**

Title 29 Section 1301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

26 C.F.R. Section 1.414(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-7

26 C.F.R. Section 1.414(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-8

29 C.F.R. Section 4001.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-13

29 C.F.R. Section 4001.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-18

**Effective:[See Notes]**

United States Code Annotated Currentness
   Title 29. Labor
      Chapter 18. Employee Retirement Income Security Program (Refs & Annos)
         Subchapter III. Plan Termination Insurance (Refs & Annos)
         Subtitle A. Pension Benefit Guaranty Corporation
           → → **§ 1301. Definitions**

**(a)** For purposes of this subchapter, the term--

   **(1)** "administrator" means the person or persons described in paragraph (16) of section 1002 of this title;

   **(2)** "substantial employer", for any plan year of a single-employer plan, means one or more persons--

     **(A)** who are contributing sponsors of the plan in such plan year,

     **(B)** who, at any time during such plan year, are members of the same controlled group, and

     **(C)** whose required contributions to the plan for each plan year constituting one of--

       **(i)** the two immediately preceding plan years, or

       **(ii)** the first two of the three immediately preceding plan years,

       total an amount greater than or equal to 10 percent of all contributions required to be paid to or under the plan for such plan year;

   **(3)** "multiemployer plan" means a plan--

     **(A)** to which more than one employer is required to contribute,

     **(B)** which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer, and

**(C)** which satisfies such other requirements as the Secretary of Labor may prescribe by regulation,

except that, in applying this paragraph--

**(i)** a plan shall be considered a multiemployer plan on and after its termination date if the plan was a multiemployer plan under this paragraph for the plan year preceding such termination, and

**(ii)** for any plan year which began before September 26, 1980, the term "multiemployer plan" means a plan described in section 414(f) of Title 26 as in effect immediately before such date;

**(4)** "corporation", except where the context clearly requires otherwise, means the Pension Benefit Guaranty Corporation established under section 1302 of this title;

**(5)** "fund" means the appropriate fund established under section 1305 of this title;

**(6)** "basic benefits" means benefits guaranteed under section 1322 of this title (other than under section 1322(c) of this title), or under section 1322a of this title (other than under section 1322a(g) of this title);

**(7)** "non-basic benefits" means benefits guaranteed under section 1322(c) of this title or 1322a(g) of this title;

**(8)** "nonforfeitable benefit" means, with respect to a plan, a benefit for which a participant has satisfied the conditions for entitlement under the plan or the requirements of this chapter (other than submission of a formal application, retirement, completion of a required waiting period, or death in the case of a benefit which returns all or a portion of a participant's accumulated mandatory employee contributions upon the participant's death), whether or not the benefit may subsequently be reduced or suspended by a plan amendment, an occurrence of any condition, or operation of this chapter or Title 26;

**(9)** "reorganization index" means the amount determined under section 1421(b) of this title;

**(10)** "plan sponsor" means, with respect to a multiemployer plan--

**(A)** the plan's joint board of trustees, or

**(B)** if the plan has no joint board of trustees, the plan administrator;

**(11)** "contribution base unit" means a unit with respect to which an employer has an obligation to contribute under a multiemployer plan, as defined in regulations prescribed by the Secretary of the Treasury;

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(12)** "outstanding claim for withdrawal liability" means a plan's claim for the unpaid balance of the liability determined under part 1 of subtitle E of this subchapter for which demand has been made, valued in accordance with regulations prescribed by the corporation;

**(13)** "contributing sponsor", of a single-employer plan, means a person described in section 1082(b)(1) of this title (without regard to section 1082(b)(2) of this title) or section 412(b)(1) of Title 26 (without regard to section 412(b)(2) of Title 26).[FN1]

**(14)** in the case of a single-employer plan--

  **(A)** "controlled group" means, in connection with any person, a group consisting of such person and all other persons under common control with such person;

  **(B)** the determination of whether two or more persons are under "common control" shall be made under regulations of the corporation which are consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under subsections (b) and (c) of section 414 of Title 26; and

  **(C)(i)** notwithstanding any other provision of this subchapter, during any period in which an individual possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of an affected air carrier of which he was an accountable owner, whether through the ownership of voting securities, by contract, or otherwise, the affected air carrier shall be considered to be under common control not only with those persons described in subparagraph (B), but also with all related persons; and

  **(ii)** for purposes of this subparagraph, the term--

    **(I)** "affected air carrier" means an air carrier, as defined in section 40102(a)(2) of Title 49, that holds a certificate of public convenience and necessity under section 41102 of Title 49 for route number 147, as of November 12, 1991;

    **(II)** "related person" means any person which was under common control (as determined under subparagraph (B)) with an affected air carrier on October 10, 1991, or any successor to such related person;

    **(III)** "accountable owner" means any individual who on October 10, 1991, owned directly or indirectly through the application of section 318 of Title 26 more than 50 percent of the total voting power of the stock of an affected air carrier;

    **(IV)** "successor" means any person that acquires, directly or indirectly through the application of section 318 of Title 26, more than 50 percent of the total voting power of the stock of a related person, more than 50 percent of the total value of the securities (as defined in section 1002(20) of this title) of the related person, more than 50 percent of the total value of the assets of the related person, or any person into

which such related person shall be merged or consolidated; and

    **(V)** "individual" means a living human being;

**(15)** "single-employer plan" means any defined benefit plan (as defined in section 1002(35) of this title) which is not a multiemployer plan;

**(16)** "benefit liabilities" means the benefits of employees and their beneficiaries under the plan (within the meaning of section 401(a)(2) of Title 26);

**(17)** "amount of unfunded guaranteed benefits", of a participant or beneficiary as of any date under a single-employer plan, means an amount equal to the excess of--

    **(A)** the actuarial present value (determined as of such date on the basis of assumptions prescribed by the corporation for purposes of section 1344 of this title) of the benefits of the participant or beneficiary under the plan which are guaranteed under section 1322 of this title, over

    **(B)** the current value (as of such date) of the assets of the plan which are required to be allocated to those benefits under section 1344 of this title;

**(18)** "amount of unfunded benefit liabilities" means, as of any date, the excess (if any) of--

    **(A)** the value of the benefit liabilities under the plan (determined as of such date on the basis of assumptions prescribed by the corporation for purposes of section 1344 of this title), over

    **(B)** the current value (as of such date) of the assets of the plan;

**(19)** "outstanding amount of benefit liabilities" means, with respect to any plan, the excess (if any) of--

    **(A)** the value of the benefit liabilities under the plan (determined as of the termination date on the basis of assumptions prescribed by the corporation for purposes of section 1344 of this title), over

    **(B)** the value of the benefit liabilities which would be so determined by only taking into account benefits which are guaranteed under section 1322 of this title or to which assets of the plan are allocated under section 1344 of this title;

**(20)** "person" has the meaning set forth in section 1002(9) of this title;

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(21)** "affected party" means, with respect to a plan--

    **(A)** each participant in the plan,

    **(B)** each beneficiary under the plan who is a beneficiary of a deceased participant or who is an alternate payee (within the meaning of section 1056(d)(3)(K) of this title) under an applicable qualified domestic relations order (within the meaning of section 1056(d)(3)(B)(i) of this title),

    **(C)** each employee organization representing participants in the plan, and

    **(D)** the corporation,

except that, in connection with any notice required to be provided to the affected party, if an affected party has designated, in writing, a person to receive such notice on behalf of the affected party, any reference to the affected party shall be construed to refer to such person.

**(b)(1)** An individual who owns the entire interest in an unincorporated trade or business is treated as his own employer, and a partnership is treated as the employer of each partner who is an employee within the meaning of section 401(c)(1) of Title 26. For purposes of this subchapter, under regulations prescribed by the corporation, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer. The regulations prescribed under the preceding sentence shall be consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under section 414(c) of Title 26.

**(2)** For purposes of subtitle E of this subchapter--

    **(A)** except as otherwise provided in subtitle E of this subchapter, contributions or other payments shall be considered made under a plan for a plan year if they are made within the period prescribed under section 412(c)(10) of Title 26 (determined, in the case of a terminated plan, as if the plan had continued beyond the termination date), and

    **(B)** the term "Secretary of the Treasury" means the Secretary of the Treasury or such Secretary's delegate.

CREDIT(S)

(Pub.L. 93-406, Title IV, § 4001, Sept. 2, 1974, 88 Stat. 1003; Pub.L. 96-364, Title IV, § 402(a)(1), Sept. 26, 1980, 94 Stat. 1296; Pub.L. 99-272, Title XI, § 11004, Apr. 7, 1986, 100 Stat. 238; Pub.L. 100-203, Title IX, §§ 9312(b)(4), (5), 9313(a)(2)(F), Dec. 22, 1987, 101 Stat. 1330-363, 1330-365; Pub.L. 101-239, Title VII, § 7891(a)(1), Dec. 19, 1989, 103 Stat. 2445; Pub.L. 102-229, Title II, § 214, Dec. 12, 1991, 105 Stat. 1718; Pub.L. 103-465, Title VII, § 761(a)(11), Dec. 8, 1994, 108 Stat. 5034; Pub.L. 109-280, Title I, § 108(b)(1), formerly §

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

107(b)(1), Aug. 17, 2006, 120 Stat. 819, renumbered § 108(b)(1), Pub.L. 111-192, Title II, § 202(a), June 25, 2010, 124 Stat. 1297.)

[FN1] So in original. The period probably should be a semicolon.

2010 Acts. Amendments by Pub.L. 111-192, § 202(a), which redesignated section 107 of Pub.L. 109-280, found in the credit to this section, as section 108 of that Act, shall take effect as if included in Pub.L. 109-280, see Pub.L. 111-192, § 202(c)(1), set out as a note under 26 U.S.C.A. § 401.

Current through P.L. 112-207 approved 12-7-12

Westlaw. (C) 2013 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

26 C.F.R. § 1.414(b)–1                                                                                    Page 1

Treas. Reg. § 1.414(b)–1

**Effective:[See Text Amendments]**

Code of Federal Regulations Currentness
   Title 26. Internal Revenue
     Chapter I. Internal Revenue Service, Department of the Treasury
       Subchapter A. Income Tax
         Part 1. Income Taxes (Refs & Annos)
          Normal Taxes and Surtaxes
           Deferred Compensation, Etc.
            Pension, Profit–Sharing, Stock Bonus Plans, Etc.
        ➡  **§ 1.414(b)–1 Controlled group of corporations.**

**(a) Definition of controlled group of corporations.** For purposes of this section, the term "controlled group of corporations" has the same meaning as is assigned to the term in section 1563(a) and the regulations thereunder, except that (1) the term "controlled group of corporations" shall not include an "insurance group" described in section 1563(a)(4), and (2) section 1563(e)(3)(C) (relating to stock owned by certain employees' trusts) shall not apply. For purposes of this section, the term "members of a controlled group" means two or more corporations connected through stock ownership described in section 1563(a) (1), (2), or (3), whether or not such corporations are "component members of a controlled group" within the meaning of section 1563(b). Two or more corporations are members of a controlled group at any time such corporations meet the requirements of section 1563(a) (as modified by this paragraph). For purposes of this section, if a corporation is a member of more than one controlled group of corporations, such corporation shall be treated as a member of each controlled group.

**(b) Single plan adopted by two or more members.** If two or more members of a controlled group of corporations adopt a single plan for a plan year,

then the minimum funding standard provided in section 412, the tax imposed by section 4971, and the applicable limitations provided by section 404(a) shall be determined as if such members were a single employer. In such a case, the amount of such items and the allocable portion attributable to each member shall be determined in the manner provided in regulations under sections 412, 4971, and 404(a).

**(c) Cross reference.** For rules relating to the application of sections 401, 408(k), 410, 411, 415, and 416 with respect to two or more trades or businesses which are under common control, see section 414(c) and the regulations thereunder.

[T.D. 8179, 53 FR 6605, March 2, 1988]

SOURCE: T.D. 6500, 25 FR 11402, Nov. 26, 1960; 25 FR 14021, Dec. 21, 1960, unless otherwise noted.

Treas. Reg. § 1.414(b)–1, 26 C.F.R. § 1.414(b)–1

Current through January 24, 2013; 78 FR 5145

© 2013 Thomson Reuters.
END OF DOCUMENT

26 C.F.R. § 1.414(c)–1                                                                           Page 1

Treas. Reg. § 1.414(c)–1

© 2013 Thomson Reuters.
END OF DOCUMENT

**Effective:[See Text Amendments]**

Code of Federal Regulations Currentness
   Title 26. Internal Revenue
      Chapter I. Internal Revenue Service, Department of the Treasury
         Subchapter A. Income Tax
            Part 1. Income Taxes (Refs & Annos)
               Normal Taxes and Surtaxes
                  ↘▣ Deferred Compensation, Etc.
                     ↘▣ Pension, Profit–Sharing, Stock Bonus Plans, Etc.
                       ➡ **§ 1.414(c)–1 Commonly controlled trades or businesses.**

For purposes of applying the provisions of sections 401 (relating to qualified pension, profit-sharing, and stock bonus plans), 408(k) (relating to simplified employee pensions), 410 (relating to minimum participation standards), 411 (relating to minimum vesting standards), 415 (relating to limitations on benefits and contributions under qualified plans), and 416 (relating to top-heavy plans), all employees of two or more trades or businesses under common control within the meaning of § 1.414(c)–2 for any period shall be treated as employed by a single employer. See sections 401, 408(k), 410, 411, 415, and 416 and the regulations thereunder for rules relating to employees of trades or businesses which are under common control. See § 1.414(c)–5 for effective date.

[T.D. 8179, 53 FR 6606, March 2, 1988]

SOURCE: T.D. 6500, 25 FR 11402, Nov. 26, 1960; 25 FR 14021, Dec. 21, 1960, unless otherwise noted.

Treas. Reg. § 1.414(c)–1, 26 C.F.R. § 1.414(c)–1

Current through January 24, 2013; 78 FR 5145

26 C.F.R. § 1.414(c)–2                                                    Page 1

Treas. Reg. § 1.414(c)–2

**Effective:[See Text Amendments]**

Code of Federal Regulations Currentness
   Title 26. Internal Revenue
     Chapter I. Internal Revenue Service, Department of the Treasury
       Subchapter A. Income Tax
         Part 1. Income Taxes (Refs & Annos)
           Normal Taxes and Surtaxes
             Deferred Compensation, Etc.
              Pension, Profit–Sharing, Stock Bonus Plans, Etc.
               ➙ **§ 1.414(c)–2 Two or more trades or businesses under common control.**

**(a) In general.** For purposes of this section, the term "two or more trades or businesses under common control" means any group of trades or businesses which is either a "parent-subsidiary group of trades or businesses under common control" as defined in paragraph (b) of this section, a "brother-sister group of trades or businesses under common control" as defined in paragraph (c) of this section, or a "combined group of trades or businesses under common control" as defined in paragraph (d) of this section. For purposes of this section and §§ 1.414(c)–3 and 1.414(c)–4, the term "organization" means a sole proprietorship, a partnership (as defined in section 7701(a)(2)), a trust, an estate, or a corporation.

**(b) Parent-subsidiary group of trades or businesses under common control--(1) In general.** The term "parent-subsidiary group of trades or businesses under common control" means one or more chains of organizations conducting trades or businesses connected through ownership of a controlling interest with a common parent organization if--

   **(i)** A controlling interest in each of the organizations, except the common parent organization, is owned (directly and with the application of §

1.414(c)–4(b)(1), relating to options) by one or more of the other organizations; and

**(ii)** The common parent organization owns (directly and with the application of § 1.414(c)–4(b)(1), relating to options) a controlling interest in at least one of the other organizations, excluding, in computing such controlling interest, any direct ownership interest by such other organizations.

**(2) Controlling interest defined--(i) Controlling interest.** For purposes of paragraphs (b) and (c) of this section, the phrase "controlling interest" means:

   (A) In the case of an organization which is a corporation, ownership of stock possessing at least 80 percent of total combined voting power of all classes of stock entitled to vote of such corporation or at least 80 percent of the total value of shares of all classes of stock of such corporation;

   (B) In the case of an organization which is a trust or estate, ownership of an actuarial interest of at least 80 percent of such trust or estate;

   (C) In the case of an organization which is a partnership, ownership of at least 80 percent of the profits interest or capital interest of such partnership; and

   (D) In the case of an organization which is a sole proprietorship, ownership of such sole proprietorship.

**(ii) Actuarial interest.** For purposes of this section, the actuarial interest of each beneficiary of trust or estate shall be determined by assuming the maximum exercise of discretion by the fiduciary in favor of such beneficiary. The factors and methods prescribed in § 20.2031–7 or, for certain prior periods, § 20.2031–7A (Estate Tax Regulations) for use in ascertaining the value of an interest in property for

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

estate tax purposes shall be used for purposes of this subdivision in determining a beneficiary's actuarial interest.

**(c) Brother-sister group of trades or businesses under common control--(1) In general.** The term "brother-sister group of trades or businesses under common control" means two or more organizations conducting trades or businesses if (i) the same five or fewer persons who are individuals, estates, or trusts own (directly and with the application of § 1.414(c)–4) a controlling interest in each organization, and (ii) taking into account the ownership of each such person only to the extent such ownership is identical with respect to each such organization, such persons are in effective control of each organization. The five or fewer persons whose ownership is considered for purposes of the controlling interest requirement for each organization must be the same persons whose ownership is considered for purposes of the effective control requirement.

    **(2) Effective control defined.** For purposes of this paragraph, persons are in "effective control" of an organization if--

    **(i)** In the case of an organization which is a corporation, such persons own stock possessing more than 50 percent of the total combined voting power of all classes of stock entitled to vote or more than 50 percent of the total value of shares of all classes of stock of such corporation;

    **(ii)** In the case of an organization which is a trust or estate, such persons own an aggregate actuarial interest of more than 50 percent of such trust or estate;

    **(iii)** In the case of an organization which is a partnership, such persons own an aggregate of more than 50 percent of the profits interest or capital interest of such partnership; and

    **(iv)** In the case of an organization which is a sole proprietorship, one of such persons owns such sole proprietorship.

**(d) Combined group of trades or businesses under**

**common control.** The term "combined group of trades or businesses under common control" means any group of three or more organizations, if (1) each such organization is a member of either a parent-subsidiary group of trades or businesses under common control or a brother-sister group of trades or businesses under common control, and (2) at least one such organization is the common parent organization of a parent-subsidiary group of trades or businesses under common control and is also a member of a brother-sister group of trades or businesses under common control.

**(e) Examples.** The definitions of parent-subsidiary group of trades or businesses under common control, brother-sister group of trades or businesses under common control, and combined group of trades or businesses under common control may be illustrated by the following examples.

    **Example 1.** (a) The ABC partnership owns stock possessing 80 percent of the total combined voting power of all classes of stock entitled to voting of S corporation. ABC partnership is the common parent of a parent-subsidiary group of trades or businesses under common control consisting of the ABC partnership and S Corporation.

    (b) Assume the same facts as in (a) and assume further that S owns 80 percent of the profits interest in the DEF Partnership. The ABC Partnership is the common parent of a parent-subsidiary group of trades or businesses under common control consisting of the ABC Partnership, S Corporation, and the DEF Partnership. The result would be the same if the ABC Partnership, rather than S, owned 80 percent of the profits interest in the DEF Partnership.

    **Example 2.** L Corporation owns 80 percent of the only class of stock of T Corporation, and T, in turn, owns 40 percent of the capital interest in the GHI Partnership. L also owns 80 percent of the only class of stock of N Corporation and N, in turn, owns 40 percent of the capital interest in the GHI Partnership. L is the common parent of a parent-subsidiary group of trades or businesses under common control consisting of L Corporation, T Corporation, N Corporation, and the GHI

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Partnership.

**Example 3.** ABC Partnership owns 75 percent of the only class of stock of X and Y Corporations; X owns all the remaining stock of Y, and Y owns all the remaining stock of X. Since interorganization ownership is excluded (that is, treated as not outstanding) for purposes of determining whether ABC owns a controlling interest of at least one of the other organizations, ABC is treated as the owner of stock possessing 100 percent of the voting power and value of all classes of stock of X and of Y for purposes of paragraph (b)(1)(ii) of this section. Therefore, ABC is the common parent of a parent-subsidiary group of trades or businesses under common control consisting of the ABC Partnership, X Corporation, and Y Corporation.

**Example 4.** Unrelated individuals A, B, C, D, E, and F own an interest in sole proprietorship A, a capital interest in the GHI Partnership, and stock of corporations M, W, X, Y, and Z (each of which has only one class of stock outstanding) in the following proportions:

| ORGANIZATIONS | | | | | | | |
|---|---|---|---|---|---|---|---|
| Individuals | A | GHI | M | W | X | Y | Z |
| A | 100% | 50% | 100% | 60% | 40% | 20% | 60% |
| B | -- | 40% | -- | 15% | 40% | 50% | 30% |
| C | -- | -- | -- | -- | 10% | 10% | 10% |
| D | -- | -- | -- | 25% | -- | 20% | -- |
| E | -- | 10% | -- | -- | 10% | -- | -- |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

Under these facts the following four brother-sister groups of trades or businesses under common control exist: GHI, X and Z; X, Y and Z; W and Y; A and M. In the case of GHI, X, and Z, for example, A and B together have effective control of each organization because their combined identical ownership of GHI, X and Z is greater than 50%. (A's identical ownership of GHI, X and Z is 40% because A owns at least a 40% interest in each organization. B's identical ownership of GHI, X and Z is 30% because B owns at least a 30% interest in each organization.) A and B (the persons whose ownership is considered for purposes of the effective control requirement) together own a controlling interest in each organization because they own at least 80% of the capital interest of partnership GHI and at least 80% of the total combined voting power of corporations X and Z. Therefore, GHI, X and Z comprise a brother-sister group of trades or businesses under common control. Y is not a member of this group because neither the effective control requirement nor the 80% controlling interest requirement are met. (The effective control requirement is not met because A's and B's combined identical ownership in GHI, X, Y and Z (20% for A and 30% for B) does not exceed 50%. The 80% controlling interest test is not met because A and B together only own 70% of the total combined voting power of the stock of Y.) A and M are not members of this group because B owns no interest in either organization and A's ownership of GHI, X and Z, considered alone, is less than 80%.

**Example 5.** The outstanding stock of corporations U and V, which have only one class of stock outstanding, is owned by the following unrelated individuals:

| CORPORATIONS | |
|---|---|
| U | V |

Treas. Reg. § 1.414(c)–2

| Individuals | (percent) | (percent) |
|---|---|---|
| A | 12 | 12 |
| B | 12 | 12 |
| C | 12 | 12 |
| D | 12 | 12 |
| E | 13 | 13 |
| F | 13 | 13 |
| G | 13 | 13 |
| H | 13 | 13 |
|  | 100 | 100 |

Any group of five of the shareholders will own more than 50 percent of the stock in each corporation, in identical holdings. However, U and V are not members of a brother-sister group of trades or businesses under common control because at least 80 percent of the stock of each corporation is not owned by the same five or fewer persons.

**Example 6.** A, an individual, owns a controlling interest in ABC Partnership and DEF Partnership. ABC, in turn, owns a controlling interest in X Corporation. Since ABC, DEF, and X are each members of either a parent-subsidiary group or a brother-sister group of trades or businesses under common control, and ABC is the common parent of a parent-subsidiary group of trades or businesses under common control consisting of ABC and X, and also a member of a brother-sister group of trades or businesses under common control consisting of ABC and DEF, ABC Partnership, DEF Partnership, and X Corporation are members of the same combined group of trades or businesses under common control.

[T.D. 8179, 53 FR 6606, March 2, 1988; T.D. 8540, 59 FR 30102, June 10, 1994]

SOURCE: T.D. 6500, 25 FR 11402, Nov. 26, 1960; 25 FR 14021, Dec. 21, 1960, unless otherwise noted.

Treas. Reg. § 1.414(c)–2, 26 C.F.R. § 1.414(c)–2

Current through January 24, 2013; 78 FR 5145

© 2013 Thomson Reuters.
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

29 C.F.R. § 4001.2    Page 1

**Effective: July 14, 2011**

Code of Federal Regulations Currentness
Title 29. Labor
Subtitle B. Regulations Relating to Labor
Chapter XL. Pension Benefit Guaranty Corporation (Refs & Annos)
Subchapter A. General
Part 4001. Terminology (Refs & Annos)
➡ § 4001.2 Definitions.

For purposes of this chapter (unless otherwise indicated or required by the context):

Affected party means, with respect to a plan--

(1) Each participant in the plan;

(2) Each beneficiary of a deceased participant;

(3) Each alternate payee under an applicable qualified domestic relations order, as defined in section 206(d)(3) of ERISA;

(4) Each employee organization that currently represents any group of participants;

(5) For any group of participants not currently represented by an employee organization, the employee organization, if any, that last represented such group of participants within the 5–year period preceding issuance of the notice of intent to terminate; and

(6) The PBGC.

If an affected party has designated, in writing, a person to receive a notice on behalf of the affected party, any reference to the affected party (in connection with the notice) shall be construed to refer to such person.

Annuity means a series of periodic payments to a participant or surviving beneficiary for a fixed or contingent period.

Bankruptcy filing date means, with respect to a plan, the date on which a petition commencing a case under the United States Bankruptcy Code is filed, or the date on which any similar filing is made commencing a case under any similar Federal law or law of a State or political subdivision, with respect to the contributing sponsor of the plan, if such case has not been dismissed as of the termination date of the plan. If a bankruptcy petition is filed under one chapter of the United States Bankruptcy Code, or under one chapter or provision of any such similar law, and the case is converted to a case under a different chapter or provision of such Code or similar law (for example, a Chapter 11 reorganization case is converted to a Chapter 7 liquidation case), the date of the original petition is the bankruptcy filing date. If such a plan has more than one contributing sponsor:

(1) If all contributing sponsors entered bankruptcy on the same date, that date is the bankruptcy filing date;

(2) If all contributing sponsors did not enter bankruptcy on the same date (or if not all contributing sponsors are in bankruptcy), PBGC will determine the date that will be treated as the bankruptcy filing date based on the facts and circumstances, which may include such things as the relative sizes of the contributing sponsors, the relative amounts of their minimum required contributions to the plan, the timing of the different bankruptcies, and the expectations of participants.

Basic-type benefit means a benefit that is guaranteed under part 4022 of this chapter or that would be guaranteed if the guarantee limits in §§ 4022.22 through 4022.27 of this chapter did not apply. In a PPA 2006 bankruptcy termination, it also includes a benefit accrued by a participant, or to which a

participant otherwise became entitled, on or before the plan's termination date but that is not guaranteed solely because of the provisions of §§ 4022.3(b) or 4022.4(c).

Benefit liabilities means the benefits of participants and their beneficiaries under the plan (within the meaning of section 401(a)(2) of the Code).

Code means the Internal Revenue Code of 1986, as amended.

Complete withdrawal means a complete withdrawal as described in section 4203 of ERISA.

Contributing sponsor means a person who is a contributing sponsor as defined in section 4001(a)(13) of ERISA.

Controlled group means, in connection with any person, a group consisting of such person and all other persons under common control with such person, determined under § 4001.3 of this part. For purposes of determining the persons liable for contributions under section 412(c)(11)(B) of the Code or section 302(c)(11)(B) of ERISA, or for premiums under section 4007(e)(2) of ERISA, a controlled group also includes any group treated as a single employer under section 414 (m) or (o) of the Code. Any reference to a plan's controlled group means all contributing sponsors of the plan and all members of each contributing sponsor's controlled group.

Corporation means the Pension Benefit Guaranty Corporation, except where the context demonstrates that a different meaning is intended.

Defined benefit plan means a plan described in section 3(35) of ERISA.

Disclosure officer means the official designated as disclosure officer in the Office of the General Counsel, PBGC.

Distress termination means the voluntary termination of a single-employer plan in accordance with

section 4041(c) of ERISA and part 4041, subpart C, of this chapter.

Distribution date means:

(1) Except as provided in paragraph (2)--

(i) For benefits provided through the purchase of irrevocable commitments, the date on which the obligation to provide the benefits passes from the plan to the insurer; and

(ii) For benefits provided other than through the purchase of irrevocable commitments, the date on which the benefits are delivered to the participant or beneficiary (or to another plan or benefit arrangement or other recipient authorized by the participant or beneficiary in accordance with applicable law and regulations) personally or by deposit with a mail or courier service (as evidenced by a postmark or written receipt); or

(2) The deemed distribution date (as defined in § 4050.2) in the case of a designated benefit paid to the PBGC in accordance with part 4050 of this chapter (dealing with missing participants).

Earliest retirement age at valuation date means the later of: a participant's age on his or her birthday nearest to the valuation date, or the participant's attained age as of his or her Earliest PBGC Retirement Date (as determined under § 4022.10 of this chapter).

EIN means the nine-digit employer identification number assigned by the Internal Revenue Service to a person.

Employer means all trades or businesses (whether or not incorporated) that are under common control, within the meaning of § 4001.3 of this chapter.

ERISA means the Employee Retirement Income Security Act of 1974, as amended.

Expected retirement age (XRA) means the age, determined in accordance with §§ 4044.55 through

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

4044.57 of this chapter, at which a participant is expected to begin receiving benefits when the participant has not elected, before the allocation date, an annuity starting date. This is the age to which a participant's benefit payment is assumed to be deferred for valuation purposes. An XRA is equal to or greater than the participant's earliest retirement age at valuation date but less than his or her normal retirement age.

Fair market value means the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.

FOIA means the Freedom of Information Act, as amended (5 U.S.C. 552).

Funding standard account means an account established and maintained under section 302(b) of ERISA or section 412(b) of the Code.

Guaranteed benefit means a benefit under a single-employer plan that is guaranteed by the PBGC under section 4022(a) of ERISA and part 4022 of this chapter, or a benefit under a multiemployer plan that is guaranteed by the PBGC under section 4022A of ERISA.

Insurer means a company authorized to do business as an insurance carrier under the laws of a State or the District of Columbia.

Irrevocable commitment means an obligation by an insurer to pay benefits to a named participant or surviving beneficiary, if the obligation cannot be cancelled under the terms of the insurance contract (except for fraud or mistake) without the consent of the participant or beneficiary and is legally enforceable by the participant or beneficiary.

IRS means the Internal Revenue Service.

Mandatory employee contributions means amounts contributed to the plan by a participant that are required as a condition of employment, as a condition of participation in such plan, or as a condition of obtaining benefits under the plan attributable to employer contributions.

Mass withdrawal means:

(1) The withdrawal of every employer from the plan,

(2) The cessation of the obligation of all employers to contribute under the plan, or

(3) The withdrawal of substantially all employers pursuant to an agreement or arrangement to withdraw.

Multiemployer Act means the Multiemployer Pension Plan Amendments Act of 1980.

Multiemployer plan means a plan that is described in section 4001(a)(3) of ERISA and that is covered by title IV of ERISA. Multiemployer plan also means a plan that elects to be a multiemployer plan under ERISA section 3(37)(G) and Code section 414(f)(6), pursuant to procedures prescribed by PBGC.

Multiple employer plan means a single-employer plan maintained by two or more contributing sponsors that are not members of the same controlled group, under which all plan assets are available to pay benefits to all plan participants and beneficiaries.

Nonbasic-type benefit means any benefit provided by a plan other than a basic-type benefit.

Nonforfeitable benefit means a benefit described in section 4001(a)(8) of ERISA. Benefits that become nonforfeitable solely as a result of the termination of a plan will be considered forfeitable.

Non–PPA 2006 bankruptcy termination means a plan termination that is not a PPA 2006 bankruptcy termination.

Normal retirement age means the age specified in the plan as the normal retirement age. This age

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 12-2312    Document: 00116488978    Page: 43    Date Filed: 02/05/2013    Entry ID: 5709400

shall not exceed the later of age 65 or the age attained after 5 years of participation in the plan. If no normal retirement age is specified in the plan, it is age 65.

Notice of intent to terminate means the notice of a proposed termination of a single-employer plan, as required by section 4041(a)(2) of ERISA and § 4041.21 (in a standard termination) or § 4041.41 (in a distress termination) of this chapter.

PBGC means the Pension Benefit Guaranty Corporation.

Person means a person defined in section 3(9) of ERISA.

Plan means a defined benefit plan within the meaning of section 3(35) of ERISA that is covered by title IV of ERISA.

Plan administrator means an administrator, as defined in section 3(16)(A) of ERISA.

Plan sponsor means, with respect to a multiemployer plan, the person described in section 4001(a)(10) of ERISA.

Plan year means the calendar, policy, or fiscal year on which the records of the plan are kept.

PN means the three-digit plan number assigned to a plan.

PPA 2006 bankruptcy termination means a plan termination to which section 404 of the Pension Protection Act of 2006 applies. Section 404 of the Pension Protection Act of 2006 applies to any plan termination in which the termination date occurs while bankruptcy proceedings are pending with respect to the contributing sponsor of the plan, if the bankruptcy proceedings were initiated on or after September 16, 2006. Bankruptcy proceedings are pending, for this purpose, if a contributing sponsor has filed or has had filed against it a petition seeking liquidation or reorganization in a case under title 11, United States Code, or under any similar Federal law or law of a State or political subdivision, and the case has not been dismissed as of the termination date of the plan.

Proposed termination date means the date specified as such by the plan administrator of a single-employer plan in a notice of intent to terminate or, if later, in the standard or distress termination notice, in accordance with section 4041 of ERISA and part 4041 of this chapter.

Single-employer plan means any defined benefit plan (as defined in section 3(35) of ERISA) that is not a multiemployer plan (as defined in section 4001(a)(3) of ERISA) and that is covered by title IV of ERISA.

Standard termination means the voluntary termination, in accordance with section 4041(b) of ERISA and part 4041, subpart B, of this chapter, of a single-employer plan that is able to provide for all of its benefit liabilities when plan assets are distributed.

Substantial owner means a substantial owner as defined in section 4022(b)(5)(A) of ERISA.

Sufficient for benefit liabilities means that there is no amount of unfunded benefit liabilities, as defined in section 4001(a)(18) of ERISA.

Sufficient for guaranteed benefits means that there is no amount of unfunded guaranteed benefits, as defined in section 4001(a)(17) of ERISA. In a PPA 2006 bankruptcy termination, the determination whether a plan is sufficient for guaranteed benefits is made taking into account the limitations in sections 4022(g) and 4044(e) of ERISA (and corresponding provisions of these regulations). The determinations of which benefits are guaranteed and which benefits are in priority category 3 under section 4044(a)(3) of ERISA are made by reference to the bankruptcy filing date, but the present values of those benefits are determined as of the proposed termination date and the date of distribution.

Termination date means the date established pursu-

Case: 12-2312    Document: 00116488978    Page: 44    Date Filed: 02/05/2013    Entry ID: 5709400

ant to section 4048(a) of ERISA.

Title IV benefit means the guaranteed benefit plus any additional benefits to which plan assets are allocated pursuant to section 4044 of ERISA and part 4044 of this chapter.

Unreduced retirement age (URA) means the earlier of the normal retirement age specified in the plan or the age at which an unreduced benefit is first payable.

Voluntary employee contributions means amounts contributed by an employee to a plan, pursuant to the provisions of the plan, that are not mandatory employee contributions.

[61 FR 63989, Dec. 2, 1996; 62 FR 35342, July 1, 1997; 62 FR 60428, Nov. 7, 1997; 62 FR 67728, Dec. 30, 1997; 73 FR 79635, Dec. 30, 2008; 74 FR 11029, March 16, 2009; 74 FR 27081, June 8, 2009; 74 FR 59095, Nov. 17, 2009; 76 FR 34601, June 14, 2011]

SOURCE: 61 FR 34003, July 1, 1996; 61 FR 34010, July 1, 1996; 68 FR 61347, Oct. 28, 2003, unless otherwise noted.

AUTHORITY: 29 U.S.C. 1301, 1302(b)(3).

29 C. F. R. § 4001.2, 29 CFR § 4001.2

Current through January 24, 2013; 78 FR 5145

© 2013 Thomson Reuters.
END OF DOCUMENT

Case: 12-2312    Document: 00116488978    Page: 45    Date Filed: 02/05/2013    Entry ID: 5709400
Westlaw.

29 C.F.R. § 4001.3                                                                                      Page 1

**Effective:[See Text Amendments]**

Code of Federal Regulations Currentness
  Title 29. Labor
    Subtitle B. Regulations Relating to Labor
      Chapter XL. Pension Benefit Guaranty Corporation (Refs & Annos)
        Subchapter A. General
          Part 4001. Terminology (Refs & Annos)
          ➔ **§ 4001.3 Trades or businesses under common control; controlled groups.**

For purposes of title IV of ERISA:

(a)(1) The PBGC will determine that trades and businesses (whether or not incorporated) are under common control if they are "two or more trades or businesses under common control", as defined in regulations prescribed under section 414(c) of the Code.

(2) The PBGC will determine that all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer, and all such trades and businesses shall be treated as a single employer.

(3) An individual who owns the entire interest in an unincorporated trade or business is treated as his own employer, and a partnership is treated as the employer of each partner who is an employee within the meaning of section 401(c)(1) of the Code.

(b) In the case of a single-employer plan:

(1) In connection with any person, a controlled group consists of that person and all other persons under common control with such person.

(2) Persons are under common control if they are members of a "controlled group of corporations", as defined in regulations prescribed under section 414(b) of the Code, or if they are "two or more trades or businesses under common control", as defined in regulations prescribed under section 414(c) of the Code.

SOURCE: 61 FR 34003, July 1, 1996; 61 FR 34010, July 1, 1996; 68 FR 61347, Oct. 28, 2003, unless otherwise noted.

AUTHORITY: 29 U.S.C. 1301, 1302(b)(3).

29 C. F. R. § 4001.3, 29 CFR § 4001.3

Current through January 24, 2013; 78 FR 5145

© 2013 Thomson Reuters.
END OF DOCUMENT