No. 12-2312

# In the
# United States Court of Appeals
# for the First Circuit

NEW ENGLAND TEAMSTERS & TRUCKING INDUSTRY PENSION FUND,

*Defendant-Appellant,*

v.

SUN CAPITAL PARTNERS III, LP, ET AL.,

*Plaintiffs-Appellees.*

**On Appeal From The United States District Court
For The District of Massachusetts, Boston
Case No. 10-CV-10921
Hon. Douglas P. Woodlock**

### APPELLEES' RESPONSE BRIEF

| | | |
|---|---|---|
| Theodore J. Folkman, P.C. | John F. Hartmann, P.C. | Patrick F. Philbin |
| Murphy & King P.C. | Marla Tun | Kellen S. Dwyer |
| 1 Beacon Street | Jeffrey S. Quinn | John S. Moran* |
| 21st Floor | Kirkland & Ellis LLP | Kirkland & Ellis LLP |
| Boston, MA  02108-0000 | 300 N LaSalle Street | 655 Fifteenth Street, NW |
| | Chicago, IL 60654 | Washington, D.C. |
| | (312) 862-2000 | 20005 |
| | | (202) 879-5000 |

April 3, 2013          *Counsel for Plaintiffs-Appellees*

*Admitted only in Virginia.  Practice is supervised by principals of the Firm.

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ..................................................................................................1

STATEMENT OF THE ISSUES............................................................................4

STATEMENT OF FACTS .....................................................................................4

    A.    The Sun Funds and Sun Capital Advisors, Inc. ..............................4

    B.    The Sun Funds' Investment in Scott Brass, Inc. ...................................8

    C.    SBI's Bankruptcy and the Ensuing Litigation ...................................10

SUMMARY OF THE ARGUMENT ....................................................................12

ARGUMENT ........................................................................................................14

I.    Neither Sun Fund Is a "Trade or Business" Under Section 1301(b)(1).........15

    A.    Congress Directed that "Trade or Business" Should Have the Same Meaning Under Section 1301(b)(1) that It Has Under the Tax Code. .........................................................................................15

    B.    Entities That Simply Make Investments, Manage Investments, and Earn Investment Returns Are Not "Trades or Businesses."..........18

    C.    The Teamsters and the PBGC Misstate the Law with Their "Investment Plus" Test for Trades or Businesses. .............................21

        1.    The PBGC's Views Are Not Entitled to Deference. ................21

        2.    The "Investment Plus" Standard Ignores Settled Precedent. .................................................................................24

    D.    The Sun Funds Are Not Trades or Businesses....................................27

II.    Section 1392(c) Cannot Be Used To Rewrite the Sun Funds' Investments and Make Sun Fund IV "Under Common Control" with SBI. ..............................................................................................................35

A.    "Evading or Avoiding" SBI's Potential Withdrawal Liability Was Not a Principal Purpose of the "Transaction" at Issue — the Sun Funds' Investment in SBI. ....................................................37

B.    The Sun Funds' Decisions To Limit Their Investments Below the 80% Threshold Does Not Constitute "Evading or Avoiding Liability" Within the Meaning of the Act. ..........................................39

　　1.    Section 1392(c) targets evasion of *current* obligations, not decisions to stop short of *acquiring new* obligations. ........39

　　2.    The text and history of section 1392(c) show that it targets sham or otherwise deceptive transactions. ...................46

　　3.    Applying the remedy specified in section 1392(c) cannot result in either Sun Fund being part of a control group with SBI. ..................................................................................52

　　4.    The Teamsters' unprecedented expansion of section 1392(c) would frustrate the purposes of the Act. ....................54

CONCLUSION ...........................................................................................56

ii

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Auer v. Robbins*,
  519 U.S. 452 (1997) ................................................................ 21, 22

*Bd. of Trustees, Sheet Metal Workers' Nat'l Pension Fund v.
  Palladium Equity Partners, LLC*,
  722 F. Supp. 2d 854 (E.D. Mich. 2010) ............................................26

*Beck v. Pace Intern. Union*,
  551 U.S. 96 (2007) .....................................................................23

*Bell v. Comm'r*,
  1998 WL 155448 (U.S. Tax Ct. 1998) ............................................34

*Berkshire Hathaway, Inc. v. Textile Workers Pension Fund*,
  874 F.2d 53 (1st Cir. 1989) ..........................................................23

*Board of Trustees of W. Conf. of Teamsters Pension Trust Fund v. Lafrenz*,
  837 F.2d 892 (9th Cir. 1988) ........................................................26

*Cardero-Suarez v. Rodriguez*,
  689 F.3d 77 (1st Cir. 2012) ..........................................................38

*Cent. States Health & Welfare Fund v. Cullum Cos.*,
  973 F.2d 1333 (7th Cir. Ill. 1992) .................................................46

*Cent. States Se. & Sw. Areas Pension Fund v. Ditello*,
  974 F.2d 887 (7th Cir. 1992) ........................................................26

*Cent. States Se. & Sw. Areas Pension Fund v. Fulkerson*,
  238 F.3d 891 (7th Cir. 2001) .................................................... 25, 28

*Cent. States Se. & Sw. Areas Pension Fund v. Messina Products, LLC*,
  706 F.3d 874 (7th Cir. 2013) ................................... 13, 26, 27, 28

*Cent. States, Se. & Sw. Areas Pension Fund v. White*,
  258 F.3d 636 (7th Cir. 2001) ........................................................26

iii

*Cf. CIC-TOC Pension Plan v. Weyerhaeuser Co.*,
   2012 WL 5879525 (D. Or. Nov. 20, 2012) ............................................. 38, 41, 47

*Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc.*,
   467 U.S. 837 (1984)...................................................................................23

*Chicago Truck Drivers v. El Paso Co.*,
   525 F.3d 591 (7th Cir. 2008) ....................................................................... 43, 46

*Choeum v. I.N.S.*,
   129 F.3d 29 (1st Cir. 1997).........................................................................23

*Christopher v. SmithKline Beecham Corp.*,
   132 S.Ct. 2156 (2012)..................................................................... 22, 23

*Comm'r v. Keystone Consol. Indus., Inc.*,
   508 U.S. 152 (1993)...................................................................................16

*Commissioner v. Groetzinger*,
   480 U.S. 23 (1987)...................................................................................... 20, 25

*Connors v. Marontha Coal Co., Inc.*,
   670 F. Supp. 45 (D.D.C. 1987)..................................................................43

*Connors v. Peles*,
   724 F.Supp. 1538 (W.D. Pa. 1989)...........................................................42

*Cuyamaca Meats, Inc. v. San Diego & Imperial Cntys.*
   *Butchers' & Food Emp'rs' Pension Trust Fund*,
   827 F.2d 491 (9th Cir. 1987) ....................................................................47

*Dagres v. Commissioner*,
   136 T.C. 263 (T.C. 2011)............................................................................ 20, 31

*DeBreceni v. Graf Bros. Leasing, Inc.*,
   828 F.2d 877 (1st Cir. 1987)......................................................................55

*Deputy v. du Pont*,
   308 U.S. 488 (1940).....................................................................................34

*Dorn's Transp., Inc. v. Teamsters' Pension Tr. Fund of Phila.*,
   787 F.2d 897 (3d Cir. 1986) ..................................................................... 37, 48

iv

*Durando v. United States*,
   70 F.3d 548 (9th Cir. 1995) ...............................................................34

*FAA v. Cooper*,
   132 S. Ct. 1441 (2012)........................................................................16

*Freeman v. Quicken Loans, Inc.*,
   132 S. Ct 2034 (2012).........................................................................40

*French v. United States*,
   487 F.2d 1246 (1st Cir. 1973)............................................................19

*Gonzales v. Oregon*,
   546 U.S. 243 (2006).............................................................................21

*Harrell v. Eller Maritime Co.*,
   No. 8:09-CV-1400-T-27AEP,
   2010 WL 3835150 (M.D. Fla. Sept. 30, 2010)..................................26

*HBE Leasing Corp. v. Frank*,
   48 F.3d 623 (2d Cir. 1995) ................................................................42

*Helvering v. Gregory*,
   69 F.2d 809 (2d Cir. 1934) ................................................................41

*Higgins v. Commissioner*,
   312 U.S. 212 (1941)............................................................................18

*In re Challenge Stamping & Porcelain Co.*,
   719 F.2d 146 (6th Cir. 1983) ............................................................56

*In re Scott Brass, Inc.*,
   No. 1:08-bk-13702 (Bankr. D.R.I. Nov. 21, 2008) ...........................11

*Kantor v. Commissioner*,
   998 F.2d 1514 (9th Cir. 1992) ...........................................................20

*Latta v. Kilbourn*,
   150 U.S. 524 (1893).............................................................................31

*Lawson v. FMR LLC*,
   670 F.3d 61 (1st Cir. 2012)............................................................ 23, 24

*Lewin v. Commissioner*,
    335 F.3d 345 (4th Cir. 2003) ...............................................................20

*Lopresti v. Pace Press, Inc.*,
    868 F.Supp.2d 188 (S.D.N.Y. 2012) ........................................... 44, 47

*Mason & Dixon Tank Lines, Inc. v. Central States, SE & SW Areas Pension Fund*,
    852 F.2d 156 (6th Cir. 1988) ...............................................................17

*McDougall v. Pioneer Ranch Ltd. P'ship*,
    494 F.3d 571 (7th Cir. 2007) ...............................................................15

*Neal v. Clark*,
    95 U.S. 704 (1878) ...............................................................................40

*Penn Cent. Corp. v. W. Conference of Teamsters Pension Trust Fund*,
    75 F.3d 529 (9th Cir. 1996) .................................................................51

*Phillips v. Pembroke Real Estate, Inc.*,
    459 F.3d 128 (1st. Cir. 2006)...............................................................40

*Reynolds v. Comm'r*,
    1945 WL 7104 (T.C. 1945) ..................................................................33

*Sherwin-Williams v. New York State Teamsters Conf. Pension & Ret. Fund*,
    158 F.3d 387 (6th Cir. 1998) ...............................................................48

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944)..............................................................................23

*Teamster's Joint Council No. 83 of Virginia Pension Fund v. Empire Beef Co., Inc.*,
    2011 WL 201492 (E.D. Va 2011)........................................................48

*Teamsters Pension Trust Fund v. Cent. Mich. Trucking, Inc.*,
    857 F.2d 1107 (6th Cir. 1988) ....................................................... 43, 53

*Teamsters Pension Trust of Phila. & Vicinity v. Cent. Mich. Trucking Inc.*,
    698 F. Supp. 698 (W.D. Mich. 1987) ..................................................42

*Trustees of Utah Carpenters' & Cement Masons' Pension Trust v. Loveridge*,
    2012 WL 2522596 (D. Utah 2012)......................................................44

*United Elec., Radio & Machine Workers v. 163 Pleasant St Corp.*,
  960 F.2d 1080 (1st Cir. 1992) .................................................................... 54, 55

*United States v. Clark*,
  358 F.2d 892 (1st Cir. 1966) ........................................................................19

*United States v. DeCicco*,
  439 F.3d 36 (1st Cir. 2006) ..........................................................................40

*Whipple v. Comm'r*,
  373 U.S. 193 (1963) ........................................................................ 16, 18, 25

*White v. Mercury Marine*,
  129 F.3d 1428 (11th Cir. 1997) ....................................................................47

*Wills v. Brown Univ.*,
  184 F.3d 20 (1st Cir. 1999) ..........................................................................36

*Zink v. United States*,
  929 F.2d 1015 (5th Cir. 1991) ......................................................................20

**Statutes**

26 U.S.C. § 401(a)(4) ......................................................................................17

26 U.S.C. § 410(b) ...........................................................................................17

26 U.S.C. § 9722 ..............................................................................................47

29 U.S.C. § 1301(b)(1) ............................................................................ passim

29 U.S.C. § 1381 ..............................................................................................14

29 U.S.C. § 1381(a) .........................................................................................11

29 U.S.C. § 1383(a)(2) .....................................................................................11

29 U.S.C. § 1392(c) ................................................................................. passim

29 U.S.C. § 1398 ..............................................................................................51

29 US.C. § 1001-1368 .....................................................................................11

6 Del Code § 15-301 ........................................................................................31

Pub. L. No. 93-406, § 1015, 88 Stat. 829, 926 ........................................................16

**Regulations**

26 C.F.R. § 1.414(c)–2(b)(1) ...........................................................................35

26 C.F.R. § 1.414(c)-2(b)(2)(i)(C) ..................................................................41

26 C.F.R. § 1.414(c)-2(c)(2)(iii) .....................................................................41

29 C.F.R. § 2510.3-101(d) ..............................................................................29

29 C.F.R. § 2510.3-101(d)(1) ..........................................................................29

29 C.F.R. § 2510.3-101(d)(3) ..........................................................................29

29 C.F.R. § 4001.2 ...........................................................................................21

29 C.F.R. § 4001.3 ...........................................................................................21

29 C.F.R. § 4001.3(a)(1) ..................................................................................22

**Legislative History**

126 Cong. Rec. 23,038 (1980) (statement of Rep. Frank Thompson) ...................46

H.R. Rep. No. 93-807, 93d Cong.,
   2d Sess. at 50 (Feb. 21, 1974)........................................................................17

**Other Authorities**

7 Mertens Law of Fed. Income Tax'n § 28:61 ......................................................16

Webster's Third New Int'l Dict. (1986) .................................................................39

## <u>INTRODUCTION</u>

When Scott Brass, Inc. (SBI) went bankrupt, the New England Teamsters and Trucking Industry Pension Fund (the "Teamsters" or "Teamsters Fund") went after the deepest pockets it could find to satisfy SBI's "withdrawal liability" under the Multiemployer Pension Plan Amendment Act ("MPPAA") to the Employee Retirement Income Security Act ("ERISA"). The Teamsters targeted two private equity funds — known here as Sun Fund III and Sun Fund IV — that indirectly owned 30% and 70% stakes in SBI. There is no dispute that to hold either Sun Fund liable under the "control-group" provision of ERISA, the Teamsters had to show that the Fund was *both* (i) a "trade or business"; and (ii) "under common control" with SBI. 29 U.S.C. § 1301(b)(1).

The Teamsters fail on both tests. Their attack on the decision below has one recurring theme: disregard for distinctions between separate legal entities — between the two Sun Funds themselves, and between the Funds and the distinct entities that provide management services for a fee to companies (like SBI) in which the Funds invest. The Teamsters' effort to sow confusion provides no basis for reversing the decision below.

Under settled law, an entity is not a "trade or business" if its only activity is making and managing investments and it earns only investment returns. The Sun Funds are quintessential investors. They are pools of capital that invest (indirectly)

in companies and earn investment returns.  Control-group liability under ERISA is limited to "trades or businesses" because it is designed to prevent a business from avoiding ERISA obligations by breaking up its operations into separate entities, each carrying on a different part of the business.  It is not designed to reach the *owners* of the business.  The Sun Funds are precisely such owners.

The Teamsters and the Pension Benefit Guaranty Corporation ("PBGC") as amicus wrongly claim that participating in management of the portfolio companies in which they invest would, without more, convert the Sun Funds into "trades or business."  That misstates the law.  But even if it were correct, the undisputed facts show that the management activity identified by the Teamsters was not carried out *by the Sun Funds*.  Instead, separate entities affiliated with the private equity firm that helped organize the Funds performed those activities.  The Teamsters attribute those actions to the Funds by simply ignoring the distinction between the Sun Funds and these other entities.  The district court rightly rejected that approach as fundamentally misunderstanding the law of agency.

The Sun Funds are also not "under common control" with SBI, because neither has an 80% (or greater) stake in SBI (the threshold for "control" under applicable regulations). To get around the fact that the Funds acquired only 30% and 70% stakes, the Teamsters claim that the Funds' decisions to stop short of an 80% investment was an effort to "evade or avoid" liability that can be ignored.  *See*

2

29 U.S.C. § 1392(c).  That theory suffers from multiple errors, not least of which is that deciding *not to acquire* an 80% interest in a company (so as not to acquire that company's potential withdrawal liability) is not what Congress had in mind when it targeted efforts to "evade or avoid" liability under ERISA.  Contrary to the Teamsters' belief, when it targeted *evasion* Congress did not effectively create an obligation for investors to invest in amounts sufficient to expose themselves to liability to the Teamsters.

To salvage their theory, the Teamsters once again resort to obliterating distinctions between different entities.  They pretend that investments made by the two Sun Funds involved merely "taking money out of one pocket to put into another," Teamsters' Br. 29 — as if the two investments were an artifice concocted by one monolithic entity that merely wrote checks from different bank accounts.  That is false.  The Funds are separate entities that pool the capital of different investors, and the Teamsters provide no basis for ignoring their separate existence.

The district court also rightly recognized that the Teamsters' approach to expanding liability would undermine the MPPAA's goal of promoting financial stability of multi-employer pension plans by deterring investment in distressed employers with unfunded pension obligations.  Deterring investment makes it more likely that distressed employers would become failed employers — which simply increases financial stress on the pension funds to which the employers contribute.

3

## STATEMENT OF THE ISSUES

1. Whether a private equity fund whose only activity is making investments and whose only income is from returns on investments is a "trade or business" under 29 U.S.C. § 1301(b)(1).

2. Where acquiring an 80% interest in a target company would make an investor part of the company's "control group" and potentially expose the investor to liability for the target's unfunded pension obligations, is an investor's decision to acquire *less than* an 80% interest an effort to "evade or avoid" liability under ERISA within the meaning of 29 U.S.C. § 1392(c)?

## STATEMENT OF FACTS

### A.    The Sun Funds and Sun Capital Advisors, Inc.

Appellees   Sun Capital Partners III,  LP,  Sun Capital Partners III QP,  LP (together,  "Sun  Fund III"),[1]  and  Sun Capital Partners IV,  LP  ("Sun  Fund IV") (collectively, "the Sun Funds" or "the Funds"), are private equity funds.  They are investment vehicles for large private and institutional investors, including, for example, dozens of ERISA-protected employee benefit plans, public and private

---

[1]    Sun Capital Partners III,  LP and  Sun Capital Partners III QP, LP are "parallel funds."  They have the same general partner and typically invest in the same opportunities in the same proportions.  *See* Sealed App'x ("S.App.") 96 ¶ 6.15(a),  155  ¶ 6.15(a).    Although  they  are  separate  partnerships,  for convenience they are referred to collectively as "Sun Fund III."

4

universities, and charitable organizations. *Id.*[2] Each Fund is a Delaware limited partnership. *See* S.App. 5, 66, 124.

Under the limited partnership agreements, after providing capital into the partnership, the limited partners (the investors) have virtually no control over the Fund's investment decisions. *See id.* at 36 ¶ 7.2, 97 ¶ 7.2, 156 ¶ 7.2. Instead, authority to make investment decisions is assigned to each Fund's general partner ("GP"). *Id.* at 28 ¶ 6.1(a), 89 ¶ 6.1(a), 147 ¶ 6.1(a). Each GP is a separate legal entity (a limited partnership) with a decision-making committee that consists of two individuals, Marc Leder and Rodger Krouse, who are the co-CEOs of the private equity firm Sun Capital Advisors, Inc. *Id.* at 265, 283 ¶ 4.1, 302, 321 ¶ 4.1. Each GP also has entered a Master Advisory Agreement to receive investment advisory services from Sun Capital Advisors, Inc. *Id.* at 916-17.[3] In return for the services they provide each Fund, each GP receives both an annual fee and a percentage of the Fund's profits from investments. *See id.* at 25 ¶ 4.3(a)-(e), 85-86 ¶ 4.3(a)-(e), 143-44 ¶ 4.3(a)-(e); *id* at 28 ¶ 6.1(a), 89 ¶ 6.1(a), 147 ¶ 6.1(a).

---

[2]    Fund IV's limited partners, for example, include the Houston Municipal Employees Pension System, the Kentucky Retirement Systems, and Sherman Fairchild Foundation. *See* S.App. 926-33.

[3]    The GP of Fund III is Sun Capital Advisors III, LP, and the GP of Fund IV is Sun Capital Advisors IV, LP.

Each Fund typically invests by forming a limited liability company, or "LLC," which, in turn, invests in a holding company that acquires a controlling interest in the operating "portfolio company." S.App 939 (Leder Dep. 11:1-6); *id.* at 940-41, at 30:16-31:13; *id.* at 988-89 (Calhoun Dep. 120:15-121:10);[4] *see also id.* at 29; *id.* at 410 (Leder Dep.).

Neither Sun Fund has any employees. *See id.* at 960-61 (Calhoun Dep. at 39:14-15, 44:14-15). The tax returns for each Fund show that the only income each receives is from returns on its investments. *See* S.App. 1018-1062.

Sun Fund III and Sun Fund IV were formed at different times by separate partnership agreements, they file separate tax returns, issue separate annual reports to their limited partners, and keep separate financial statements. *See* S.App. 5, 66, 124; *id.* at 1018-62. They also have different limited partner investors. *See id.* at 922-936. Of the 230 limited partners in Fund IV as of March 31, 2009, only 64 were also limited partners in Fund III. *Id.*

Sun Capital Advisors, Inc. is a private equity *firm* that is distinct from the *funds* it helps to organize. Along with its affiliated entities, it provides investment advisory and management services for a fee both to funds and to portfolio

---

[4]  The Sun Funds have filed a motion seeking leave to file a supplemental "Sealed Appendix To Appellees' Response Brief" reproducing relevant portions of the record omitted from the Teamsters' Sealed Appendix. To avoid confusion, pagination of this appendix begins where the Teamsters' Sealed Appendix ends, at page 922, and this appendix is also cited as "S.App."

companies in which the funds have invested.  Sun Capital Advisors, Inc. and its related entities provide essentially three types of services: (1) they bring investors together and create the limited partnership entities (funds) in which investors can pool their capital; (2) they manage the funds through entities that serve as GPs of the funds and provide the expertise to find, conduct diligence on, and recommend investments for the funds; and (3) through contractual arrangements with portfolio companies in which funds have invested, they provide management services to ensure the success of the portfolio companies, *see* S.App. 412 (Leder Dep. 34:10-15); *id.* at 990-91 (Calhoun Dep.).  Sun Capital Advisors, Inc. employs approximately 123 professionals to provide these services.  *See id.* at 966, 990.

In this case, for example, the GPs of Fund III and Fund IV are themselves limited partnerships formed by Leder and Krouse and are affiliates of Sun Capital Advisors, Inc.  *See* App. 68 ¶ 43; S.App. 972-73 (Calhoun Dep.).

In addition, the formation documents of each Sun Fund make clear that the GP of each Sun Fund (and other affiliates of Sun Capital Advisors, Inc.) may provide personnel to serve as officers or directors of portfolio companies in which the Fund invests.  *See, e.g.*, S.App. 26 ¶ 5.1(d); *id.* at 32 ¶ 6.10; *see also id.* at 410 (Leder Dep. 32:17-20).  In this case, Sun Capital Advisors, Inc. provided management services to the portfolio company through a subsidiary of the GP of Fund IV.  Specifically, the holding company that made the investment in SBI

entered a contract with a subsidiary of the GP (a subsidiary known as Sun Capital Partners Management IV, LLC) for management services. *See id.* at 340-49. That subsidiary also signed the Master Advisory Agreement to receive management and consulting services from Sun Capital Advisors, Inc. *See id.* at 912 ¶ 2.[5]

When promoting the Funds to potential investors through Private Placement Memoranda (PPMs), Sun Capital Advisors, Inc. highlights its ability to guide the management of the portfolio companies in which the Funds invest. *See, e.g.*, *id.* at 189, 209. As the arrangements described above illustrate, after a Fund acquires an interest (indirectly) in a portfolio company, it can exercise its shareholder authority to appoint professionals from Sun Capital Advisors, Inc. (or one of its affiliates) to the board of the parent in which the Fund has directly invested. Then those professional, acting as members of the board, can direct management of the portfolio company either by installing personnel from Sun Capital Advisors, Inc. as officers or by entering a contract with an affiliate of Sun Capital Advisors, Inc. for management services (or both).

### B.    The Sun Funds' Investment in Scott Brass, Inc.

This lawsuit arises out of investments the Sun Funds made, indirectly, in Scott Brass, Inc. (SBI), a Rhode Island manufacturer of brass and copper coil. In

---

[5]    For ease of reference, unless context requires otherwise, this brief will refer to services provided by Sun Capital Advisors, Inc. *and its affiliates*. The exact affiliated entities involved are described here.

8

December 2006, the Funds formed Sun Scott Brass, LLC ("SSB-LLC") to invest in SBI, with Sun Fund III investing $900,000 for a 30% interest in the LLC and Sun Fund IV investing $2.1 million for a 70% interest. *Id.* at 426-27 (Leder Dep.); *id.* at 448; *id.* at 1063-64. SSB-LLC then invested the $3 million in Scott Brass Holding Corporation ("SB Holdco"), which, in turn, purchased all of SBI's stock. *See id.* at 491, 587.

Sun Fund III and Sun Fund IV made their investments in a 30%/70% ratio for several reasons. That approach helped to diversify the investments of each Fund. *Id.* at 416 (Leder Dep.). In fact, the Sun Funds have "[m]any investments" that "are jointly owned by two or even three funds, sometimes with outside investors and co-investors as well." *Id.* at 413-14; *see also id.* at 444-447 (memo identifying five other companies in which Funds III and IV both invested). In addition, at the time of the SBI investment,[6] Sun Fund III was nearing the end of its six-year investment cycle and seeking to diversify further by making small investments. Fund IV was earlier in its life cycle and seeking larger investments. *See id.*; *id.* at 672 (Liff Dep.).

In deciding the size of the investment each Fund should make, each Fund's GP also considered advice from counsel that, if either Fund owned 80% or more of

---

[6] Unless context makes the existence of SSB-LLC and SB Holdco significant, for ease of reference this brief generally discusses the investment in SBI without repeating the existence of the intermediate entities.

a company, it would risk joining the company's "control group" and potentially take on some of the company's liabilities, including a contingent obligation to pay the company's unfunded pension obligations if it went bankrupt. *Id.* at 416-17 (Leder Dep.). Protecting the Funds from becoming responsible for that contingent liability was a factor in each GP's decision to have the Fund it managed acquire less than an 80% interest. *Id.* at 416-17.

After the Sun Funds had created SSB-LLC and SSB-LLC had incorporated SB Holdco, SSB-LLC exercised its shareholder rights in SB Holdco to appoint two professionals from Sun Capital Advisors, Inc. (Chris Metz and Dixon McElwee) to SB Holdco's board. SB Holdco then retained a subsidiary of the GP of Fund IV to provide management and consulting services to SBI for a fee. *See id.* at 340-49. That subsidiary, in turn, had signed the Master Advisory Agreement to receive advisory services from Sun Capital Advisors, Inc. *Id.* at 912-21. Pursuant to these contracts, professionals from Sun Capital Advisors, Inc. worked with SBI's management team to help improve the company's efficiency and financial health. *See id.* at 637-51 (Metz Dep.); *id.* at 990-91 (Calhoun Dep.). These efforts would ultimately prove unsuccessful.

### C.    SBI's Bankruptcy and the Ensuing Litigation

In the fall of 2008, the declining price of copper reduced the value of SBI's inventory to such an extent that SBI violated its loan covenants. *See id.* at 1081-

10

82.  As a result, SBI lost its ability to obtain credit and became unable to pay its bills.  *Id.*  In October 2008, SBI ceased operations and stopped making contributions to the Teamsters Fund.  *See id.* at 1083.  By so doing, SBI incurred "withdrawal liability" under ERISA, as amended by the MPPAA, which requires employers who cease contributing to covered pension plans to pay their proportionate share of the plan's unfunded vested benefits.  *See* 29 U.S.C. §§ 1381(a), 1383(a)(2).  An involuntary Chapter 11 bankruptcy proceeding was commenced against SBI, *see In re Scott Brass, Inc.*, No. 1:08-bk-13702 (Bankr. D.R.I. Nov. 21, 2008), and the Sun Funds lost their entire investment through the bankruptcy.

The Teamsters subsequently sent a notice of default to the Sun Funds, claiming that they were obligated to pay SBI's withdrawal liability under 29 U.S.C. § 1301(b)(1).  *See* S.App. 1091-92.  The Sun Funds then filed a declaratory action in district court seeking a judgment that they are not liable for SBI's unpaid withdrawal liability.  *See* Teamsters' App'x ("App.") 1-23.  The Teamsters counterclaimed seeking $4,516,539 in withdrawal liability — over 150% of the Funds' combined original investment (which had already been completely lost).  *Id.* at 24-42.

On cross motions for summary judgment, the district court held that the Sun Funds were not liable for SBI's withdrawal liability because they are not "trades or

11

businesses" within the meaning of 29 U.S.C. § 1301(b)(1).  Memorandum and

Order 23 ("Op.").  The court also rejected the claim that Fund IV should be

deemed to own 100% of SSB-LLC under 29 U.S.C. § 1392(c).  *Id.* at 39-40.  This

appeal by the Teamsters followed.

## SUMMARY OF THE ARGUMENT

It is undisputed that to establish control-group liability for either Sun Fund,

the Teamsters must show that the Fund both (i) is a "trade or business" and (ii) was

under "common control" with SBI.  The Teamsters cannot make either showing.

1.    Congress directed that the control-group provision of section

1301(b)(1) — including the term "trades or businesses" — should be given the

same meaning as a parallel provision under the Tax Code.  Under settled tax

precedent, an entity (like the Sun Funds) that merely makes and manages

investments is not a trade or business.

The Teamsters' and PBGC's claim for deference for a different "investment

plus" test (under which some amount of management activity would turn an

investor into a "trade or business") should be rejected.  Contrary to its claims, the

PBGC is not interpreting its own regulation here and the agency provides no

persuasive basis for rejecting settled precedent from the tax context.

Under the proper test, the Sun Funds are not trades or businesses because

they are quintessential investors that have merely invested in SBI and earn only

investment returns. That result also comports with the purposes of the control-group provision in section 1301(b)(1), which is designed to prevent an employer from circumventing ERISA obligations by divvying up its business operations into separate entities. It is *not* intended to reach the "owners" of a business so as to require them to "dig into their pockets" to pay withdrawal liability of a company they own. *Cent. States Se. & Sw. Areas Pension Fund v. Messina Products, LLC*, 706 F.3d 874, 878 (7th Cir. 2013). The Sun Funds are precisely the sort of owners (investors) — not engaged in other business operations — who should not be required to shoulder responsibility for withdrawal liability incurred by a company they (indirectly) own.

The Teamsters' effort to turn the Funds into "trades or businesses" by pointing out management activities peformed by personnel of Sun Capital Advisors, Inc. and its affiliates is misguided. Even if the Funds themselves undertook those actions (which they did not), that would not make them trades or businesses under the proper test. Moreover, the Teamsters can attribute those actions to the Funds only by ignoring the distinctions between separate entities and erroneously attributing to the Funds actions taken by *other* entities.

2.   It is also undisputed that "common control" here requires an 80% ownership stake in an entity, but that Sun Fund III and Sun Fund IV had only 30% and 70% stakes in SBI, respectively. A decision to stop short of acquiring an 80%

13

stake cannot be treated as an effort to "evade or avoid" liability under 29 U.S.C. § 1392(c). And the Teamsters' effort to treat the Sun Funds as if they were a single entity that artificially partitioned its investment is simply another attempt to lump together distinct entities indiscriminately without justification. The Teamsters' vague approach to expanding section 1392(c) would also frustrate the purposes of the MPPAA by deterring investment in distressed employers, thereby hastening their demise.

## **ARGUMENT**

Under the MPPAA, when an employer stops contributing to a covered pension plan that has unfunded liabilities the employer incurs "withdrawal liability" and must pay its proportionate share of the plan's unfunded vested benefits. *See* 29 U.S.C. § 1381 *et seq*. The Teamsters seek to hold the Sun Funds liable for SBI's withdrawal liability under the "control group" provision of ERISA, which provides that "all employees of trades or businesses … under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer." 29 U.S.C. § 1301(b)(1). It is undisputed that, to impose withdrawal liability on the Sun Funds under section 1301(b)(1), the Teamsters must prove *both* that the Sun Funds are "trades or businesses" *and* that they were under "common control" with SBI. *See McDougall v. Pioneer Ranch*

14

*Ltd. P'ship*, 494 F.3d 571, 577 (7th Cir. 2007); Teamsters' Br. 14. As a matter of law, the Teamsters cannot succeed on either prong of that test.

**I.    Neither Sun Fund Is a "Trade or Business" Under Section 1301(b)(1).**

There is no dispute that the statute itself provides no definition of "trade or business." The text and history of section 1301(b)(1), however, make plain that Congress intended "trades and businesses" in that section to have the same meaning it has long been given under the Tax Code. And under the Tax Code, an entity that solely makes investments and earns only investment income — like the Sun Funds — is not a "trade or business."

**A.    Congress Directed that "Trade or Business" Should Have the Same Meaning Under Section 1301(b)(1) that It Has Under the Tax Code.**

By its terms, section 1301(b)(1) expressly directs that "regulations prescribed" to interpret the control-group provision "shall be *consistent and coextensive* with regulations prescribed for similar purposes by the Secretary of the Treasury under section 414 (c) of title 26." 29 U.S.C. § 1301(b)(1) (emphasis added). That command could hardly make it clearer that Congress sought to ensure that construction of the provisions in the Tax Code and ERISA would remain parallel and that interpretations applied under the Tax Code would control.

It is also "a cardinal rule of statutory construction that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that

15

were attached to each borrowed word in the body of learning from which it was taken." *FAA v. Cooper*, 132 S. Ct. 1441, 1449 (2012) (quotations omitted). There can be no question that "[t]he term 'trade or business' is a term of art which has been defined by case law" under the Tax Code. 7 Mertens Law of Fed. Income Tax'n § 28:61. As explained below, *see infra* pp.19-23, in a line of cases dating back to 1941, the Supreme Court has made clear that the term does not include investment activity that results solely in investment returns. *See, e.g.*, *Whipple v. Comm'r*, 373 U.S. 193, 202 (1963). When Congress used the term in section 1301(b)(1), it must be presumed that Congress knew about, and adopted, the meaning given that phrase in the tax context. *See, e.g.*, *Comm'r v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 159 (1993) (when Congress used the term "sale or exchange," it presumably was aware of the "settled judicial and administrative interpretation" of such phrase).

The history of section 1301(b) further confirms that Congress intended the term "trades or businesses" to follow interpretations under the Tax Code. The same bill that enacted ERISA added an identically-worded control group provision in section 414(c) of the Tax Code. *See* Pub. L. No. 93-406, § 1015, 88 Stat. 829, 926. Section 414(c) is an anti-circumvention provision designed to "make it clear that the coverage and antidiscrimination provisions" that apply to pension plans

under the Tax Code[7] "cannot be avoided by operating through separate corporations instead of separate branches of the one corporation."  H.R. Rep. No. 93-807, 93d Cong., 2d Sess. at 50 (Feb. 21, 1974), *reprinted in* 1974 U.S.C.C.A.N. 4670, 4716.  At the same time, Congress added section 1301(b)'s control-group provision to ERISA to serve an identical anti-circumvention purpose related to liability to pension plans — to ensure that employers could not shirk their obligations by compartmenting a business into separate entities.  In fact, courts have relied on the same committee reports describing the purposes of section 414(c) to interpret section 1301(b).  *See, e.g., Mason & Dixon Tank Lines, Inc. v. Central States, SE & SW Areas Pension Fund*, 852 F.2d 156, 159 (6th Cir. 1988).  Given that section 1301(b)(1) was enacted together with section 414(c), contains identical language, serves the same anti-circumvention purpose, and that Congress expressly directed that implementation of section 1301(b)(1) should track implementation of section 414(c), it makes no sense to think that Congress intended the phrase "trades and businesses" to have a different meaning under section 1301(b)(1) from the one it has in the tax context.

---

[7]  To qualify for beneficial tax treatment, pension plans must meet certain coverage requirements, 26 U.S.C. § 410(b), and may not "discriminate in favor of highly compensated employees," *id.* § 401(a)(4).

**B.    Entities That Simply Make Investments, Manage Investments, and Earn Investment Returns Are Not "Trades or Businesses."**

It is settled law under the Tax Code that an entity is not engaged in a "trade or business" where its only activity is making and managing investments and the only income it earns is a return on its investments (*i.e.*, interest, dividends, or capital gains).  The Supreme Court made that clear in *Higgins v. Commissioner*, 312 U.S. 212 (1941), where it considered a "taxpayer, with extensive investments in real estate, bonds and stocks, [who] devoted a considerable portion of his time to the oversight of his interests and hired others to assist him in offices rented for that purpose."  *Id.* at 213.  The Court rejected an attempt to treat expenses incurred in managing the investments (including rent and salaries for staff), as deductions from business income, holding that, where "managerial attention to his investments" still earned the taxpayer income only through "interest and dividends from his securities" (not through any management fee or salary), he was not conducting a trade or business "[n]o matter how large the estate or how continuous or extended the work required" to manage it.  *Id.* at 218.

Similarly, in *Whipple v. Commissioner*, 373 U.S. 193, 202 (1963), the taxpayer had devoted considerable time to managing a corporation he owned, but had received no salary or other remuneration for his services.  The Court rejected an effort to treat that management activity as a trade or business.  It explained that "[d]evoting one's time and energies to the affairs of a corporation is not of itself …

18

a trade or business" and that while "such activities may produce income, profit or gain in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing" and does not arise from a "trade or business of the taxpayer." *Id.* at 202. The Court thus made clear that, even when an individual is active in managing a business, "[w]hen the only return is that of an investor," the individual is not engaged in a trade or business. *Id.* As a result, it was "untenable" to claim that "one who actively engages in serving his own corporations for the purpose of creating future income through those enterprises is in a trade or business." *Id.* at 203; *see also id.* ("[F]urnishing management and other services to corporations for a reward not different from that flowing to an investor in those corporations is not a trade or business ….").

This Court's decisions reflect the same distinction between making (and managing) investments and "trades and businesses." In *United States v. Clark*, 358 F.2d 892 (1st Cir. 1966), this Court held that an investor who also advised and managed several small businesses in which he had invested was not conducting a trade or business, because that would require a "reward or compensation from these corporations … different from that flowing to an investor." *Id.* at 895. Similarly, *French v. United States*, 487 F.2d 1246 (1st Cir. 1973), held that the sole owner of a car dealership who was actively "rendering management services to [the dealership]" was not conducting a trade or business because the management

19

activity "was done primarily to protect or enhance his investment rather than to earn a salary." *Id.* at 1249.

Other Courts of Appeals have similarly recognized that "[t]he *management of investments … is not a trade or business*, regardless of how extensive or complex the investment portfolio or how much time is required to manage investments." *Zink v. United States*, 929 F.2d 1015, 1021 (5th Cir. 1991) (emphasis in original); *see also Dagres v. Commissioner*, 136 T.C. 263, 281-82 (T.C. 2011). Indeed, courts have specifically held that where a limited partnership is invested in a business and its general partners have "active involvement" with the business, including "apply[ing] … knowledge and experience to insure that an investment is successful," the limited partnership is not engaged in a trade or business where the partners' involvement did "not exceed that of an interested and active investor." *Lewin v. Commissioner*, 335 F.3d 345, 349, 350 (4th Cir. 2003); *see also Kantor v. Commissioner*, 998 F.2d 1514, 1520 (9th Cir. 1992).

The Supreme Court's *Groetzinger* decision did not establish a different test. In holding that gambling could be a trade or business, the Court focused analysis on two points: [1] "continuity and regularity" of the activity, and [2] that the taxpayer's "primary purpose for engaging in the activity must be for income or profit." *Commissioner v. Groetzinger*, 480 U.S. 23, 35 (1987). The Court made clear, however, that it was not announcing a test independent from existing

caselaw. The Court reaffirmed that "an investor, seeking merely to increase his holdings, [is] not engaged in a trade or business," *id.* at 28, and expressly declared: "We do not overrule *or cut back on* the Court's holding in *Higgins*." *Id.* at 35 (emphasis added).

### C.    The Teamsters and the PBGC Misstate the Law with Their "Investment Plus" Test for Trades or Businesses.

The PBGC's "investment plus" test — under which investment "plus" some vague amount of management activity triggers trade or business status — deserves no deference and misstates the law.

### 1.    The PBGC's Views Are Not Entitled to Deference.

The PBGC seeks deference for a decision of the PBGC Appeals Board, *see* App. 42–56 (the "PBGC Opinion"), and tries to cast it as an interpretation of the PBGC's "own regulations" entitled to "controlling weight" under *Auer v. Robbins*, 519 U.S. 452 (1997). That argument is specious. An "agency does not acquire special authority to interpret its own words when, instead of using its expertise and experience to formulate a regulation, it has elected merely to paraphrase the statutory language." *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006). That is all the PBGC has done here. The PBGC's rules (29 C.F.R. §§ 4001.2, 4001.3) use the statutory terms "trades and businesses" without any additional explanation whatsoever. In fact, the PBGC's rules incorporate by reference the Treasury's rules, saying that the PBGC "will determine that trades or businesses … are under

21

common control if they are 'two or more trades or businesses under common control,' as defined in regulations prescribed under section 414(c) of the Code." 29 C.F.R. § 4001.3(a)(1). Where its rules pledge to follow the Treasury regulations, the PBGC cannot credibly claim that it is interpreting its *own* language; instead, it has bound itself to apply (and interpret) the *Treasury's rules* — an endeavor for which it receives no deference at all.

*Auer* deference is also inappropriate where significant monetary liability would be imposed on a party that did not have fair notice of the agency's interpretation when the underlying conduct took place. *See Christopher v. SmithKline Beecham Corp.*, 132 S.Ct. 2156, 2167 (2012). When the Sun Funds invested in SBI in 2006, the PBGC Opinion had not been issued. *See* PBGC Br. 6.

Finally, *Auer* "[d]eference is undoubtedly inappropriate … when the agency's interpretation is 'plainly erroneous or inconsistent with the regulation.'" *Christopher*, 132 S. Ct. at 2166 (quoting *Auer*, 519 U.S. at 461). As explained below, *see infra* p. 26-27, the PBGC's approach is plainly inconsistent with both the statutory requirement that the PBGC's regulations track Treasury regulations and with the statement in the PBGC's own rule that its control-group determinations will track the Treasury's rules for identifying "trades or businesses under common control." It disregards decades of precedent interpreting "trades or

businesses" under the tax laws.  Indeed, the PBGC's approach is expressly based on the flatly mistaken view "that Income Tax Cases are Irrelevant."  PBGC Br. 8.[8]

Deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), is also inappropriate.  First, "Congress has made [a] choice and not given the agency a role" here by assigning interpretive authority to the Treasury.  *Lawson v. FMR LLC*, 670 F.3d 61, 82 (1st Cir. 2012).[9]  In addition, *Skidmore* offers an agency's interpretation "a measure of deference proportional to the thoroughness evident in its consideration, the validity of its reasoning," and its overall "power to persuade." *Christopher*, 132 S.Ct. at 2169 (quotation marks omitted).  The PBGC Opinion lacks the hallmarks of thorough consideration since "there was no opportunity for public comment" when it was issued, *id.*, and, as explained below, the PBGC has

---

[8]  The PBGC does not claim deference under *Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc.*, 467 U.S. 837 (1984)—and for good reason. *Chevron* deference requires "'a gap for the agency to fill,'" and "'an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation.'"  *Choeum v. I.N.S.*, 129 F.3d 29, 44 (1st Cir. 1997) (quoting *Chevron*, 467 U.S. at 843-44).  Here, any delegated authority to explain the terms in section 1301(b)(1) belongs to the Treasury, not the PBGC.

[9]  The express direction in section 1301(b)(1) for the PBGC to adhere to Treasury regulations makes cases affording deference to PBGC interpretations of *other* sections of ERISA irrelevant.  *See, e.g.*, Teamsters' Br. 17 (citing *Beck v. Pace Intern. Union*, 551 U.S. 96, 104 (2007)); PBGC Br. 8 & nn. 22-24 (citing, *inter alia*, *Berkshire Hathaway, Inc. v. Textile Workers Pension Fund*, 874 F.2d 53, 55 (1st Cir. 1989)).

radically departed from caselaw while providing "no reasoning to support [its] construction," *Lawson*, 670 F.3d at 82.

### 2. The "Investment Plus" Standard Ignores Settled Precedent.

The Teamsters and the PBGC provide no sound basis for the Court to jettison precedent and adopt the PBGC's new-found "investment plus" test.

The PBGC's sweeping claims that tax cases are "inapplicable" or "irrelevant," PBGC Br. 7, 8, and that Congress never directed that interpretation of "trade or business" under section 1301(b) should parallel interpretations under the Tax Code, *id.* at 7, ignore the plain text and history described above. *See supra* p. 15-21. The PBGC's apparent view that Congress directed the PBGC to follow the Treasury's interpretation of only one phrase in section 1301(b)(1) ("common control"), but left it free to develop a divergent interpretation of "trades or businesses" makes no sense. When Congress instructed the PBGC that is rules implementing the "preceding sentence" in section 1301(b)(1) — that is, the control group provision — must be "consistent and coextensive" with regulations implementing section 414(c), Congress clearly intended to bind the PBGC to the Treasury's interpretation of the language in the *entire* "preceding sentence," not just one phrase in it.

Branding tax cases "irrelevant" is also illogical given that the PBGC and the Teamsters base their own test on (a misreading of) *Groetzinger* — which is, of

24

course, a *tax case*. Nor can *Higgins* and *Whipple* be dismissed as addressing investment activities of individuals. *See, e.g.*, PBGC Op. 11–13; Teamsters' Br. 16. *Groetzinger* also addressed an individual, and *Higgins* and *Whipple* turned on identifying activity and returns that are "distinctive to the process of investing," *Whipple*, 373 U.S. at 202, which has nothing to do with the individual status of the investor. In addition, partnerships generally receive the same treatment as individuals under the Tax Code, *see* 26 U.S.C. § 703(a), and lower courts have recognized that *Whipple* and *Higgins* logically apply to partnerships. *See supra* p. 20.

The PBGC's approach to *Groetzinger* itself is also unpersuasive, because the PBGC cherry-picks one portion of the opinion it likes (the two-part focus on profit motive and regular activity) and, without any rationale, ignores the Court's warning that it did not "cut back" on *Higgins* in the slightest. 480 U.S. at 35.

The PBGC's claim that courts have already adopted its approach misrepresents the cases. *See* PBGC Br. 8-9 & n.25. In citing *Groetzinger* for determining "trade or business" status, the Seventh Circuit has never held that the case can be applied without regard to *Whipple* and *Higgins*. To the contrary, the court has explained that "one purpose of the *Groetzinger* test is to distinguish trades or businesses from *investments*," *Cent. States Se. & Sw. Areas Pension Fund v. Fulkerson,* 238 F.3d 891, 895 (7th Cir. 2001) (emphasis added), — which is

25

precisely the purpose of the *Higgins* rule reaffirmed in *Groetzinger*.  Far from

rejecting *Higgins*, the Seventh Circuit has cited the case to support its application

of *Groetzinger*.  *See, e.g.*, *Cent. States, Se. & Sw. Areas Pension Fund v. White*,

258 F.3d 636, 643 (7th Cir. 2001).  Moreover, because none of the Seventh

Circuit's cases has called on the court to draw a line between a completely passive

investor and an investor who engages in some management activity, the Seventh

Circuit has never endorsed the PGBC's approach to ignoring *Whipple* and

*Higgins*.[10]

In reality, only one district court has followed the PBGC Opinion.  *See Bd.*

*of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Palladium Equity*

*Partners, LLC*, 722 F. Supp. 2d 854, 868-69 (E.D. Mich. 2010).[11]  Because that

court merely repeated the PBGC's rationale and the flatly mistaken premise that

---

[10]  The Seventh Circuit has rejected the broad statement in *Cent. States Se. & Sw. Areas Pension Fund v. Ditello*, 974 F.2d 887, 889–90 (7th Cir. 1992), that tax precedents are not a reliable basis for interpreting section 1301(b).  *See, e.g.*, *Messina,* 706 F.3d at 883.  The PBGC's reliance on *Ditello* thus misrepresents the law.  Similarly, *Board of Trustees of W. Conf. of Teamsters Pension Trust Fund v. Lafrenz*, 837 F.2d 892 (9th Cir. 1988), failed to cite any tax cases without any explanation.  It provides no support for the PBGC's selective rejection of *Higgins* and *Whipple*.

[11]  *Harrell v. Eller Maritime Co.*, 2010 WL 3835150 (M.D. Fla. 2010), did not cite the PBGC Opinion, but held that a holding company engaged in "regular" management activity for a subsidiary was engaged in a trade or business because it was not a completely "passive shareholder." *Id.* at *4.  Because that decision fails to consider or even cite *Whipple* and *Higgins*, its absence of reasoning also provides no persuasive authority for this Court.

26

under *Whipple* an investor who engages in management activity loses his investor status, the case provides no persuasive authority for this Court.

### D. The Sun Funds Are Not Trades or Businesses.

Because the Sun Funds simply made indirect investments in SBI (and other portfolio companies), exercised management control as shareholders, and earned only investment returns, they cannot be treated as trades or businesses.

The limited partnership agreement for each Sun Fund recites that each was "organized for the principal purposes of (i) investing in securities … (ii) managing and supervising such investments, and (iii) engaging in … other activities incidental or ancillary thereto …." *E.g.*, S.App. 124. The declared purpose of the Funds was thus investment activity. Moreover, in practice, each Fund earns income only from returns on investments (*i.e.*, dividends, interest, and capital gains or losses). *See supra* n.4. The Sun Funds provide no services to portfolio companies (or anyone else), and thus receive no income for any services or business activities. *Cf. Messina*, 706 F.3d at 886 (looking to entity's stated purpose and tax returns to evaluate trade or business status).

Applying the *Whipple/Higgins* test here to find that the Sun Funds are not trades or businesses also promotes the purposes behind section 1301(b)(1). Section 1301(b)(1) is designed to "prevent businesses from shirking their ERISA obligations by fractionalizing operations into many separate entities." *Messina,*

27

706 F.3d at 878 (quotation omitted).  At the same time, it is *not* intended to reach those who have made "investments" in an employer.  *Fulkerson*, 238 F.3d at 895. As the Seventh Circuit put it, "[t]he purpose of limiting controlled group membership to persons engaged in trades or businesses is to protect the *owners* of corporations from having to dig into their pockets to make good the withdrawal liability of their corporations."  *Messina*, 706 F.3d at 880 (emphasis added).  The *Whipple/Higgins* test polices precisely that line between mere owners — investors in an employer whose only income comes from investment returns (even if they participate in management) — and entities that are connected by ownership but *also* conduct other operations producing other income.  Only the latter are targeted by section 1301(b)(1) because they raise the risk of improperly "fractionalizing" operations of what should be considered a single employer.

The Teamsters devote much of their brief to pointing out that individuals connected with the Sun Funds' GPs and with Sun Capital Advisors, Inc. (such as Leder, Krouse, Liff, Metz, and McElwee) "were involved in the operations of SBI on a regular and continuous basis."  Teamsters' Br. 9; *see also id.* at 23. According to the Teamsters, the actions of all these individuals can be attributed to the Sun Funds themselves, and that makes the Funds trades or businesses.  That theory is fundamentally flawed for two reasons.

28

First, even if the actions of those individuals could be attributed to the Sun Funds (which they cannot, *see infra* 31-35), as a matter of law that would not make the Sun Funds "trades or businesses" if, in return for that management service, the Funds earned only investment returns. The whole point of the *Whipple/Higgins* test is that, no matter how extensive the activity may be, managing an investment (including managing a corporation in which one has invested) cannot turn an investment into a trade or business. For the same reason, the Teamsters' focus on Venture Capital Operating Company ("VCOC") status under ERISA, *see* 29 C.F.R. § 2510.3-101(d), is beside the point. *See* Teamsters' Br. 19-20. To qualify as VCOCs, the Sun Funds must have at least half their investments in operating companies over which they have management rights and must have the contractual right "to substantially participate in, or substantially influence the conduct of, the management of the operating company." 29 C.F.R. § 2510.3-101(d)(1), (d)(3). But under the *Whipple/Higgins* test, nothing about that level of influence over management is inconsistent with investor status.

Second, even if some level of involvement in managing SBI could convert the Sun Funds into trades or businesses, under the undisputed facts, the Teamsters cannot show that the individuals they identify were acting *for the Sun Funds* when they provided management services. None was an employee of the Sun Funds — the Funds have no employees. Instead, as the Teamsters acknowledge, the

29

individuals held various positions with *other* entities.  *See, e.g.*, Teamsters' Br. 7 & n.10.  They were limited partners in the Sun Funds' GPs and/or officers or employees of Sun Capital Advisors, Inc. or its affiliates.  It is black letter law, moreover, that "the same individuals may serve as officers or directors of more than one entity" and that overlapping personnel in such roles between two entities "does not in itself create relationships of agency."  Restatement (Third) of Agency (2006) § 7.03 comment d(3).  In addition, there is "a general presumption" that actions by "a shared officer are attributed to the entity for which the officer purports to be acting."  *Id.*  Thus, it misrepresents the law for the Teamsters to suggest that, if individuals who played a role in managing SBI also had some connection to the Sun Funds, the Sun Funds must have been managing SBI.

The record is clear, moreover, that SB HoldCo contracted to secure management services for SBI from a wholly owned subsidiary of Sun Fund IV's GP, *see* S.App. 340-47, and that subsidiary, in turn, signed the "Master Advisory Agreement" to secure management and advisory services from Sun Capital Advisors, Inc., *id.* at 912-21.  As a result, the presence of Sun Capital Advisors, Inc. personnel providing management services to SBI shows nothing more than the functioning of those contracts — neither of which involved the Sun Funds themselves.  Sun Capital Advisors, Inc. and certain of its affiliates have been conducting trades or businesses by selling management services for a fee, but

30

nothing in the facts suggests that the Sun Funds themselves were involved in that business.[12]  *Cf. Dagres*, 136 T.C. at 283 ("[T]he manager of venture capital funds provides a service that is an investment mechanism for the customer but that is a trade or business of the manager.").

The Teamsters also seem to think that if the GPs of the Sun Funds were engaged in management activities, their actions can automatically be attributed to the Funds themselves.  *See* Teamsters' Br. 18-19, 22-24; PBGC Br. 15-16; PBGC Op. 9, 13.  The district court correctly rejected that approach because it fundamentally "misunderstood the law of agency."  Op. 17.

Under Delaware law, a partner "is an agent of the partnership *for the purpose of its business, purposes or activities*" and the "act of a partner … *carrying on in the ordinary course the partnership's business* … binds the partnership."  6 Del Code § 15-301 (emphasis added).  The critical limitation here, inherent in the law of agency, is that a partner's acts bind the partnership when it is pursuing the partnership's business (acting within the scope of its agency).  *See, e.g.*, *Latta v. Kilbourn*, 150 U.S. 524, 544–49 (1893) (a partner in a real-estate brokerage was not an agent in buying and selling real estate on his own account);

---

[12]  It is irrelevant that the management fee paid by Fund IV to its GP is reduced by amounts earned by the GP (or its subsidiary) in management fees from arrangements with a portfolio company.  S.App. 22 ¶ 5.1(c).  Offering a price adjustment does not turn the actions of the GP into the actions of the Fund.

31

*see generally* Restatement (Third) of Agency §§ 2.01-2.03. Status as an agent does not mean that *everything* the GP does is done on the partnership's behalf and automatically attributable to the partnership.

The Teamsters proceed from the premise that the "sole purpose" for each GP's existence is serving as GP of a Sun Fund. Teamsters' Br. 18. That is wrong. The GP of Sun Fund IV, for example, runs a business (partly through a subsidiary) providing advisory and management services for a fee. *See supra* pp.7-9. Indeed, the limited partnership agreement creating the GP of Sun Fund IV expressly states that the "object and purpose" of the entity includes *both* "(i) acting as the general partner of [Sun Fund IV]" and "(iii) performing such other investment management functions as may be permitted by applicable law." S.App. 306. The record also clearly shows the distinction between the GP's actions taken on behalf of the Sun Fund (where it signs on behalf of the Fund), *see, e.g.*, *id.* 479 (agreement creating SSB-LLC), and actions taken on its own behalf (where it signs in its own name), *see, e.g.*, *id.* at 917 (Master Advisory Agreement). As the Restatement (Third) of Agency explains, "[a]n agent may enter into a contract on behalf of a disclosed principal and, additionally, enter into a separate contract on the agent's own behalf with the same third party." § 6.01 comment b. The Teamsters provide no basis for attributing all acts of the GP in running its advisory

business to the Fund.[13]   And their rationale leads to the absurd conclusion that, because each Sun Fund GP received a management fee *from the Sun Fund itself*, the Sun Fund can be treated as having received a management fee (the one that it paid to its own GP) and thus is a "trade or business."   That is obviously nonsensical.

In addition, as the district court explained, a principal does not take on the *status* of its agent.   A property owner who uses a real estate agent is not therefore in the business of being a real estate agent; nor is an investor who hires a professional money manager suddenly in the money-managing business.   Op. 17 (citing *Reynolds v. Comm'r*, 1945 WL 7104 (T.C. 1945)).

What the Teamsters seek is not applying the law of *agency*, but rather treating the GPs as the Funds' *alter egos* — without satisfying the rigorous standards of the *alter ego* doctrine.   At bottom, the Teamsters' legal theory amounts to little more than mushing together every entity that had "Sun" in its

---

[13]   The Teamsters claim it "contradicts" the PPM used to market Sun Fund IV for the Funds to explain that, in managing companies like SBI, "Principals" of the GP of Fund IV acted as "consultants" (through the management contract executed by SB Holdco), not as agents of Fund IV.   Teamsters' Br. 23.   That is wrong.   The PPM refers to the Principals of the GP merely to identify those who will perform management roles and describe how they "typically" work, S.App. 188, without specifying the *capacity* in which they will perform those tasks.   The same PPM explains that the "Principals" "[p]resently … are making equity investments through [Fund III]."   *Id.* at 187.   They were certainly not performing that role as agents of Fund IV.

33

name (or had someone from a Sun entity acting on its behalf) and hoping that confusion will lead the Court to attribute every action of every Sun entity to the Sun Funds. Needless to say, the Court cannot adopt that unprincipled approach.

The Teamsters also point out that some of the same individuals served as members of the board of SB HoldCo and SBI. Teamsters' Br. 8, 9. But even if the Sun Funds had used their control over SSB-LLC to select the boards for those subsidiaries,[14] exercising shareholder rights over the board could not convert the Sun Funds into trades or businesses.[15]

---

[14] The facts do not support that theory. SSB-LLC (acting through Liff, its VP) selected Metz, McElwee, and Golden as members of the SB HoldCo board. S. App. 587. SB HoldCo then selected Metz and McElwee for the SBI board. *Id.* at 589. While the Sun Funds were the sole owners of SSB-LLC, there is no evidence that, after establishing SSB-LLC and its management structure, either Sun Fund played any role in selecting the boards of subsidiaries.

[15] *See, e.g.*, *Deputy v. du Pont*, 308 U.S. 488, 494 (1940) ("The well established decisions of this Court do not permit any such blending of the corporation's business with the business of its stockholders."); *Durando v. United States*, 70 F.3d 548, 552 (9th Cir. 1995) (holding it "improper to treat income earned by a corporation through its trade or business as though it were earned directly by its shareholders, even when … the shareholders' services help to produce the income"); *Bell v. Comm'r*, 1998 WL 155448, at *10 (U.S. Tax Ct. 1998) ("A shareholder is not engaged in the trade or business in which the corporation is engaged unless the shareholder engages in such trade or business apart from affiliation with the corporation.").

The PPM cautions that Sun Fund IV is "ultimately" liable for actions of directors it has appointed solely due to an indemnification clause in the limited partnership agreement. *See* S.App. 32 ¶ 6.10; *cf.* Teamsters' Br. 22 n.11.

34

The Sun Funds are no different from an investor who buys a controlling interest in a company and installs a new board knowing that the board members have a particular management style and will execute it by hiring one of the board member's own affiliates for management services. Nothing in that arrangement turns the investor into a trade or business.

## II.    Section 1392(c) Cannot Be Used To Rewrite the Sun Funds' Investments and Make Sun Fund IV "Under Common Control" with SBI.

Even if the Teamsters could show that the Sun Funds were "trades or businesses," that would not be enough to establish liability. The Teamsters must *also* show that the Sun Funds and SBI were "under common control." 29 U.S.C. § 1301(b)(1). The Teamsters have alleged only a parent-subsidiary control group, which requires showing that the Sun Funds and SBI are "connected through ownership of a controlling interest with a common parent organization." 26 C.F.R. § 1.414(c)–2(b)(1). The parties agree that a "controlling interest" in an entity such as SSB-LLC (the entity that connects the Funds to SBI) means ownership of "at least 80 percent of the profits interest or capital interest" in the entity. *Id.* § 1.414(c)–2(b)(2); *see also* Teamsters' Br. 24.

But it is also undisputed that Sun Fund III and Sun Fund IV owned 30% and 70% interests in SSB-LLC, respectively. Neither owned the requisite 80% interest.

The Teamsters want to disregard that fact by invoking 29 U.S.C. § 1392(c), which provides that "[i]f a principal purpose of any transaction is to evade or avoid

35

liability under [the MPPAA], this part shall be applied (and liability shall be determined and collected) without regard to such transaction."[16]   According to the Teamsters, "a principal purpose" of Sun Fund IV's decision to take a 70% ownership stake was to evade any possibility of taking on control group liability. The Teamsters claim this Court should hold that buying less than an 80% stake in a target company was an improper effort to evade ERISA liability, disregard Sun Fund IV's actual investment, and pretend that Sun Fund IV acquired a 100% interest in SBI.   The text, history, and purpose behind section 1392(c) show that the district court correctly rejected that unprecedented result.

---

[16] Section 1392(c) does not provide an independent basis for imposing liability under the MPPAA.   It merely allows a court to "determine[] and collect[]" liability under *other* sections of the Act "without regard to" a given transaction. 29 U.S.C. § 1392(c).   Here, as the Teamsters acknowledge, the section's only role is potentially to assist the Teamsters in showing that Sun Fund IV and SBI were "under common control."   *Id.* § 1301(b)(1).

To the extent the district court suggested that the claim for withdrawal liability would "stand or fall" based on section 1392(c), Op. 26 — as if section 1392(c) could provide a route for liability *without* establishing "trade or business" status — that is not correct.   Moreover, on this appeal the Teamsters have argued solely that section 1392(c) permits this Court to treat Sun Fund IV as a "trade or business" "under common control" with SBI, not that it provides any other avenue for liability.   Accordingly, any such argument has been waived.   *See, e.g.*, *Wills v. Brown Univ.*, 184 F.3d 20, 27 (1st Cir. 1999).

A.    **"Evading or Avoiding" SBI's Potential Withdrawal Liability Was Not a Principal Purpose of the "Transaction" at Issue — the Sun Funds' Investment in SBI.**

As a threshold matter, an obvious point deserves emphasis: the principal purpose of the Sun Funds' investment in SBI was to turn around a troubled company and thereby make a profit. While the possibility that SBI might incur withdrawal liability in the future was considered, planning for that contingency was a subsidiary consideration, not a "principal purpose" of the transaction itself. As courts have recognized, evidence that a buyer of a target company "has no intention of taking subsequent actions that will reduce the payments owing to the [pension] Plan," establishes that the buyer "cannot be said to have entered into the transaction in order to evade liability." *Dorn's Transp., Inc. v. Teamsters' Pension Tr. Fund of Phila.*, 787 F.2d 897, 902 (3d Cir. 1986). Here, the undisputed evidence showed that the Sun Funds invested in SBI expecting to earn a profit, *see, e.g.,* S.App. 418-19 (Leder Dep.), and that SBI continued to meet its pension obligations for more than a year and a half after the Sun Funds had acquired it. *See id.* at 1083-90. That alone should have dispensed with the claim that a principal purpose of the transaction was evading withdrawal liability.

Indeed, as the district court recognized, whenever an investor purchases a going concern, the idea that evading withdrawal liability was "a principal purpose" of the purchase makes no economic sense. Op. 29-30. Investors do not buy target

37

companies intending them to go bankrupt — at least not absent some elaborate fraudulent scheme. And the Teamsters have not alleged any such scheme here.

Instead, the Teamsters ignore the obvious by pretending that the "transaction" at issue is solely the Sun Funds' decisions to invest in 70% and 30% stakes, respectively. Nothing in the text of section 1392(c), however, directs a court to examine subsidiary sub-parts of a transaction in that fashion. If a transaction is sliced and diced into enough pieces, it might be possible in most cases to find some term "*a* principal purpose" of which was addressing withdrawal liability. That is not the inquiry directed by the statute, which speaks in terms of "a principal purpose" of the "transaction" itself.[17] *Cf. CIC-TOC Pension Plan v. Weyerhaeuser Co.*, 2012 WL 5879525, at *8 (D. Or. 2012) (acknowledging that defendant changed one aspect of a transaction (the timing) to avoid incurring greater withdrawal liability, but holding that this did not change "the overall nature and structure" of the transaction).

---

[17] The district court effectively adopted the Teamsters' approach as it focused on whether a "'principal purpose' *of the 70%/30% split* was to 'evade or avoid' withdrawal liability." Op. 30 (emphasis added). As explained in text, that approach was mistaken. This Court, of course, may affirm the judgment on a rationale not adopted below. *See, e.g.*, *Cardero-Suarez v. Rodriguez*, 689 F.3d 77, 81 (1st Cir. 2012).

**B.    The Sun Funds' Decisions To Limit Their Investments Below the 80% Threshold Does Not Constitute "Evading or Avoiding Liability" Within the Meaning of the Act.**

Even if it were proper to focus analysis on the decision to limit investments to less-than-controlling stakes, the district court correctly held that deciding to acquire a less-than-80% interest in a target — even if motivated by a desire to avoid acquiring contingent withdrawal liability — cannot, as a matter of law, be treated as acting with "a principal purpose to evade or avoid liability" within the meaning of the statute.[18]

**1.    Section 1392(c) targets evasion of *current* obligations, not decisions to stop short of *acquiring new* obligations.**

Section 1392(c) speaks in the present tense of a purpose to "evade or avoid liability."  The plain and ordinary meaning of that language indicates that Congress was addressing efforts to escape a *current* liability.  Indeed, as the district court noted, the term "evade" itself suggests the same understanding, as it means "to manage to avoid the performance of (an obligation).'"  Op. 28 (quoting Webster's Third New Int'l Dict. 786 (1986)); *see also* Webster's Online Dictionary (defining

---

[18]  The Teamsters mistakenly fault the district court for supposedly focusing on whether evasion was "*the*" principal purpose of the transaction as opposed to "*a*" principal purpose.  Teamsters' Br. 25.  The court summed up its conclusion under the proper standard that evading liability "was not *a* principal purpose of the investment."  Op. 36 (emphasis added).  More important, the court's holding did not turn on the degree to which evading liability was a motivating factor.  The court held that, even if stopping short of control-group liability was *the* principal reason for staying below an 80% stake, that choice could not amount to "evad[ing] or avoid[ing]" liability.

evade to mean: "1. Avoid or try to avoid fulfilling … or performing (duties …); 'They tend to evade their responsibilities.'") (available at http://www.websters-online-dictionary.org/definition/evade).  Under the canon *noscitur a sociis*, "which counsels that a word is given more precise content by the neighboring words with which it is associated," *Freeman v. Quicken Loans, Inc.*, 132 S. Ct 2034, 2042 (2012), the word "avoid" does not indicate any different meaning for the phrase "evade or avoid liability."[19]

As the district court pointed out, when an investor is purchasing a stake in a going concern, only the "employer-seller … is in a position actively to evade or avoid liability at the time of the transaction."  Op. 36.  The investor has no current obligation to avoid.  Instead, it faces the decision whether to *acquire* a contingent future liability as part of its investment.  As a result, "all that likely can be said about the investor's intentions with regard to withdrawal liability is that the buyer hopes to minimize its chances of someday being liable for them."  Op. 34.  Such a decision not to *acquire* a new liability simply does not fit within the natural meaning of the statutory terms focusing on evading *current* liability.   Indeed,

---

[19] As this Court has explained, "'the coupling of words together shows that they are to be understood in the same sense.'"  *United States v. DeCicco*, 439 F.3d 36, 49 (1st Cir. 2006) (quoting *Neal v. Clark*, 95 U.S. 704, 708-09 (1878) (Harlan, J.)); *see also Phillips v. Pembroke Real Estate, Inc.*, 459 F.3d 128, 141 (1st. Cir. 2006) (*noscitur a sociis* "counsels that [a] word[] in a statute should be understood in the context of the terms around it").

treating such a decision as covered by section 1392(c) would transform a provision that targets evading present liability into a provision effectively creating a novel *obligation to acquire* a new liability. Nothing in the text of section 1392(c) indicates that Congress intended such an extraordinary result.

That understanding is strongly buttressed given the usual presumption, particularly in the tax context, that it is permissible to arrange a transaction so as to avoid maximizing liabilities. *See, e.g.*, *Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir. 1934) (Hand, J.). That principle has special relevance here, given that Congress linked control-group liability in ERISA to the same concept in the Tax Code and expressly directed that the concept shall remain "consistent and coextensive with" the Treasury's implementation of the parallel tax provision. 29 U.S.C. § 1301(b)(1). At least one court has held that this principle that allows entities to "structur[e] a real transaction in a particular way to provide a tax benefit … applies here when construing the MPPAA." *Weyerhaeuser*, 2012 WL 5879525, at *11. In addition, Treasury regulations make clear that 80% ownership is necessary to be in a control group, 26 C.F.R. § 1.414(c)-2(b)(2)(i)(C), and that an investor may acquire a lesser controlling interest ("effective control") at the 50% ownership threshold. *See id.* § 1.414(c)-2(c)(2)(iii). That structure necessarily indicates that it is permissible to limit an investment to the "effective control" level (below 80%) without being charged with an improper "evasion."

41

At a minimum, given that statutory context, a clear statement in section 1392(c) would be required to establish a rule under which a mere decision not to *acquire* liability is treated as evasion and under which (under some unspecified criteria) an investor could be *forced* to acquire control group liability. Section 1392(c) contains no statement, clear or otherwise, adopting such a radical rule.

The understanding that section 1392(c) does not reach a decision to stop short of the 80% threshold is further confirmed by the remedy provided in the section. Section 1392(c) specifies that, where evasion is found, the MPPAA "shall be applied (and liability shall be determined and collected) without regard to such transaction." In other words, the statute is to be applied as if the transaction had never taken place. *See, e.g.*, *Teamsters Pension Trust of Phila. & Vicinity v. Cent. Mich. Trucking Inc.*, 698 F. Supp. 698, 702 (W.D. Mich. 1987).

That remedy makes sense where a party takes steps to escape current liability. Ignoring the transaction and applying the MPAA based on the *status quo ante* leaves the withdrawal liability with the entity that would have borne it but for the evasive maneuver.[20] But it makes no sense when applied to a transaction like

---

[20] Indeed, ignoring a fraudulent or otherwise deceptive transaction is a familiar concept in the law, and in other contexts it is designed to hold a party to obligations it has already incurred. *See, e.g.*, *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 636 (2d Cir. 1995) (noting that, under New York law, "an appropriate creditor may void or disregard a fraudulent conveyance"); *cf. Connors v. Peles*, 724 F.Supp. 1538, 1561 (W.D. Pa. 1989) (evasive transfers under section 1392(c) "may be treated akin to … a preference transaction in bankruptcy");

the one here — an investment limited to fall short of the 80% threshold. Applying the statute "without regard to" such a transaction and restoring the *status quo ante* simply severs any connection between the investor and the entity that directly bears withdrawal liability. Where the remedy specified by Congress would result in no liability for the supposed "evasion" here, that outcome strongly supports the conclusion that deciding not to acquire liability is not properly considered "evading or avoiding" liability in the first place.

Judicial interpretation of section 1392(c) is consistent with that understanding, as courts routinely explain that the section targets efforts to duck responsibility for pension obligations already incurred. *See, e.g.*, *Chicago Truck Drivers v. El Paso Co.*, 525 F.3d 591, 596 (7th Cir. 2008) ("[Section 1392(c) recognize[s] that employers that have substantial pension liabilities may attempt to shirk their obligations through deceptive transactions."); *Teamsters Pension Trust Fund v. Cent. Mich. Trucking, Inc.*, 857 F.2d 1107, 1109 (6th Cir. 1988)) ("§ 1392(c) was envisioned by Congress as the principal means of preventing an unscrupulous employer from dumping a distressed subsidiary in order to evade or avoid liability ….").

---

*Connors v. Marontha Coal Co., Inc.*, 670 F. Supp. 45, 47 (D.D.C. 1987) (analogizing section 1392(c) to fraudulent conveyance statutes).

43

No court, moreover, has ever held that section 1392(c) prevents an investor from limiting its investment so that it does not trigger control-group responsibility. *See* Op. 34.[21]  To the contrary, as far as the Sun Funds are aware, the *only* other court that has considered a similar claim recently rejected it.  *See Lopresti v. Pace Press, Inc.*, 868 F.Supp.2d 188 (S.D.N.Y. 2012).  In *Lopresti*, the defendant wanted to buy a distressed company but did not want to acquire $1 million of withdrawal liability that the target would likely face.  *Id.* at 192.  The defendant therefore structured the transaction as a purchase of assets rather than a purchase of stock.  *Id.* at 193, 196.  The *Lopresti* court rejected the theory that structuring the transaction in that fashion amounted to "evading or avoiding" withdrawal liability because the defendant "had no obligation … to assume [the target's] withdrawal liability when it purchased [the target's] assets."  *Id.* at 206.  As the court explained, "there is a difference between declining to assume withdrawal liability that one never had the obligation to pay and evading withdrawal liability that one is already legally obligated to pay."  *Id.*  Only the latter is encompassed by section 1392(c).  *Id.*

---

[21]  *Trustees of Utah Carpenters' & Cement Masons' Pension Trust v. Loveridge*, 2012 WL 2522596 (D. Utah 2012), is irrelevant.  It addressed only "whether 'any transaction' under § 1392(c) can include an employer's joint labor agreement with a union."  *Id.* at *5.

The Teamsters' approach to section 1392(c) would distort the plain terms of the statute. It would transform a command not to dodge a current liability into an unprecedented command that (under some circumstances) a company has an *obligation to acquire* liability. The Teamsters, moreover, never explain when this novel obligation would apply. They point to the fact that Sun Fund IV initially signed a nonbinding letter of intent indicating interest in buying 100% of SBI, Teamsters' Br. 30, but nothing in the Teamsters' logic requires that. To the contrary, any time an investor decides to purchase less than an 80% interest in a target because it does not wish to acquire control-group responsibility for unfunded pension obligations, the Teamsters' version of section 1392(c) would seem to apply. As the district court pointed out, under the Teamsters' reasoning, "nearly any decision whether or not to invest, and in what proportions, could be construed as a transaction to 'evade or avoid' withdrawal liability." Op. 37.

The Teamsters ignore these problems. Their sole argument on this point is to attack the district court by arguing that 1392(c) "is not limited to 'employers'" but extends to "'any party.'" Teamsters' Br. 27. That is a non sequitur. The court did not base its holding on the view that section 1392(c) reaches only employers. It *agreed* that section 1392(c) can apply to non-employers in some circumstances.[22]

---

[22] The court acknowledged that where an employer seeks to frustrate the collection of withdrawal liability by transferring funds to non-employers, those

The district court simply held that stopping short of the 80% threshold is not acting with a purpose "to evade or avoid liability."  *See* Op. 33-36.

### 2.    The text and history of section 1392(c) show that it targets sham or otherwise deceptive transactions.

The text of section 1392(c) also shows that the section targets transactions that are deceptive and lacking in genuine substance.  As other courts have pointed out, "[t]he verb 'evade' means '[t]o escape or avoid by cleverness or deceit.'" *Lopresti*, 868 F. Supp. 2d at 201.  Courts applying section 1392(c) have thus repeatedly characterized the provision as targeting transactions that lack economic substance or otherwise involve deception.  *See, e.g.*, *Cent. States Health & Welfare Fund v. Cullum Cos.*, 973 F.2d 1333, 1340 (7th Cir. Ill. 1992) (section is targeted at "sham transactions"); *see also El Paso Co.*, 525 F.3d at 596 (section targets efforts "to shirk … obligations through deceptive transactions").

The legislative history confirms that Congress "intend[ed] that employers not be able to evade or avoid withdrawal liability through changes in identity, form, or control, or through transactions which are less than bona fide and arm's length."  126 Cong. Rec. 23,038 (1980) (statement of Rep. Frank Thompson); *see also id.* (noting that the intent of section 1392(c) is to prevent an "employer contributing to a plan … [from] evad[ing] withdrawal liability by going out of

non-employers are within the reach of section 1392(c) and jurisdictional provisions of the MPAA.  *See* Op. 26 n.3.

46

business and resuming business under a different identity"). Indeed, "[e]ach of the examples given in th[e] legislative [history] involve[s] an employer who uses various artifices or schemes to deceptively structure its business operations." *Weyerhaeuser*, 2012 WL 5879525, at *8.[23]

As a result, courts have routinely refused to apply section 1392(c) to transactions that have a legitimate basis and economic substance. *See Cuyamaca Meats, Inc. v. San Diego & Imperial Cntys. Butchers' & Food Emp'rs' Pension Trust Fund*, 827 F.2d 491, 499 (9th Cir. 1987) (refusing to apply section 1392(c) to a transaction that "had economic substance" and "was not deceptive in any way"); *Lopresti*, 868 F.Supp.2d at 205 (declining to apply section 1392(c) where "there was a legitimate business reason for" part of a transaction and it was not merely a scheme "to funnel assets" out of the company).

Here, nothing about the Sun Funds' transaction was deceptive, a sham, or in any way lacking in economic substance. As noted above, *see supra* p. 38, the fact that SBI continued making its pension contributions for a year and a half after the transaction in itself indicates that the Sun Funds "cannot be said to have entered

---

[23] The same understanding of the statutory text is confirmed by Congress's use of the same terms in another statute. *Cf. White v. Mercury Marine*, 129 F.3d 1428 (11th Cir. 1997) ("It is a familiar canon of statutory construction that courts should generally construe similar statutory language similarly."). In 1992, Congress adopted essentially verbatim the text of section 1392(c) for a provision of the Coal Industry Retiree Health Benefit Act and expressly labeled that provision "sham transactions." *See* 26 U.S.C. § 9722.

the transaction in order to evade liability." *Dorn's Transp.*, 787 F.2d at 902; *see also Teamster's Joint Council No. 83 of Virginia Pension Fund v. Empire Beef Co., Inc.*, 2011 WL 201492, at *4 (E.D. Va 2011) (transaction was not suspect where company made payments to pension fund for nearly two years after acquisition before filing for bankruptcy); *cf. Sherwin-Williams v. New York State Teamsters Conf. Pension & Ret. Fund*, 158 F.3d 387, 393-95 (6th Cir. 1998) (transaction lacked good faith where seller sold financially troubled company that had been operating at a loss to a shell that lacked assets, because the seller knew the company would default on pension obligations and purpose was to dodge withdrawal liability).

Moreover, limiting the investment of each Fund to less than an 80% stake served legitimate objectives without regard to withdrawal liability. It helped "reduce … risk" through diversification. S.App. 416 (Leder Dep.). Sun Capital Advisors, Inc. sometimes achieves diversification by bringing two or more Sun Funds into a particular investment opportunity. The Sun Funds thus have "[m]any investments" that "are jointly owned by two or even three funds, sometimes with outside investors and co-investors as well." *Id.* at 413-14 (Leder Dep.). Here, at the time of the SBI investment, Sun Fund III was nearing the end of its six-year investment cycle and seeking diversification through small investments. Sun Fund IV was earlier in its life cycle and seeking larger investments. *See id.* at 416

48

(Leder Dep.); *id.* at 672 (Liff Dep.). Accordingly, investments at a 30% and 70%

level addressed the needs of both Funds.

The Teamsters' primary argument under section 1392(c) boils down to an

effort to portray the two investments as some sort of artifice, as if Sun Fund III and

Sun Fund IV were a single entity that "partitioned" an investment merely to create

the *appearance* that no one had crossed the 80% threshold. Thus, the Teamsters

act as if the two investments involved "in essence taking money out of one pocket

to put into another." Teamsters' Br. 29.

That theory ignores the undisputed facts. Sun Fund III and Sun Fund IV are

separate entities that make investments on behalf of "different investors." S.App.

413-14 (Leder Dep.); *see also id.* at 671 (Liff Dep.). The limited partner investors

in each Fund are different institutional and individual investors, not the same group

of owners. *See id.* at 922-936. There is no basis in the record for treating the

Funds as if they were just two pools of money belonging to the same entity. Once

again, the Teamsters' strategy seems to be to lump all Sun Capital entities together,

treat them as if they are the same, and hope that confusion will lead the Court to

adopt the same approach.

Nor does it help the Teamsters that the same individuals, Leder and Krouse,

made decisions for both Funds. The Teamsters seem to want to treat Leder and

Krouse as if they *owned* the money in the two Sun Funds — as if they were taking

49

*their* money from one of *their* "pockets" and putting it in another. That also ignores the facts. Leder and Krouse acted in their roles as decisionmakers for the GP of each Sun Fund. They were not simply investing their own money. And sharing common decisionmakers cannot obliterate the legal distinction between the two limited partnership Funds. The Teamsters' approach is no different from pretending that two separate individuals can be treated as if they were the same merely because they both used the same investment advisor and the advisor put them in the same investment. That is nonsense.

The Teamsters also try to conjure hints of bad faith by analogizing this case to a situation in which a buyer knows that a target will go bankrupt and incur withdrawal liability. According to the Teamsters, the Sun Funds knew that their strategy called for selling SBI in a few years; they knew that a sale would necessarily trigger SBI's withdrawal liability; and their expectation of withdrawal liability prompted them to acquire less than an 80% stake. Teamsters' Br. 28. That theory is riddled with errors. The Teamsters never raised that argument below and thus have waived it. In addition, for the reasons above, limiting an investment short of the control-group threshold is not "evading or avoiding" liability within the terms of the statute. *See supra* pp. 39-45. In any event, the theory is also incoherent. As a matter of law, it is simply not true that the Sun Funds would necessarily trigger withdrawal liability for SBI upon a future sale. A

50

stock sale (like the Sun Funds' initial investment), would not trigger withdrawal liability under the MPPAA, *see Penn Cent. Corp. v. W. Conference of Teamsters Pension Trust Fund*, 75 F.3d 529, 533 (9th Cir. 1996), nor would a sale of assets combined with an assumption of pension obligations, *see* 29 U.S.C. § 1398.

The undisputed evidence also provides no support for the theory that the Sun Funds *expected* that selling their interest in SBI would trigger withdrawal liability. The Diligence Memo cited by the Teamsters simply points out that a future buyer would put a lower value on SBI because of SBI's contingent withdrawal liability. The memo notes that "we have included [potential withdrawal] liability in our purchase price analysis due to the fact that *a buyer* will most likely take at least a portion of this underfunded amount into account in their purchase price," *see* S.App. 375 (emphasis added), and it notes in particular that "[a] *future buyer* may impair our exit value based on *their* desire to exit the Cranston, RI facility (which would trigger the Company's need to settle the underfunded amount)." *Id.* at 378 (emphases added). That analysis explains that a future buyer would pay less because SBI was burdened by the contingent possibility of withdrawal liability and that a buyer would particularly pay less if it intended to close the Cranston facility, because *that action* (by the buyer) would trigger withdrawal liability. That analysis, moreover, also has nothing to do with the Sun Funds' decisions not to invest in an 80% stake. A future buyer would make the same assessment about

51

SBI and its contingent withdrawal liability without regard to whether the Sun Funds were responsible for withdrawal liability themselves.[24]

### 3. Applying the remedy specified in section 1392(c) cannot result in either Sun Fund being part of a control group with SBI.

The remedy provided in section 1392(c) not only confirms the construction of the statute above, *see supra* pp. 40-42, it also independently shows that applying section 1392(c) cannot make either of the Sun Funds a part of the same control group as SBI. Applying the MPPAA "without regard to" the transaction in which the Sun Funds invested in SBI would sever any connection between the Funds and SBI and thus would *not* result in control-group liability.

The Teamsters cannot avoid that straightforward result by claiming that the Court should ignore only the limitation on Sun Fund IV's investment to a 70% stake — and should pretend that Sun Fund IV acquired a 100% stake. *See* Teamsters' Br. 30. What the Teamsters seek is not to have the Court apply the MPPAA "without regard to" the transactions the Sun Funds executed (as the text of section 1392(c) commands), but rather to have the Court embark on an extra-statutory *restructuring* of the transactions into an investment that Sun Fund IV

---

[24] It is also wrong to suggest that the Sun Funds reduced their purchase price for SBI based on concern that *they* would incur withdrawal liability. Teamsters' Br. 27. The passage above makes clear that the price was reduced to reflect the expectation that a *future buyer* would pay less for a company with unfunded pension obligations.

never made.  The statute provides no authority for such a free-wheeling rewriting of history.  *Cf. Cent. Mich. Trucking, Inc.*, 857 F.2d at 1109 ("There is no congressional mandate to engage in legal gymnastics in order to guarantee pension plans at all costs.").

The Teamsters fare no better by pretending there was a single investment by one entity that "t[ook] money out of one pocket to put into another."  *Id.* at 29.  That is just an unprincipled effort to lump all the Sun Capital entities together.  *See supra* p. 49-50.  At bottom, by seeking control-group liability, the Teamsters are asking the Court to ignore the separate existence of Sun Fund III and Sun Fund IV (1) without providing any basis for piercing the veil of the two limited liability entities, and doing so (2) based on the unexplained assumption that once the veil is pierced, the entities will collapse into one.  That theory is wrong on both the law and the facts.

It is wrong on the law because it "would require a disregard of business organization formalities in the absence of some recognized grounds for doing so."  Op. 33; *cf. Connors*, 670 F.Supp. at 47 (courts may not ignore corporate forms when applying section 1392(c) unless the entities "abused the[ir] corporate forms … in such a manner as to justify piercing the[ir] corporate veils").  ERISA provides no free license for courts (or pension funds) to ignore the separateness of distinct legal entities.  Even in the ERISA context, "litigants who insist that the

53

corporate veil be brushed aside must first prove three things": (1) the targeted entities "ignored the independence of their separate operations"; (2) "fraudulent intent"; and (3) that "substantial injustice would be visited on the proponents of veil piercing should the court validate the corporate shield." *United Elec., Radio & Machine Workers v. 163 Pleasant St Corp.*, 960 F.2d 1080, 1092-93 (1st Cir. 1992).  The Teamsters have not even attempted to make these showings.

The Teamsters' approach is wrong on the facts because, even if the Court could look behind the limited partnership entities, the undisputed facts show that the partnerships are *not* masking the same owner.  *See* S.App. 922-36.

### 4.    The Teamsters' unprecedented expansion of section 1392(c) would frustrate the purposes of the Act.

The Teamsters' distortion of section 1392(c) would also frustrate the MPPAA's objective of promoting the financial stability of multiemployer pension plans.  Investors such as venture capital and private equity funds are a critical source of capital injections that can help turn around distressed employers and prevent them from becoming *failed* employers — who cease contributing to pension funds and put strains on the funds due to their unfunded liabilities.  Preserving incentives for investments in distressed employers is thus important to the purposes of the Act.

Current law provides a bright line rule under which investors have certainty that they can gain effective control of a business with a 50% or even greater

investment, but stop short of the 80% threshold that will trigger the expanded liability that comes with being in a control group — including potential responsibility for withdrawal liability incurred by *another* entity. *Cf. DeBreceni v. Graf Bros. Leasing, Inc.*, 828 F.2d 877, 879 (1st Cir. 1987) (recognizing that "the principle of limited liability" is critical for incentives to invest because it allows investors "to take a calculated risk").

The Teamsters' unprecedented approach would eliminate that certainty. Instead, investors might incur liability precisely *because* they decided to stop short of acquiring an 80% stake. Nor is there any clear standard for determining when limiting an investment may be treated as "evading" liability. Under the Teamsters' approach, all that matters is that investors contemplated an investment, recognized the possibility of withdrawal liability, and avoided an 80% stake to avoid joining a control group. As the district court noted, that vague notion of evasion could apply to "nearly any decision whether or not to invest, and in what proportions." Op. 37.

That result would significantly deter investors "from providing capital for companies subject to multiemployer pension plan obligations." *Id.*; *see also United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant Street Corp.*, 960 F.2d 1080, 1093 (1st Cir. 1992) (courts generally respect corporate separateness, even in ERISA context, because the alternative would "undermine the predictability of corporate risk-taking; and provide a huge disincentive for the

investment of venture capital"). And jeopardizing that source of investment for distressed employers will simply hasten their demise, a result that "clearly conflicts with the congressional purpose of ensuring financially sound multiemployer pension plans." Op. 37. In short, expanding control-group liability beyond the scope specified by Congress "would actually frustrate the goal of encouraging the private sector to assume control of failing companies and their pension plans." *In re Challenge Stamping & Porcelain Co.*, 719 F.2d 146, 150 (6th Cir. 1983).

## CONCLUSION

For the foregoing reasons, the decision below should be affirmed.

*/s/ Patrick F. Philbin*

| | |
|---|---|
| John F. Hartmann, P.C. | Patrick F. Philbin |
| Marla Tun | Kellen S. Dwyer |
| Jeffrey S. Quinn | John S. Moran* |
| KIRKLAND & ELLIS LLP | KIRKLAND & ELLIS LLP |
| 300 N LaSalle Street | 655 Fifteenth Street, NW |
| Chicago, IL 60654 | Washington, D.C.  20005 |
| (312) 862-2000 | (202) 879-5000 |

Theodore J. Folkman
Murphy & King P.C.
1 Beacon Street
21st Floor
Boston, MA  02108-0000

*Admitted only in Virginia.  Practice is supervised by principals of the Firm.

**Certificate of Compliance**

I hereby certify that the foregoing brief complies with the type-volume limitations provided in Fed. R. App. P. 32(a)(7)(B). The foregoing brief contains 13,965 words of Times New Roman (14 point) proportional type. The word processing software used to prepare this brief was Microsoft Word 2007.


/s/ *Patrick F. Philbin*
Patrick F. Philbin

**Certificate of Service**

I hereby certify that on April 3, 2013, a copy of the foregoing Appellees' Response Brief was filed with the Clerk of Court using the CM/ECF system, which will send a notice of docket activity to counsel for Defendant-Appellant.

Dated:  April 3, 2013

*/s/  Patrick F. Philbin*
Patrick F. Philbin

**ADDENDUM OF STATUTORY AND REGULATORY PROVISIONS**

## <u>Table of Contents</u>

<u>**Page**</u>

**<u>29 U.S.C. § 1301(b)(1)</u>** ...............................................................................1

**<u>26 U.S.C. § 414(c)</u>** ...................................................................................1

**<u>29 C.F.R. § 4001.2</u>** ..................................................................................2

**<u>29 C.F.R. § 4001.3</u>** ..................................................................................2

# ADDENDUM OF STATUTORY AND REGULATORY PROVISIONS

## 29 U.S.C. § 1301 – Definitions

\* \* \*

**(b)(1)**  An individual who owns the entire interest in an unincorporated trade or business is treated as his own employer, and a partnership is treated as the employer of each partner who is an employee within the meaning of section 401 (c)(1) of Title 26. For purposes of this subchapter, under regulations prescribed by the corporation, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer. The regulations prescribed under the preceding sentence shall be consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under section 414 (c) of Title 26.

\* \* \*

## 26 U.S.C. § 414 – Definitions and special rules

\* \* \*

**(c)**  For purposes of sections 401, 408 (k), 408 (p), 410, 411, 415, and 416, under regulations prescribed by the Secretary, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer. The regulations prescribed under this subsection shall be based on principles similar to the principles which apply in the case of subsection (b).

\* \* \*

**29 C.F.R. § 4001.2** – **Definitions**

\* \* \*

Employer means all trades or businesses (whether or not incorporated) that are under common control, within the meaning of § 4001.3 of this chapter.

\* \* \*

**29 C.F.R. § 4001.3** – **Trades or businesses under common control; controlled groups**

For purposes of title IV of ERISA:

(a) (1) The PBGC will determine that trades and businesses (whether or not incorporated) are under common control if they are "two or more trades or businesses under common control", as defined in regulations prescribed under section 414(c) of the Code.

(2) The PBGC will determine that all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer, and all such trades and businesses shall be treated as a single employer.

(3) An individual who owns the entire interest in an unincorporated trade or business is treated as his own employer, and a partnership is treated as the employer of each partner who is an employee within the meaning of section 401(c)(1) of the Code.

(b) In the case of a single-employer plan:

(1) In connection with any person, a controlled group consists of that person and all other persons under common control with such person.

(2) Persons are under common control if they are members of a "controlled group of corporations", as defined in regulations prescribed under section 414(b) of the Code, or if they are "two or more trades or businesses under common control", as defined in regulations prescribed under section 414(c) of the Code.

2